**Page 1**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TARA BRANDO SULLIVAN   :   CIVIL ACTION NO.
: 5:19-CV-00784

VERSUS                 :   JUDGE DONALD E. WALTER
:
KTBS, LLC              :   MAGISTRATE MARK L. HORNSBY

REMOTE DEPOSITION OF TARA BRANDO SULLIVAN
September 28, 2020

Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

**Page 2**

1  REMOTE APPEARANCES:
2    COUNSEL FOR PLAINTIFF:
3    ALLISON A. JONES, ESQUIRE
      Downer, Jones, Marino & Wilhite
4    401 Market Street, Suite 1250
      Shreveport, Louisiana 71101
5    318.213.4444
      318.213.4445 - Facsimile
6    jones@dhw-law.com
7
8    COUNSEL FOR DEFENDANT:
9    BRIAN R. CARNIE, ESQUIRE
      Kean Miller, LLP
      333 Texas Street, Suite 450
10    Shreveport, Louisiana 71101
      318.562.2700
11    318.562.2751 - Facsimile
      brian.carnie@keanmiller.com
12
13    ALSO PRESENT: Ms. Terri Glorioso Brando
                    Mr. George Sirven
14
15    ///
16    ///
17    ///
18    ///
19    ///
20    ///
21    ///
22    ///
23    ///
24    ///
25    ///

**Page 3**

1                S T I P U L A T I O N S
2
3        The remote deposition of TARA BRANDO
4    SULLIVAN, taken by counsel for Defendant, Mr Brian R.
5    Carnie, pursuant to Notice and agreement by and
6    between counsel, for all purposes as allowed by the
7    Federal Rules of Civil Procedure, before Karen Tyler,
8    Certified Court Reporter, with the parties being in
9    Louisiana, on September 28, 2020.  It being stipulated
10   by and between counsel that all formalities, with the
11   exception of the swearing of the witness, are waived.
12       It being further stipulated that the reading
13   and signing of the deposition are not waived by
14   counsel nor by the witness.
15       It being further stipulated that all
16   objections, except as to the form of the question and
17   responsiveness of the answer, are reserved until the
18   time of trial.
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///

**Page 4**

1                  I N D E X
2                                      Page
3    Examination by Mr. Carnie..................... 5
4    Examination by Mr. Jones..................... 108
5
6               E X H I B I T S
7    Exhibit   Description                    Page
8    Ex. 1   1/20/17 Paid Leave Time            33
             Acknowledgement - 1 pg.
9
     Ex. 2   Tara Brando Sullivan texts with Randy  47
10           Bain - 1 pg.
11   Ex. 3   5/11/27 letter from Sherri McCallie   58
             to Tara Brando Sullivan - 1 pg.
12
     Ex. 4   5/24/17 letter from Sherri McCallie   82
13           to Tara Brando Sullivan - 1 pg.
14   Ex. 5   EEOC Charge of Discrimination -       88
             2 pgs.
15
     Ex. 6   Complaint - 6 pgs.                    95
16
17
18
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///

9

1    reside?
2        A. In Ridgeland, Mississippi.
3        Q. And how long have you been at that address?
4        A. A little over a year.
5        Q. Okay. Could you please tell me the street
6    address that you have in Ridgeland?
7        A. Okay. It's 37 Enclave Circle, Ridgeland,
8    Mississippi 39157.
9        Q. Okay. And who else lives with you at that
10   current address?
11       A. My husband, John, and my daughter, Wilma
12   Scarlett.
13       Q. Okay. Where did you reside during the short
14   time that you worked for KTBS in 2017?
15       A. At 224 Harders Crossing Boulevard in Norris
16   Ferry Crossing.
17       Q. And that's in Shreveport, Louisiana?
18       A. Shreveport. Yeah.
19       Q. Okay. And who lived with you at that
20   location back in 2017?
21       A. My husband and my daughter.
22       Q. Okay. And how old is your daughter?
23       A. She is four.
24       Q. Okay.
25       A. Just turned four.

10

1        Q. Okay. And what was her date of birth?
2        A. September 7, 2016.
3        Q. Okay. And when did you get married to John?
4        A. May 24th of 2014.
5        Q. Okay. Is John currently employed?
6        A. He is.
7        Q. Where does he work?
8        A. He works at University Medical Center in
9    Jackson, Mississippi.
10       Q. Okay. Was he employed back in 2017 when you
11   worked at KTBS?
12       A. No, he was not.
13       Q. Okay. Was he in medical school at the time?
14       A. He was.
15       Q. Okay. Other than yourself, have you ever --
16   are you aware of any other relatives that ever worked
17   for KTBS?
18       A. Not that truly -- I really don't know, other
19   than my grandfather did some things at the station,
20   and my dad --
21       Q. Okay.
22       A. -- had done things, like promos and different
23   things, but never worked, I don't believe. Not to my
24   knowledge. I'm not a hundred percent on that, though.
25       Q. What's your grandfather's name you think did

11

1    some things at the station?
2        A. Hub Brando.
3        Q. And your father is Tim Brando; correct?
4        A. Uh-huh.
5        Q. You need to answer yes or no.
6        A. Yes.
7        Q. Thank you. It's easier for Karen. When
8    she's taking it down, it's easy to put yes and no, but
9    uh-huhs or huh-uhs, that's harder.
10           Tara, I want to talk about your education
11   background briefly.
12       A. Okay.
13       Q. Where did you graduate from high school?
14       A. Captain Shreve High School.
15       Q. Okay. And what year did you graduate high
16   school?
17       A. In 2009.
18       Q. And then I understand you went to Ole Miss;
19   correct?
20       A. I did.
21       Q. When did you graduate from Ole Miss?
22       A. In 2013.
23       Q. And, obviously, you and I are both probably
24   upset about the results of the football game. I'm an
25   LSU fan, although I did not go to LSU, so it was not a

12

1    good weekend.
2        A. Yeah. No. I was not happy that Mississippi
3    State won. No.
4        Q. What degree did you get from Ole Miss?
5        A. A bachelor's in journalism. Bachelor of arts
6    in journalism.
7        Q. Any other postgraduate vocation or training
8    that you've had?
9        A. I've taken a couple graduate-level broadcast
10   classes, but that's it.
11       Q. What school did you take those from?
12       A. Oh, University of Mississippi.
13       Q. Okay. Were those in-person classes or did
14   you take them, like, online?
15       A. I believe they were in-person. Yeah.
16       Q. Okay. Other than that, any other
17   postgraduate or vocation training that you've
18   received?
19       A. Vocational training, I've done sexual
20   harassment training. I've done that. I've done
21   safety in the workplace. I believe that's it.
22       Q. Is this training that you got through your
23   whatever employer you worked with at the time?
24       A. Uh-huh. Different -- different careers.
25       Q. Okay. I want to talk about -- I understand

13

1   you were hired by KTBS in January of 2017; correct?
2   A. Uh-huh. Yes. That's right.
3   Q. Could you tell me about -- yeah. Could you
4   tell me about your prior broadcast journalism
5   experience? In other words, I want to know -- kind of
6   just get a brief synopsis of your work history before
7   you started with KTBS.
8   A. Right. So, as far as broadcasting goes, as
9   far as it -- KTBS was my first real broadcasting job.
10  I had done internships before at other local stations
11  in college and then at Fox News. While I was in
12  college my senior year, I did an internship there.
13  But KTBS was my first broadcasting job.
14  Q. Okay. Did you work at any other -- for any
15  other employers in a non-broadcasting capacity?
16  A. I did.
17  Q. Could you briefly tell me about that?
18  A. I worked in higher ed before. I did
19  admissions and recruiting when I graduated from
20  college at Ole Miss, and then I worked for LSUS here
21  in Shreveport, and Northwestern State, the nursing
22  school here in Shreveport.
23  Q. How long did you work at LSUS?
24  A. I want to say a little over a year. It might
25  have been two years.

14

1   Q. And what did you do for LSUS?
2   A. Well, I started as the Assistant Director for
3   Admissions, and then I was the Director of Admissions
4   after that.
5   Q. Uh-huh. Was that the -- where you worked
6   before taking the KTBS job?
7   A. No. I worked at Northwestern before.
8   Q. Okay.
9   A. Uh-huh.
10  Q. What were the years that you worked at
11  Northwestern?
12  A. Oh, I want -- I've got to think for a second.
13  2016. I want to say 2016.
14  Q. Okay.
15  A. I'd have to -- I would have to look at my --
16  you know, my resume.
17  Q. Sure.
18  A. It's been a long time since then.
19  Q. Sure. So you started in 2016, and then when
20  did your employment end at Northwestern?
21  A. When I took the job at KTBS.
22  Q. Okay.
23  A. Right before that.
24  Q. And what was your job at Northwestern?
25  A. I did -- I did the student activities. I was

15

1   in charge of student activities for all the students
2   at the nursing school.
3   Q. Okay.
4   A. Student services. I loved that job.
5   Q. And that was the role you had the entire time
6   that you worked at Northwestern?
7   A. Yes.
8   Q. Okay. And I understand that -- I've seen
9   that you have a public LinkedIn page; correct?
10  A. Right. I don't think I've -- I haven't
11  updated that in years.
12  Q. Okay. But I would assume that whatever prior
13  experiences -- because you listed, I think, a lot of
14  the internships --
15  A. Uh-huh.
16  Q. -- with respect to your broadcasting, at
17  least with respect to your broadcasting experience, I
18  would assume the things that you listed on there are
19  accurate?
20  A. Oh, yes.
21  Q. Okay. One of the things that I saw on your
22  LinkedIn page, it said you did some freelance
23  reporting or broadcasting. And it looked like you did
24  some -- indicated you did some of the stuff before
25  KTBS. Can you tell me what sort of freelance work you

16

1   did before you started at KTBS?
2   A. I did work -- that was in college -- I did
3   some things for St. Jude. It's a long time ago. It's
4   hard to remember. I really -- I don't remember
5   exactly what it was.
6   Q. Okay. That -- what you remember doing for
7   St. Jude, that's what you're referring to in your
8   LinkedIn page with respect to the freelance, you know,
9   broadcasting experience you had before KTBS?
10  A. I believe so.
11  Q. Okay. You don't recall --
12  A. I really -- I don't remember.
13  Q. Okay. So I understand, looking through your
14  records, you were employed by KTBS from, looks like,
15  January 19th of 2017 through May 24th of 2017. Do
16  those dates sound accurate to you?
17  A. Can you say them again for me? I'm sorry.
18  Q. Sure. January 19th of 2017 through May 24th
19  of 2017?
20  A. Yes.
21  Q. Okay. And I understand that you were
22  employed as a multimedia journalist?
23  A. Yes.
24  Q. Correct? Okay. And I'm probably going to
25  refer to that position today as an MMJ.

TARA BRANDO SULLIVAN                                    9/28/2020

17

1    A. Okay.
2    Q. And I believe that's how you -- that's how it
3  was referred to at the station, too; correct?
4    A. (Nods head, yes.)
5    Q. That's yes?
6    A. Yes.
7    Q. Okay. Could you briefly describe for me what
8  you recall your job duties when you worked at KTBS as
9  an MMJ?
10   A. So as an MMJ, I kind of -- during my time
11 there, I kind of did it all. I would go out and
12 report as a reporter. When I first began there, I
13 actually was producing. Which was something, when I
14 began there, that it was really new to me, and I
15 wasn't 100 percent thinking it was something that I
16 would truly enjoy. And then as time went on and I got
17 to do it, I realized that I loved it, and I had fun
18 producing, too, while I was there.
19       I did that. I did some fill-in work on the
20 anchor desk, as well. But, yeah, I went -- I went
21 out, I reported, I shot, edited packages, I produced.
22 I filled in different slots, different times.
23       On the -- during the week, I worked as a
24 reporter, and on the weekend I was mainly producing.
25 I did some production in the beginning, like I said.

18

1  When I first started, that was pretty much all I did
2  was learning how to produce and producing. And then
3  once -- once more time went on was when I started
4  going out reporting.
5    Q. Okay. Focusing just on the reporting aspects
6  of what you did for KTBS --
7    A. Okay.
8    Q. -- could you just -- you know, I did not work
9  at KTBS, I don't work in broadcasting -- just kind of
10 briefly explain to me, you know, the duties that you
11 recall doing as a reporter generally.
12   A. Okay. So you get to work -- before you came
13 to work, you kind of had ideas of different things
14 that were going on in the area. You knew what you
15 were possibly going to cover that day when you came
16 in. You would have a meeting; you would talk about
17 what was going on that day. We would all be together.
18 We would talk about what was going to go on. You'd
19 find out what story you were going to cover, or what
20 stories you were going to go and cover, and then you'd
21 start -- you'd get to work. So you'd start getting
22 your -- any interviews you needed, you'd know what
23 time you needed to be where to film who you were going
24 to talk to. And then you would find out, you know,
25 what shows you were going to be on for.

19

1    Q. Okay. Who were your supervisors when you
2  worked at KTBS?
3    A. Randy Bain, Stephanie Samuels, and Clay
4  Kirby. It was kind of -- they kind of all -- I mean,
5  I know Randy was my supervisor, to my knowledge, but
6  Stephanie and Clay Kirby played a big role, too, in,
7  you know, what I was doing each day for work, and what
8  I would be covering, what was expected of me.
9    Q. And Randy was the news director; correct?
10   A. Uh-huh. Yes. Sorry.
11   Q. Can you tell me about your subsequent work
12 history after your employment ended at KTBS?
13   A. I haven't worked since KTBS.
14   Q. Okay. So no jobs, either in broadcasting or
15 in a non-broadcasting capacity?
16   A. No jobs.
17   Q. Any freelance work that you've done?
18   A. No.
19   Q. That's a no; right?
20   A. No.
21   Q. I did see on your LinkedIn page, it says that
22 you're the owner of Tara Brando Media and Productions?
23   A. Yeah.
24   Q. I mean, other than having that as a company,
25 do you do anything with respect to that?

20

1    A. I haven't done anything with that company in
2  a long time.
3    Q. Okay.
4    A. Only when something would come up, and a lot
5  of the work that I had done -- that I have done for
6  Tara Brando Media and Productions has been for
7  friends, and I was never paid for it.
8    Q. Okay. So, as we sit here today, you don't
9  recall doing anything for Tara Brando Media and
10 Productions where you actually got -- received revenue
11 for doing something?
12   A. Only one time.
13   Q. Okay. Tell me that one time.
14   A. That was years ago.
15   Q. Okay. Was it before or after KTBS?
16   A. Before.
17   Q. Okay.
18   A. A lot of the times I do -- I have done work
19 for that where -- because they're friends of mine, I
20 don't -- it's like a gift for their wedding that I do
21 something for them.
22   Q. Okay.
23   A. And though I know many times they've wanted
24 to pay me for this.
25   Q. Okay. Shortly before your employment at KTBS

TARA BRANDO SULLIVAN                                              9/28/2020

21

1    ended, I know you were out on leave for a couple of
2    weeks before that, but do you have any personal
3    knowledge of any job vacancies that were open at that
4    time at the station?
5        A.  I'm sorry.  Can you say that again?
6        Q.  Sure.  Shortly before your employment ended
7    at KTBS, do you have any personal knowledge of any
8    available job vacancies that were -- or any job
9    vacancies that were available at KTBS?
10       A.  So I know at the time they were -- I don't
11   know if they were posted.  I know they were talking
12   about -- I mean, I knew there was a need for
13   producers.  Pretty much, to my knowledge, KTBS could
14   create positions if they needed them.  Producers,
15   reporters, MMJs, anchors.  I knew they were looking
16   for an anchor at the time, I believe.  That's all I
17   knew.
18       Q.  Okay.  What is the basis for your
19   understanding that you believe that KTBS could just --
20       A.  Well, they're a local news company.  So they
21   have the ability to do that.
22       Q.  Are you aware of any particular positions,
23   though, that were actually posted where they were
24   seeking applicants shortly before your employment
25   ended?

22

1        A.  Not to my -- so I remember seeing -- I don't
2    remember what time it was, what date it was.  I
3    remember seeing different things online that were --
4    on TV that were running that they were looking for,
5    but I know that producers were needed.
6        Q.  And what's the basis --
7        A.  I don't know if there was anything posted a
8    hundred percent.  I can't say that.
9        Q.  Okay.  And what is the basis for your
10   understanding that you knew that the position --
11   producers were needed at the station?
12       A.  Because producers were working to fill in
13   other times.  I was producing, and I was an MMJ.  I
14   was producing some.  I know they were training new
15   producers.  But I know -- there's always a need for
16   producers; so, I mean.
17       Q.  Can you tell me, since you did do, you know,
18   stand-in and did some work as a producer during your
19   employment at KTBS, could you tell me your
20   understanding of what the job duties are for a
21   producer?
22       A.  That you gather news, and you come up with a
23   rundown, a format, for what is going to go on the air.
24   What -- what the media, you know, needs to share, what
25   is going on, what the people around, you know, the

23

1    community need to hear.  That's what a producer does.
2        They're looking to make ratings.  That's what
3    matters.  The producers do that.
4        Q.  Okay.  In terms of -- and this may not be
5    fair, but in terms of where a producer is versus an
6    MMJ, how do those positions compare?  I mean, is one
7    higher in status and rank than the other?
8        A.  You know, in my opinion -- this is my
9    opinion -- in my opinion, a producer is more valuable
10   than an MMJ to a newsroom.
11       Q.  Okay.  Do you know how --
12       A.  They're both important roles.
13       Q.  Obviously.  Right.
14       A.  Yeah.
15       Q.  Do you know what the pay -- what the pay rate
16   is for producers versus what it was for an MMJ at that
17   time?
18       A.  I have no idea.
19       Q.  Okay.  Do the producers have to go out and
20   sometimes do stories too?
21       A.  Well, you know, during my time there, I -- as
22   a producer, I never did that.
23       Q.  Okay.
24       A.  I never had to go out and cover a story like
25   that.

24

1        Q.  What about other producers?
2        A.  They may be, but I'm not other producers.
3        Q.  Okay.  You just don't have personal knowledge
4    one way or the other as to what the others did?
5        A.  To my knowledge, I never saw other producers
6    go out --
7        Q.  Okay.
8        A.  -- and do that.
9        Q.  But, obviously, you --
10       A.  Now, the ones that were MMJs that were
11   producing like I was, I feel like I wasn't the only
12   one as an MMJ that was also doing production work too.
13   So those people might have been going out, but I don't
14   think they were necessarily just a producer.
15       Q.  Okay.  But you wouldn't have personal
16   knowledge of those that were just employed as
17   producers and just worked as producers.  You wouldn't
18   know one way or another as to whether they, on
19   occasion, went out -- outside the station?
20       A.  Like I said, I only know what I saw with the
21   producers that I worked with --
22       Q.  Okay.
23       A.  -- when I was there.
24       Q.  Who were those producers that you worked with
25   when you were there?

25

1    A.  Jasmine Creshan (phonetic), Amanda -- I might
2    not be able to remember all of their names fully right
3    now because it's been a while -- Will Trahan, Limon,
4    Keller.  I mean, Cassandra -- at the time, Cassandra
5    was producing, and I believe she was -- I don't know
6    what her actual current title was.  She was working to
7    eventually, you know -- her goal was to be an MMJ and
8    a reporter, which she ultimately was able to do at
9    KTBS, I believe, based on seeing her on TV.  But I
10   believe, at the time when I worked there, she was a
11   producer.
12        Q.  Okay.
13        A.  And during that time, I never saw her go out
14   and cover stories unless she was in training.  She
15   might have been doing it as training, just like
16   Jasmine.  Jasmine was also learning maybe to be an MMJ
17   and a reporter.  So she could have been a producer and
18   been going out some, but also I think that was because
19   she was trying -- they were trying to help her get her
20   feet wet reporting as well.
21        Q.  Okay.
22        A.  So that's just my knowledge.
23        Q.  Okay.  Any other producers that you recall
24   working with at KTBS other than the ones you've
25   identified?

26

1        A.  There were others, and I -- I know I have
2    them -- I have those producers in my mind, and I know
3    I have it written down somewhere, but it's been a
4    while, and I just don't remember.  I can't remember
5    anyone else right now.
6        Q.  Other than your EEOC charge and the complaint
7    that you filed against KTBS, have you filed any other
8    employment or discrimination claims against anyone
9    else?
10       A.  No.
11       Q.  Have you made any other internal complaints
12   of discrimination, harassment, or retaliation, against
13   anyone else?
14       A.  Not to my knowledge.  Not that I remember,
15   no.
16       Q.  Okay.  Excluding minor traffic violations,
17   such as speeding and parking tickets --
18       A.  Yeah.
19       Q.  -- since January of 2017, have you ever been
20   arrested or charged with any misdemeanors, felonies,
21   or other crimes?
22       A.  No.
23       Q.  Let's talk about -- get into a little bit
24   more detail about your employment at KTBS.  How did
25   you first learn of the MMJ job at KTBS?

27

1        A.  So, let's see.  So from the time that I first
2    came back to Shreveport, when I finished college, I
3    actually talked with KTBS about a job.  And Randy --
4    before I even took the job at LSUS, I had talked with
5    Randy about possibly working at KTBS, but there just
6    wasn't -- and I believe, actually -- no.
7        When I think about it, they actually offered
8    me a job as an MMJ at the time.  I don't remember
9    exactly what date that was or what year that was, but
10   they did offer me a job a few years -- a few years --
11   or a couple of years before I took the job when I did.
12       Q.  Okay.  And who was it that offered you the
13   job, if you remember --
14       A.  Randy.
15       Q.  -- back -- Randy?
16       A.  Yeah.
17       Q.  And then was Randy the one that you
18   communicated with about the job at -- when you first
19   learned of the opening again in 2017?
20       A.  Yes.  So I talked to Randy -- you know, I --
21   I love -- I love higher education.  I love working
22   with students.  I'm a people person.  I loved working
23   with students and parents.  I love people.
24       So I enjoyed -- I enjoy higher ed, but I had
25   this -- just want to work in television and be a

28

1    broadcaster.  And I had grown up here.  To me, KTBS
2    was like my -- to me, it was everything, you know.  I
3    had already been on Fox News for an internship.  I had
4    done -- I had had a little spot of national TV.  I was
5    on national TV, and that was a little highlight, and I
6    was like, it was awesome.  But it was like I had hit
7    this awesome goal.
8        But to me, the coolest thing to me, in my
9    mind, was being able to work for a local news station
10   that I had grown up loving from the time I was a
11   little girl, and knowing that my grandfather --
12   everybody always -- always would talk about that to
13   me, that my grandfather worked at KTBS.  Whether he
14   worked there or was hired -- whether he was just at
15   the station, started -- you know, began doing his
16   show.  Like I said, I don't know the exact, you know,
17   information on that as far as, like, his hiring and
18   whatever, but I know that he was on KTBS, on
19   Channel 3, because people would talk to me about that.
20       And so I always felt that KTBS was like
21   family to me.  And so I had this want to work for
22   KTBS.  I had talked with other stations different
23   times, with other news directors in the area, about
24   working for them.  I wanted to work for KTBS.
25       I had watched that station predominantly my

33

1  full day or if it was a couple of hours, but I know
2  that there was one time, before any of that, where I
3  was sick or something, and that I believe where, you
4  know, they let me be off for whatever for one day.  As
5  I remember.
6      Q.  Okay.
7      MR. CARNIE:  And, Karen, I'm going to mark
8  that exhibit as Exhibit 1, and I guess I'll just send
9  you the exhibits.  And, Allison, I'll send you a copy,
10  as well, when we conclude the depositions.
11     MS. JONES:  Is that --
12     (Sullivan Deposition Ex. 1 was marked for
13  identification.)
14     THE WITNESS:  Hey, Brian, do you mind if I
15  stand up for a second?
16     MR. CARNIE:  That's fine.  Do you need to
17  take a break or anything or you just want to stand up?
18     THE WITNESS:  I just need to stand up for one
19  second.
20     MR. CARNIE:  Oh, sure.  Allison, I heard
21  you --
22     MS. JONES:  Is this not one of the documents
23  that you provided to us?
24     MR. CARNIE:  It is, yes.
25     MS. JONES:  Okay.  Then you don't need to

34

1  send me a copy.  I'll just mark it as Exhibit 1.
2      MR. CARNIE:  Okay.
3      THE WITNESS:  Okay.  Thank you for that.
4      Q.  (By Mr. Carnie)  Okay.  You ready?
5      A.  I am.
6      Q.  Okay.  Tara, to your knowledge, how many
7  employees did KTBS have when you worked for them?
8      A.  I don't know.
9      Q.  Do you know how many MMJs they had
10  when you worked for them?
11     A.  No.  I don't know.
12     Q.  Any ballpark as to how many MMJs they had?
13  Just a guesstimate?
14     A.  Oh, I don't know.
15     Q.  Okay.
16     A.  Like I said, to me, there were a lot of us
17  that worked, and this was our title, but we did lots
18  of other things.
19     Q.  Okay.
20     A.  So I don't really know what anybody's exact
21  titles were.
22     Q.  Okay.  As an MMJ, did you have any particular
23  geographic region that you covered, or is it something
24  that you could have covered anywhere in the
25  broadcasting market?

35

1      A.  You know, I don't know.  I would say that it
2  just depended on what was going on and where they
3  wanted to send you --
4      Q.  Okay.
5      A.  -- that was in the news viewing area, you
6  know, that would matter to, you know, people in the
7  Ark-La-Tex.
8      Q.  Okay.  And just for the record, KTBS, they're
9  the ABC affiliate in the Ark-La-Tex region; right?
10     A.  Right.  Yes.
11     Q.  How would you get to the locations when you
12  went out and interviewed people and filmed?
13     A.  I would drive.
14     Q.  Okay.
15     A.  Or I would ride with a photographer.
16     Q.  Okay.
17     A.  Most of the time I was by myself driving.
18     Q.  Did you take a personal vehicle or did KTBS
19  have news units that you would take?
20     A.  You would take a news unit.  I think there
21  were a couple of times, maybe, where I took my own
22  car.  I don't remember why.  There might have been
23  once or twice that I took my own car.
24     Q.  Okay.
25     A.  But I don't remember.

36

1      Q.  I know in the -- I don't want to say the
2  olden days -- but back when I was growing up, news
3  reporters, there was always at least a crew of two,
4  because the camera was big and bulky and --
5      A.  Right.
6      Q.  -- and things like that.  It's my
7  understanding that in 2017, and it continues to this
8  day, the cameras are such that oftentimes you, as the
9  MMJ, could go out on your own and do the interviews
10  and set up the camera --
11     A.  Yes.
12     Q.  -- and the lights; is that correct?
13     A.  Yes.
14     Q.  What sort of equipment -- or how would you
15  describe the camera and the equipment that you would
16  use?  You would be able to set up?
17     A.  It was just a camera, you'd have your bag.  I
18  would have the bag so that I could do a live shot if I
19  needed to.  So it was a bag, tripod, camera, really
20  everything you need to make good film.
21     Q.  How big is the camera that you guys took?
22  That you took?
23     A.  Probably about this big (indicating).
24     Q.  Okay.
25     A.  To my knowledge.  I mean.

TARA BRANDO SULLIVAN                                    9/28/2020

37

1     MS. JONES:  Why don't you say in terms of
2  distance.
3     THE WITNESS:  Okay.
4     MS. JONES:  Brian, I just asked her to
5  identify what that was so the written record would
6  read correctly.
7     Q.  (By Mr. Carnie)  Okay.
8     MS. JONES:  The distance.
9     A.  I mean, I would -- I would say a little
10  bigger than maybe 12 inches, maybe more than that.  I
11  really don't know.
12     Q.  (By Mr. Carnie)  Okay.
13     A.  I really can't remember exactly, but --
14     Q.  Okay.
15     A.  -- not too large that I couldn't hold it and
16  set it up and carry it myself with ease.  I will say,
17  I dropped a camera once while I worked there.
18     Q.  Okay.  Let's talk about the May 2nd, 2017,
19  incident.  I understand that you were assigned to
20  cover the aftermath of tornados in the Canton, Texas
21  area; correct?
22     A.  Uh-huh.  Yes.
23     Q.  And I understand, I think Trey Lankford was
24  also there with you on that day; correct?
25     A.  Yes.

38

1     Q.  Was there anyone else assigned to go with
2  you?
3     A.  Not to my knowledge.
4     Q.  Okay.
5     A.  Just Trey and I.
6     Q.  Did you and Trey -- did Trey accompany you
7  there or did you guys drive separately?
8     A.  We rode together --
9     Q.  Okay.
10     A.  -- in one of the news units.
11     Q.  And what is your recollection of what Trey's
12  job was at KTBS at that time?
13     A.  Trey, man, he -- I don't know what Trey
14  doesn't do.  He runs -- he pretty much does it all.
15  Oh, report -- I mean, he would get footage.  He was --
16  to me, he's a photographer, but, I mean, he might as
17  well have been a reporter.
18     He would get footage and then send it back.
19  He would go out and film, you know, different
20  reporters.  He would fix things if you broke them;
21  i.e., the camera that I dropped when I tripped and
22  almost busted it on the concrete.  He would help
23  you -- he helped teach me what I needed to do --
24     Q.  Okay.
25     A.  -- when I began there.  He taught me so much

39

1  that I will, you know, take with me forever.
2     Q.  It sounds like, you know, a lot of people had
3  different roles depending on what the needs were of
4  the station --
5     A.  Right.
6     Q.  -- at the time.  Would that be accurate?
7     A.  I would say to your previous, you know,
8  question regarding what Trey does, Trey also edits
9  packages.  He did that when I was there.  But he
10  taught me a lot about how to edit with different
11  software.  And when I was there, we actually went
12  through an extensive -- they were -- there was a lot
13  of changes going on when I worked there.  Big-time
14  changes.  They were coming in -- I know that there
15  were -- they had people come in; they were telling
16  them what they needed to do as far as we -- I did
17  trainings.  It was an entire new system for editing
18  video that really was -- it was supposed to make it
19  where it would be a lot easier for the MMJs.
20     They were also training the producers, which
21  was new at the time.  They were training the producers
22  to be able to edit footage.  And so Trey was -- Trey
23  was a huge part of that with the teach -- you know
24  with the people that came in for that company, really
25  learning everything and teaching us all.  Because we

40

1  all had to come in when we weren't working and do, you
2  know, when we were -- you know, I came in on some of
3  my off time to do the training for that, to learn that
4  stuff, because we were -- we had to learn it.
5     So you either came in or you didn't come in.
6  So Trey -- to me, Trey, I mean, he just -- I think he
7  does -- could probably do most jobs there, to be
8  honest.
9     Q.  Okay.  Going back to talk about the incident
10  on May 2nd of 2017, tell me what you remember of that
11  day.
12     A.  Say that again?  I'm sorry.
13     Q.  Yeah.  Our focus now is going to be on the
14  May 2nd, 2017, and obviously that's the day that you
15  collapsed --
16     A.  Right.
17     Q.  -- while covering the story.  Tell me what
18  you remember of that day.
19     A.  I remember waking up in an emergency room.
20     Q.  Okay.  Let's talk about what you remember
21  before you collapsed.
22     A.  I remember getting to where I was.
23     Q.  Okay.
24     A.  I remember Trey and I's good conversation.
25  We had more fun going to cover that story, just

TARA BRANDO SULLIVAN                                    9/28/2020

41

1  talking about life and talking about fun stories he
2  had covered before.  And I was eating grapes.
3        That's really what I remember.  I remember --
4  I remember what it looked like, and I remember that we
5  were covering -- the one thing I remember, I remember
6  that.  And then I remember we were parked, and I was
7  looking at this house across the street where there
8  were kids' dolls, playhouses, just -- it was like this
9  family had just lost everything.  And I remember
10  seeing that, and it was just destroyed.  And this --
11  there were just people.  You know, they were just
12  picking up their life.  I remember that.
13        And I remember, wow, this is one of the
14  hardest things I think I've, you know -- I might
15  cover.  Tornados are the scariest thing to me.  And
16  after -- I remember seeing that and being, like, wow,
17  that's how powerful a tornado actually is.  And I
18  believe in my life I had ever seen real tornado damage
19  like that right in front of me that was so severe, and
20  that's what I remember.
21        Q.  Okay.
22        A.  That --
23        Q.  What time of day was it that you went out
24  and, like, you remember this house?  Was it during
25  daylight?  Evening?

42

1        A.  It was daylight.  I don't remember what time
2  it was.
3        Q.  Okay.  Do you recall --
4        A.  Yeah.  I don't remember.  I was trying to
5  recall it, but I don't remember exactly what time.
6        Q.  Okay.  Do you have any memory of what you
7  were doing right before you collapsed?
8        A.  No.
9        Q.  Okay.  I understand that you were -- I think
10  you said earlier, the next thing you remember is
11  waking up in the hospital; correct?
12        A.  Uh-huh.  Yeah.  Like, it was --
13        Q.  If I understand correctly, I think you were
14  taken to Christus Mother Frances Hospital in Sulfur
15  Springs, Texas; correct?
16        A.  Uh-huh.  Yes.
17        Q.  Okay.
18        A.  You'd think I'd get better at the saying yes
19  or no.
20        Q.  So other than what you've told me as to what
21  you remember doing, and then the time waking up, I
22  assume you don't have any recollection of any other
23  specifics about that day.
24        A.  No.  I will say that -- I mean, I've tried
25  and tried and tried because, to be honest, I've been

43

1  trying to figure out what happened to myself that day
2  for years now.  And that day, to be honest, because I
3  just don't know what happened, I would say -- I mean,
4  I will say that I have had -- you know, when you
5  dream, you dream things.  When you're asleep, you
6  dream things.  I will say that I have had, like, maybe
7  dreams that, you know -- and I don't know if they're
8  real, you know, they're -- it's like in a dream, so I
9  don't know if I'm remembering something, you know.  I
10  will say that I have, like, had visions, you know --
11  and it might have been after that.  I really don't
12  remember.  I mean, obviously, it was after that, where
13  I had, like, visions of -- like, not even visions.
14  Like, I remember hearing Trey, but I don't remember --
15  like, I -- and I've tried to put it all together, but
16  I really -- I don't.  I don't.  And it -- and I've
17  tried.
18        The only thing is, I remember -- I remember,
19  like, Trey's voice.  I remember, like, the sun, and I
20  remember Trey's voice.  And I've tried to put it all
21  together, and that's, you know --
22        Q.  Okay.
23        A.  -- you know, the biggest thing that I do
24  remember is waking up in the ER and then the nurse
25  coming in and me being, like, okay, where is Trey?

44

1  Because, like, he was my -- you know, where's Trey.
2  Because -- and also, like, you know, I think the
3  biggest thing when I woke up, I was like, where's
4  Trey.  And, oh, my gosh, we've got this story.  You
5  need to let me out of here.  Because I remember being
6  like that.  Like, we got to go cover these people and
7  their house.  But that's what I remember.
8        Q.  Okay.  When you woke up and you were in the
9  ER, was there anybody else from your family, or Trey,
10  there with you?
11        A.  Trey was -- Trey came in.  The nurses -- I
12  remember the nurse first and -- because I was -- I
13  mean, I was really -- I mean, I was freaked out.  I
14  didn't know, like -- I didn't know what had happened.
15  I didn't -- I didn't know why I was there.  And I
16  think that's very -- it's an extremely scary thing to
17  wake up in a completely different place and not know
18  how you got there or what.  But I remember Trey coming
19  in, and I just remember, like, seeing Trey and being
20  like, what the heck happened.  Like, I just remember,
21  like, thinking that.  I don't know exactly what I said
22  to him.  I do remember telling him, like, hey -- I do
23  remember telling him that I think I got some footage
24  or something of something.  I don't remember.  I
25  remember that.

45

1      But I just remember Trey telling me, I
2  think -- yeah.  He told me that, you know, he had
3  called my family I think is what he told me.  And
4  that, you know, don't worry about -- he was like, you
5  know, don't worry about it, you know.  Are you okay?
6  That's what I remember.  I just remember being
7  grateful for Trey.  I think if I had been alone, it
8  would have been even more scary.  I was just grateful
9  to see a familiar face.
10     Q.  Okay.  Do you have any understanding, as you
11 sit here today, as to whether anyone else at KTBS
12 might have contacted your family about the incident?
13     A.  I know that -- I know that Randy, I believe,
14 talked -- I know Randy talked to my mom.
15     Q.  Okay.
16     A.  And John.  You know.  I mean, I know that
17 because that's what they told me, and that's what --
18 you know, that's what I know and that's what I've
19 seen, you know.
20     Q.  Right.
21     A.  But, you know, the reality -- the reality is
22 that day, I can't -- my memory is so -- it's like I
23 have these little spurts where I can remember certain
24 things, but I really don't remember what was going on.
25 Yeah.

46

1      Q.  Okay.
2      A.  Yeah.
3      Q.  Is your memory, and the difficulty that you
4  have about the ability to recall, is it just about
5  that day or is it about things that happened in the
6  weeks or months either before or after?
7      A.  Not before.  So I never -- you know, the only
8  things that I don't remember, and everything's kind of
9  hazy, is after it happened.  You know, after it
10 happened.  Then I was in and out of -- I was seeing
11 different doctors, and I was on different medications,
12 new medications.  And I think the worst part of the
13 whole thing was that I was, like, constantly spinning.
14 I had vertigo really bad.  I mean, it was, like,
15 awful.  It was, like, I would -- I couldn't stand up
16 on my own.
17     It was like I wasn't me.  And I think that's
18 why that day continues to haunt me, because it was,
19 like, what happened, why was I like that.  And, you
20 know, I know me.  I'm a strong, tough person, you
21 know, and so I didn't understand why I couldn't --
22 couldn't, like -- why I was like that.  Why can't I
23 control things.  You know, why can't I -- I couldn't
24 even hold my daughter, you know, when all this was
25 going on.  I couldn't even hold her, because, like, I

47

1  could drop her.  I was -- I had terrible headaches.
2  They were awful.  And, you know, it was, like, is the
3  medicine doing that?
4      So I just -- I don't remember a lot of things
5  because of everything going on.
6      Q.  I understand that your attorney, Ms. Jones,
7  had sent us some text messages earlier this morning,
8  which I've had a chance to take a look at.  And it
9  looks like you were communicating via -- with Randy on
10 the next day, on May 3rd.  I want to show you those
11 texts.
12     A.  Okay.
13     Q.  Give me a second to pull those up.
14     A.  Okay.
15     Q.  I'm going to mark this as Exhibit 3 -- or
16 Exhibit 2.  I'm sorry.
17     (Sullivan Deposition Ex. 2 was marked for
18 identification.)
19     Q.  And you see in front of you the text, and it
20 says Tara Brando Sullivan text with Randy Bain?
21     A.  Yeah, I see them.
22     Q.  Okay.  Let me know when you're ready.  I just
23 had a couple of questions about these.
24     A.  These make me sad, but, yeah, I see them.
25     Q.  Okay.  You ready?

48

1      A.  Yeah.
2      Q.  Okay.  Are these true and accurate copies of
3  the text messages that you had with Randy on May 3rd
4  of 2017?
5      A.  Yeah.  They are.  Yes.
6      Q.  Okay.  Other than the texts between you and
7  Randy on May 3rd, at any point from May 3rd until your
8  employment ended, did you -- are there any other text
9  messages that you have between Randy and yourself?
10     A.  Not that I recall, no.
11     Q.  Okay.
12     A.  I don't remember.
13     Q.  Do you know -- do you recall texting him
14 about something after the May 3rd?
15     A.  I don't remember.
16     Q.  Okay.  What about any -- do you know of any
17 email communications that you had with Randy between
18 May 3rd and May 24th of 2017?
19     A.  Between -- I'm sorry.  Say that again?
20     Q.  Between May 3rd --
21     A.  Uh-huh.
22     Q.  -- 2017, and then when your employment ended
23 several weeks later, on May 24th, 2017.
24     A.  I don't remember emails that I sent with
25 Randy.

TARA BRANDO SULLIVAN                                    9/28/2020

49

1    Q.  Okay.  It is my understanding that you had a
2  couple of phone calls --
3    A.  Yeah.
4    Q.  -- with Randy.
5    A.  I don't remember emails.
6    Q.  Okay.  And that's why I'm asking.  I'm
7  just --
8    A.  I know I looked at my email account.  You
9  know, look at my emails, but I don't remember -- I
10  don't think so.  I just remember talking to him on the
11  phone, via text, and, like, over the phone.
12    Q.  Okay.  How long were you in the hospital in
13  Sulfur Springs?
14    A.  Too long.
15    Q.  Days?
16    MS. JONES:  Before we go there --
17    MR. CARNIE:  Yeah.
18    MS. JONES:  -- did you attach that one text
19  message or the whole text messages that we sent
20  in globo?
21    MR. CARNIE:  Just that page.  So it just
22  would have been the ones between Tara and Randy.
23    MS. JONES:  I just want to make sure I have
24  the exhibits right.
25    MR. CARNIE:  Yeah.  And, Allison, I'm going

50

1  to send you a PDF when we're done, just so you have
2  it.
3    MS. JONES:  All right.
4    Q.  (By Mr. Carnie)  Okay.  Tara, I'll go ahead
5  and -- do you recall how many days that you were
6  hospitalized in Sulfur Springs?
7    A.  I don't remember.  I want to say it was
8  overnight.
9    Q.  Okay.
10    A.  I just know that I was, like, wanting to get
11  out of there.  I wanted -- I wanted to get back to
12  Shreveport.  I wanted to see my doctor.  You know, I
13  wanted to be with my family.
14    Q.  Did anyone from your family -- were they with
15  you in Sulfur Springs when you were still in the
16  hospital?
17    A.  Yeah.  My husband.  My husband came over.
18  Yeah.
19    Q.  Anyone else from your family?
20    A.  No.  Because I was like, don't worry about
21  it.  I remember saying, like, don't worry.  I'm coming
22  home.  So I was like, get me out of Texas at that
23  point.  I just wanted to go home.
24    Q.  Okay.
25    A.  I wanted to get home to normalcy, and I

51

1  wanted to figure out what was wrong so I could work.
2  That's all I cared about.
3    Q.  Okay.  Did you ask to be discharged from the
4  hospital or did the doctors -- do you remember if they
5  wanted you to stay a little bit longer to figure out
6  what might have been going on?
7    A.  I don't remember.
8    Q.  Okay.  I understand --
9    A.  I just remember telling them that I was going
10  to -- you know, the plan was that I was going to talk
11  with my doctor.  You know, get with my doctor.
12    Q.  And that would have been a doctor in
13  Shreveport, I guess; right?
14    A.  Yes.  Dr. Haynie.  Yeah.
15    Q.  Was he your internist?
16    A.  Yeah.
17    Q.  Yeah.  I understand that your mother, Terri
18  Brando, was in communication with Randy about your
19  condition or status, although, you know, the dates, I
20  think, are reflected in her text messages that we've
21  received.  Were you aware of anyone else in your
22  family who was in communication with anyone at KTBS
23  after you collapsed on May 2nd?
24    A.  My husband.
25    Q.  Okay.

52

1    A.  Yeah.  I'd have to look at the text messages
2  exactly and remember, but I know John -- I believe
3  John talked to Randy.  I know he talked to Randy, I
4  believe.  Yeah.  And Trey.  Yeah.
5    Q.  Do you recall when it was that -- what's your
6  understanding as to when John spoke with Randy?
7    A.  Just after it had all happened.
8    Q.  So that would have been the day of or either
9  the next day?
10    A.  I don't remember.  Maybe both.  I don't -- I
11  don't remember.
12    Q.  Okay.
13    A.  I'd have to, like, look at the date and time
14  to tell you.
15    Q.  Okay.  You told me a few minutes ago about
16  the difficulties that you were having, the symptoms
17  that you were experiencing, with the vertigo.
18    A.  Right.
19    Q.  The balance issues.  I assume at that point
20  that your doctors did not want you to return to work
21  at that point; correct?
22    A.  You know, I was still receiving treatment and
23  seeing different doctors.  You know, everybody -- the
24  doctors that I saw, you know, it was like, you know,
25  I -- I left Sulfur Springs.  I came back to

53

1   Shreveport, and then I saw Dr. Haynie.  Well,
2   Dr. Haynie was actually -- I called Dr. Haynie.  I
3   remember Dr. Haynie was either out of town or
4   something, and so I saw Dr. Cassiere at first, and
5   then I saw Dr. Haynie after that.  And they, you know,
6   talked together.  But Dr. Haynie admitted me to
7   Christus Schumpert Highland, and I was there -- he
8   wanted to do more tests just to really, like, see
9   what, you know, try and figure out what was going on.
10   I was just having these extreme headaches.  And so it
11   was just, you know, at that time we were still
12   figuring out what was going on.  Still trying to
13   figure out what had happened and what was going on.
14       Q.  How long were you admitted or inpatient -- I
15   assume that's inpatient at Christus?
16       A.  Uh-huh.
17       Q.  Was it Christus Highland?
18       A.  It was Highland.  Yeah.  Randy came to see me
19   while I was there.  I don't remember how long I was
20   there.  I don't remember.
21       Q.  Okay.
22       A.  I want to say overnight, I know.  But I don't
23   know for how long.
24       Q.  Okay.
25       A.  I don't remember.

54

1       Q.  Would it be fair to say that as of, you know,
2   a week after you collapsed, that the doctors were
3   still trying to figure out what caused you to collapse
4   and lose consciousness?
5       A.  I think the doctors are still trying to
6   figure out what happened to me.
7       Q.  Okay.
8       A.  I'm still trying to figure out what happened.
9       Q.  So you've indicated that you've seen -- you
10   saw Dr. Haynie, and, obviously, we've gotten a copy of
11   his records, and I think we've shared that with your
12   attorney, so you've probably seen those too.  I know
13   that I've seen -- and it may have been in a text
14   message from your mom to Mr. Bain -- that at some
15   point in May of '17, you saw an ENT doctor.
16       A.  I did.
17       Q.  What doctor was that?
18       A.  That was Blake Thornton.
19       Q.  Okay.
20       A.  I mean, we were looking for what really
21   happened.  It was, like, trying to figure out what
22   could have possibly happened.
23       Q.  And it's my understanding that Dr. Thornton
24   concluded that it wasn't an inner ear issue that was
25   causing these things; correct?

55

1       A.  To my knowledge, yes.  I don't remember
2   exactly what he said.
3       Q.  When you went to these various doctors'
4   appointments in the May 2017 time period, who -- you
5   know, did anyone accompany you to these visits?
6       A.  Oh, yes.  My mom -- my mom did, my sister was
7   with me.  Somebody -- pretty much my mom and my
8   husband were at every appointment.  My dad would come
9   when he could.  My sister would come sometimes.  It
10   was like a family affair.
11       Q.  Okay.
12       A.  Because I was not me.  I just -- I wasn't me
13   at that time.
14       Q.  Okay.
15       A.  I couldn't walk.  I couldn't support myself
16   to walk.  I was spinning.  My headaches were extreme.
17   Man.  Yeah.
18       Q.  Okay.  Have you seen the text messages
19   between your mom and Randy Bain from the week of
20   May 3rd to May 10th?
21       A.  I have.
22       Q.  Okay.  Were you aware that your mom was
23   communicating with Mr. Bain at that point?
24       A.  Yes.
25       Q.  Okay.

56

1       A.  Yeah.  I told her and John -- you know, like,
2   my biggest thing was I -- I was -- I -- like I said,
3   the only thing I -- there are two things that I, like,
4   really wanted to be doing.  I wanted to be well.  I
5   wanted to be able to hold my daughter, and I wanted to
6   be able to go to work.
7       Q.  Okay.
8       A.  That's, you know, that's the reality.  Like,
9   that's the reality.  And so it was like a family -- it
10   was a family affair to get me to the doctor, help me,
11   like, stay sane, because I was just -- I was so -- I
12   was so upset that I couldn't do things on my own.  I'm
13   an extremely independent person, and so when you take
14   that from somebody, it's kind of difficult.
15       Q.  Okay.
16       A.  You know.  Does that answer your question?
17   Does that?
18       Q.  Yeah.
19       A.  Okay.
20       Q.  On May 9th of 2017, there was a text from
21   your mom to Mr. Bain where she indicated to Randy that
22   you were still restricted to not getting up by
23   yourself and still needed help walking around.  Would
24   that be correct?
25       A.  Uh-huh.

TARA BRANDO SULLIVAN                                   9/28/2020

57

1    Q. As of that time frame, you were still having
2  those symptoms; correct?
3    A. Right.
4    Q. Okay. I'm going to show you what I'm going
5  to mark as Exhibit 3.
6    A. Okay.
7    Q. Give me a second to pull it up on my screen
8  first.
9    A. Okay.
10    MS. JONES: Brian, would this be the place to
11  take a five-minute break?
12    MR. CARNIE: That's fine.
13    MS. JONES: Just a short break.
14    MR. CARNIE: All right. Let's take a
15  five-minute break.
16    (Recess taken from 10:15 a.m. to 10:21 a.m.)
17    Q. (By Mr. Carnie) I'd like to now show you,
18  Tara, what I'm going to mark as Exhibit 3.
19    A. Okay.
20    Q. And let me know -- do you see a PDF that is
21  dated May 11th, 2017?
22    A. Yes.
23    Q. Okay. If you could just take a look at that,
24  and let me know when you're ready.
25  ///

58

1    (Sullivan Deposition Ex. 3 was marked for
2    identification.)
3    A. Okay. I'm ready.
4    Q. Okay. Do you recognize this document?
5    A. I do.
6    Q. And I understand that KTBS sent you this
7  letter. It's dated May 11th, 2017. And I think you
8  indicated in your charge that it was sent and you
9  received it via certified mail; correct?
10    A. (Nods head, yes.)
11    Q. Okay. Is this a copy of the letter that you
12  received at some point shortly after May 11th?
13    A. Yes.
14    Q. Okay. And it looks like KTBS placed you on
15  an unpaid leave of absence pending further information
16  about your ability to return to work with or without
17  restrictions; correct?
18    A. Yes.
19    Q. And it looks like KTBS agreed to continue to
20  pay the employer portion of the health insurance
21  premiums too; correct?
22    A. Yes. Up until -- yes.
23    Q. Okay.
24    A. Yes.
25    Q. And it says here you do not qualify for FMLA

59

1  since you have not worked for KTBS for at least
2  12 months or 1,250 hours. As we sit here today,
3  you're not aware of KTBS providing FMLA leave, other
4  than what's required under the statute. Are you?
5    A. Say that again? I'm sorry.
6    Q. Yeah. I mean, if you see the second sentence
7  of this letter, it says you don't qualify for FMLA --
8    A. Right.
9    Q. -- because you haven't worked there
10  essentially long enough under the --
11    A. Uh-huh.
12    Q. -- the statute. Are you aware of any policy
13  at KTBS that provided FMLA leave for employees, for
14  new employees, even though they hadn't worked
15  12 months yet?
16    A. No.
17    Q. I understand, and looking at your records, it
18  looked like you had visited with Dr. Haynie on
19  May 8th of 2017 and again on May 15th of 2017.
20    A. Okay.
21    Q. Do those dates sound accurate, based on your
22  recollection? I mean, I know you don't have the
23  records in front of you, but.
24    A. Yeah. Yes. They do.
25    Q. We did get some records from Tri-State

60

1  Neurology.
2    A. Uh-huh.
3    Q. And could you -- I'm going to pronounce --
4  attempt to pronounce it, but if you could correctly
5  pronounce the doctor's name, Dr. Sikand?
6    A. Sikand.
7    Q. Sikand.
8    A. Uh-huh.
9    Q. Is that the doctor you saw at Tri-State
10  Neurology?
11    A. That's the neurologist I saw there. Uh-huh.
12    Q. Okay. And it looks like from the records
13  that you first visited with him on May 16th of 2017;
14  does that sound correct to you?
15    A. It does.
16    Q. And I understand that at that time Dr. Sikand
17  diagnosed you with -- or he thought you had a seizure
18  disorder; is that correct?
19    A. So he was going -- he said -- I didn't know
20  if -- I don't know what he actually -- what his
21  diagnosis was. To me, there was never a real
22  diagnosis, to my knowledge, because he didn't -- there
23  was no proof --
24    Q. Okay.
25    A. -- what happened on May 2nd.

TARA BRANDO SULLIVAN                                                9/28/2020

61

1    Q. Let me ask you this: Did Dr. Sikand believe
2  that you had a seizure on May 2nd?
3    A. Not to my knowledge. He was going off of all
4  the -- all of the different symptoms and what could
5  have happened, why I wouldn't remember.
6        To my knowledge, he -- every -- he said it
7  sounded like what could be a seizure, but he had no
8  way of truly knowing because there's no test that
9  shows when a person has a seizure -- when a person has
10 had a seizure. He did send me for other tests where
11 they tried to make me have a seizure, and I never, you
12 know, that didn't show anything that would show that I
13 had had a seizure or had seizure activity or anything
14 like that.
15   Q. Okay. It looks like he put you on a
16 medication called Keppra; is that correct?
17   A. Uh-huh. Yes.
18   Q. Do you know what Keppra is for?
19   A. Yes.
20   Q. Or what's your understanding? What's your
21 understanding as to what that's for?
22   A. Keppra is a medicine used to treat seizures.
23   Q. Okay.
24   A. To my knowledge. That's what I thought it
25 was for.

62

1    Q. Did the doctor -- the neurologist explain to
2  you whether there were any side effects from that
3  medication?
4    A. I mean, I know there's side effects from it.
5  There's side effects with every medicine. And I
6  surely could have, you know, had side effects from
7  that medication, but I don't know that they were from
8  that medication if I had them.
9        But I don't remember him talking about side
10 effects.
11   Q. Okay.
12   A. I remember him saying he was going to -- we
13 were -- he was putting me on it as a precaution --
14   Q. Okay.
15   A. -- in case it was a seizure. In case I was
16 having seizures. And so he was putting me on it at
17 the time as a precaution.
18   Q. Okay. What -- do you recall what medications
19 you were on, you know, in the middle of May?
20   A. I know I was taking Vyvanse. I take Vyvanse.
21 I was probably taking birth control. I don't
22 remember, but I'm sure I was at that time. That's all
23 I remember. I don't remember anything else.
24   Q. Okay. And then the Keppra as well; correct?
25   A. And even the Keppra. I know at one point I

63

1  was put on a medication for headaches, but I don't
2  remember when that was exactly.
3    Q. Okay. And when you visited with the
4  neurologist, were you still experiencing the
5  vertigo --
6    A. Yes.
7    Q. -- and headaches and the balance symptoms
8  that you explained earlier this morning?
9    A. Yes. Yeah.
10   Q. Okay.
11   A. Yeah.
12   Q. Dr. Sikand's records indicate that he told
13 you that you would be -- should be restricted from
14 driving for six months. Do you remember him telling
15 you that?
16   A. I remember -- so what Dr. Sikand told me was
17 that, as a physician, legally, he has to tell anyone
18 who may have had a seizure that they should not drive,
19 as a precaution. Like, he can't tell me whether or
20 not -- like, in other words, he couldn't say to me,
21 you cannot drive, because there was no proof that I
22 had had a seizure. But that he could say -- but that
23 he had to tell me that.
24   Q. Okay.
25   A. Whether you drive or not, that's up to you.

64

1    Q. Do you recall him telling you --
2    A. There was nothing -- there was nothing set in
3  stone that this is what had happened.
4    Q. Okay. Do you recall him telling you any
5  other restrictions that he recommended as your doctor?
6    A. No. I don't remember.
7    Q. Okay. I understand that on May 19th of 2017
8  you had a telephone call with Randy Bain.
9    A. Uh-huh. Yes.
10   Q. Other than, you know, Dr. Haynie,
11 Dr. Thornton, and then the neurologist, were there any
12 other doctors that you recall visiting -- and I'm not
13 talking about doctors at the hospitals --
14   A. Right.
15   Q. -- but any other doctors that you visited
16 other than those three?
17   A. During that time frame, no. I -- later. I
18 saw another neurologist later because the issue was,
19 you know, you're treating somebody -- you're treating
20 me as if I had possibly had a seizure. So here I am,
21 like, being told to take this medicine as a
22 precaution, take this medicine, when you're talking
23 about a medication that is hard core. I'm young. I
24 would love to have other -- you know, love to have
25 other children in the future. And so, you know, for

TARA BRANDO SULLIVAN                                        9/28/2020

65

1   me, my husband, my family, Dr. Haynie, you know,
2   Dr. Thornton -- I remember even talking to
3   Dr. Thornton about it, I believe.  It just -- there
4   was no set-in-stone thing that I had had a seizure,
5   that I was going to have them again, that I'd had
6   them, that I'd had one.  Because even the tests that
7   they did where they tried to make me have a seizure, I
8   did not have a seizure.  There was nothing to indicate
9   that, you know -- and normally when you -- you know, I
10  mean, that's what those tests are for.  So, you know,
11  at that time, everything that was being done, you
12  know, was being done as a precaution.
13        And Dr. Sikand was, you know, telling us
14  that -- I mean, I remember, it was like, I remember us
15  sitting there, because when I first heard the word
16  seizure, to me, well, that scared me.  You know.
17  That -- what -- that's not an easy thing to hear when
18  somebody is saying that, oh, well, you know, you
19  possibly had this.
20        But, you know, the reality is there was no --
21  there's no -- there's no test to show, like, you had
22  one, you know, so --
23     Q.  Okay.
24     A.  -- no.
25     Q.  Who was the other neurologist that you saw

66

1   later on?
2      A.  Dr. Tivakaran.
3      Q.  Okay.  And we do have his records.  Is that a
4   he or she?
5      A.  A he.
6      Q.  Okay.  We've got his records, and it looks
7   like your first visit with him, according to his
8   records, is November 20th of '17.  Does that sound
9   accurate?
10     A.  Uh-huh.  Yes.
11     Q.  Okay.  And I understand that on May 19th
12  of '17, that phone call that you had with Mr. Bain,
13  you gave him an update on your status; correct?
14     A.  Uh-huh.  I did.
15     Q.  What do you recall telling Randy during that
16  phone call?
17     A.  I just remember telling him what was going on
18  with me, what it was -- what I was -- what we were
19  doing, the latest -- and I remember telling him, like,
20  you know, what was going on with Dr. Sikand.  I told
21  him that they -- they thought that I may have had a
22  seizure.  They weren't sure what it is.  And that I
23  may not be able to drive for six months.
24     Q.  Okay.
25     A.  I mean, I'm going to tell you this because

67

1   this is -- this is -- I -- I debated telling -- I
2   debated telling KTBS what they thought it was.  I
3   wasn't -- like it was -- it was a thing.  You know, it
4   was like, we talked about it as -- me and my husband,
5   my parents, and it was because I didn't want anyone to
6   ever hear the word seizure and associate that with me.
7   And so as -- for fear that they would think of me as
8   less than I am or not strong or -- because, you know,
9   I -- I've seen people have seizures, I've seen how
10  people react to people who have seizures and how
11  people view them, and I was afraid that being honest
12  and saying what they thought it might be would hurt
13  me.  And I was like, oh, no, you know.  I mean, I
14  debated my father.  Okay?  I told him, like, no, no,
15  I'm going to be honest.  I'm going to tell them what
16  they're saying and what they think because they want
17  to know, and I've told Randy I was going to do that.
18        And, to be honest, I viewed KTBS like family,
19  like, that's literally what I viewed them as.  Like, I
20  was happy to come to work like I was happy to go, you
21  know, visit with my family every day; so.
22     Q.  Do you recall telling Mr. Bain specifically
23  that Dr. Sikand did not think you should drive for at
24  least the next six months?
25     A.  I just remember saying that I -- that he said

68

1   that he may not -- that I may not drive.  Just, I
2   was -- I mean, I was like -- I was so -- I mean, I was
3   honest.  I remember telling Randy and being, like,
4   awkward on the phone just talking about it, because I
5   was talking about that they thought that I may have
6   had a seizure, and that I may not be able to -- it was
7   just -- I remember being like -- I was afraid to even
8   talk about it because it's just like who wants to say
9   that about themselves that they think you might have
10  done something, you know, something so extreme like
11  that.  And so it was a lot for me to tell him that.
12  But, yeah, I remember telling him that I may not be
13  able to drive.
14     Q.  Okay.  Do you remember telling Mr. Bain that
15  you thought that the meds that you were on should get
16  you close to normal and that you hoped to be able to
17  return at some point?
18     A.  I think that -- oh, yeah.  I think -- I
19  remember talking about -- I think, you know, it was a
20  long time ago.  I mean, that was when we hoped that
21  medication was going to help whatever was going on.
22  And that's what we were being told that -- I was just
23  literally doing what Dr. Sikand -- I was doing
24  everything I needed to do.  Everything that everybody
25  was telling me what I should do, that's what I was

69

1   doing because I was just ready to, like, for it to be
2   over and me to just move on, you know.
3       Q.  Okay.  As of May 19th, when you had this call
4   with Mr. Bain, had your doctors told you -- given you
5   a definitive date as to when they thought you'd be
6   able to return to work in any capacity?
7       A.  No.  Not at that time.
8       Q.  Okay.
9       A.  No.
10      Q.  During this telephone call that you had with
11  Mr. Bain on May 19th, what do you recall Mr. Bain
12  telling you?
13      A.  Can you say that again?  I'm sorry.
14      Q.  Yeah.  And we're focusing now on this
15  May 19th --
16      A.  Right.
17      Q.  -- 2017 phone call that you had with Randy.
18  What do you recall Randy telling you?
19      A.  On the May 19th?  Just, you know, just -- I
20  don't remember.  I just remember him --
21      Q.  Yeah.
22      A.  -- you know -- you know, Randy -- what a, you
23  know, what a great news director.  What more could you
24  want from a news director.  Came to see me in the
25  hospital.  Told me not to worry about anything with

70

1   work.  Take care of me.  You know, that's what you
2   tell family.
3       Q.  Okay.  But, again, I want to focus now on
4   what you remember him saying to you, if -- you may not
5   remember specifics --
6       A.  Yeah.
7       Q.  -- about -- on this phone call.
8       A.  I mean, I just remember him saying, okay.  I
9   mean, just acknowledging what I said.  I don't
10  remember exactly what he said.
11      Q.  Okay.
12      A.  I'm sure he was very nice and -- I'm sure he
13  was very nice and warm, you know, and genuine, because
14  that's how he is.
15      Q.  Okay.  Do you remember anything else, other
16  than what you've already told me, about this
17  particular phone call between you and Randy?
18      A.  No, I just remember being sad that I was even
19  having to have the conversation.
20      Q.  Okay.  Was there anyone else present with you
21  when you had that call with Randy?
22      A.  Yes.
23      Q.  Okay.
24      A.  So that is the whole thing.  So with
25  everything going on with me, I made sure, like -- that

71

1   was why my mom and John were the ones talking, is
2   because -- because I wasn't -- I would have these
3   moments where I wasn't right, or I was having a
4   headache and I couldn't talk, and so, you know, they
5   were always with me.
6       But the biggest thing is, before I made that
7   phone call -- and this is literally -- it goes back to
8   what I said about how I was not -- like, how I
9   debated, like, not telling that, because it is my --
10  you know, it's my health, and so I didn't have to say
11  what was really going on.  I didn't have to, but I
12  chose to.
13      And so it goes back to that, because I didn't
14  want -- I didn't want to say anything wrong.  I didn't
15  want to say the wrong thing.  I didn't want to hurt me
16  or make -- and I -- and to be fair, I don't remember,
17  and so I wanted them to be there, too, and so, you
18  know, I mean, I was --
19      Q.  Who was it, again, that was with you when you
20  had this call?
21      A.  On the 19th?
22      Q.  Yeah.  Yes.
23      A.  So I know my husband was with me, and my mom
24  was right there.
25      Q.  Okay.  Was this a call you had -- were you on

72

1   speaker when you had it or were they just overhearing
2   what you were saying to him?
3       A.  I don't remember if I was on speaker exactly,
4   but I know I had the volume all the way up, and I was
5   talking like this.  So I don't know if they -- I mean,
6   I know they heard everything I said.  I don't know if
7   they heard everything he said.  You know, I know they
8   heard everything I was saying because they were right
9   there.
10      Q.  Okay.
11      A.  But I know it -- you know, I was just going
12  through -- and it was just hard for me -- I just
13  needed that support, you know.
14      Q.  Okay.
15      A.  That's why they were there.
16      Q.  I understand from looking at your medical
17  records, it looked like your next visit after this
18  May 19th call would have been with Dr. Haynie on
19  May 22nd of 2017; does that sound accurate?
20      A.  Uh-huh.  Yes.  Sorry.
21      Q.  And then I was looking at your neurologist's,
22  Dr. Sikand's --
23      A.  Uh-huh.
24      Q.  -- records.  He's got a notation in his files
25  that on May 23rd of 2017, someone contacted his office

73

1   to say that you had another spell that was witnessed
2   by your husband.  What is that referring to?
3       A.  You know, I don't remember.  You'd have to
4   ask my husband.
5       Q.  Okay.  Do you recall your husband telling you
6   anything about this --
7       A.  I just know that I had lots of spells like
8   that.  I would -- during that time, I would get dizzy.
9   And that -- when you say it like -- during all this
10  time, like, that's what we -- that's why, you know, I
11  still am trying -- I never really knew what actually
12  happened --
13      Q.  Okay.
14      A.  -- you know.  And so that's why -- I mean --
15  I mean, I fear that one day, you know, I could have
16  another one of those fainting spells, you know.  I
17  mean, I don't know.  But why did I have it that day,
18  you know.  But I don't know exactly what he's
19  referring to.
20      Q.  Okay.
21      A.  But I know that I had moments during that
22  time where I felt like I was going to faint, you know.
23  I had a headache, and I would just -- like, I would
24  get really dizzy, like I was going to fall.  Which I
25  do remember -- I mean, I know -- you know, a

74

1   concussion, you know, can cause -- I mean, every
2   doctor has a different opinion, and that was obvious
3   to me.  I saw -- I heard lots of different opinions.
4       But, you know, I know that a concussion can
5   cause you to have headaches and vertigo and all that.
6   It just depends on, like, you know, what exactly
7   happened and, like, how you're affected by that.
8       So, you know, but, yeah, I don't really know
9   what he means exactly by that, but to my knowledge,
10  that's probably what he's talking about.
11      Q.  Okay.  These spells that you were just
12  telling me about, I mean, do you -- you say you get
13  the headaches, you feel faint.  Do you actually lose
14  consciousness during these spells?  If you know?
15      A.  No.  Not -- no.
16      Q.  Okay.
17      A.  Not to my knowledge.  I've never lost
18  consciousness.  Not to my knowledge.
19      Q.  Have you had these spells before the
20  May 2nd, 2017, incident?
21      A.  So I will say in high school, I had some
22  issues that were similar to this.  And to be honest, I
23  think it could have been the same thing.  But there's
24  no way of knowing that.  To be fair, I think it -- I
25  think it has -- I think it could have to do with, like

75

1   when it's -- when a woman has that time of the month
2   and her hormones are off.  I don't know if that has
3   anything to do with it, but, I mean, I remember
4   growing up as a girl, you know, when I was 16 years
5   old, and, you know, you'd have your period and you'd
6   kind of feel like, kind of terrible, you know.  And
7   you just feel like really uhh.  That was always during
8   that time.  And so I guess there's a part of me, in my
9   mind, that thinks maybe that could have been
10  something.  And I actually remember talking to my
11  doctors.  I mean, I've talked to my doctors about
12  that.  But there's just no way of knowing, like, is
13  that it, is that what happened on May 2nd.  Like,
14  there's no way to know what's happened.
15      Q.  Okay.
16      A.  But there's just no way to know that.  And
17  those times that that happened, that's the other
18  thing, whenever that had happened -- I mean, that
19  happened in high school twice.  It happened at school,
20  one day at school.  I had like a thing like that.  And
21  that was one time that I remembered.  And then one
22  time it happened when I was with my boyfriend at the
23  time, in high school, and, you know, it was like, I
24  don't know what that was.
25      But, you know, I remember there was never --

76

1   it never was, oh, that it was a seizure.  I mean, that
2   was never discussed, you know.
3       Q.  Was -- were those spells back when you were
4   in high school, did the doctor ever give any sort of
5   diagnosis as to what he or she thought they may be
6   attributed to?
7       A.  No.  I mean, I -- I know Dr. Waterfallen and
8   I talked a lot about those, and, no.
9       Q.  Okay.  And those spells that you were talking
10  about after the May 2nd, 2017, incident, how long, you
11  know -- is it still something that you deal with from
12  time to time, or was there a point that they seemed to
13  resolve themselves again?
14      A.  Can you repeat that?  I'm sorry.
15      Q.  Yeah.  I'm asking about the spells that
16  you've been having after the May 2nd, 2017, incident,
17  in Canton, Texas.
18      A.  Yeah.
19      Q.  Is it something that you still have from time
20  to time or was there a point when your symptoms and
21  your -- these spells --
22      A.  Right.
23      Q.  -- resolved themselves?
24      A.  So since -- I mean, since then, no.  There
25  hasn't -- I haven't -- I haven't had any, you know,

77

1  fainting, feeling like I was going to be faint, or
2  anything like that since, you know.
3        Q.  Since when?
4        A.  I would say, you know, like -- I would say,
5  like, around that time.  It got better.  I mean, it
6  got better.  Like, I would say, within a couple of
7  weeks I didn't have any fainting or feeling like I was
8  going to faint.  I still had a headache, you know.
9        And then I eventually got off of -- I was
10 taking a medicine called Fioricet that Dr. Sikand had
11 put me on, and when I went and saw Dr. Tivakaran, that
12 was the first thing he did was take me off of that
13 medicine because he said that it can cause rebound
14 headaches.
15       Q.  Okay.
16       A.  And so that's the difference in doctor
17 opinion right there.  Because he was like, well, you
18 don't need to be taking this medicine, because this
19 could be causing your headache.  So, you know, so --
20 so who knows what those headaches were caused from.
21 Were they caused at the time from a concussion, or
22 being put on another medicine that made your headaches
23 worse.  I don't know.
24       Q.  Okay.  When you saw the second neurologist in
25 the November 2017 time period, I saw something in the

78

1  records that indicated that you had indicated to him
2  that you and your husband were thinking about having
3  another child at some point in the near future.
4        A.  So the biggest thing was why -- why -- okay.
5  I haven't -- you know, I was put on this seizure
6  medication as a precaution, but here I am a young
7  woman who's just taking a seizure medication when I
8  haven't had any problems, there's never been a
9  proof -- there's no proof that you ever had a seizure,
10 except you're putting this woman, who's young, who
11 wants to have children again, on a medication that
12 could truly affect her ability to conceive later on.
13 And why pay for a medication -- why be on a medication
14 if you don't have to be on a medication, you know.
15       Q.  It looks like the neurologist told you that
16 if you did want to get off the Keppra, I guess you had
17 to do it, kind of wean yourself off it.
18       A.  Right.
19       Q.  And it looked like during that time that you
20 would also be restricted from driving.  In fact, I
21 think I saw something in the records about three
22 months.
23       A.  So he -- when it comes to the whole driving
24 thing, Dr. Sikand never said that I couldn't drive.
25 He said that, as a medical doctor, he has to tell

79

1  every patient if it could have been -- that he legally
2  has to tell them that they -- you know, typically
3  people who have a seizure don't drive for six months.
4  Well, I didn't have a seizure.  There was no proof
5  that I did.
6        Q.  Right.
7        A.  But as a doctor, he had to tell me what
8  legally he has to tell me for the State of Louisiana;
9  so.
10       Q.  And I understand that.
11       A.  But that it was up to me whether, you know.
12       Q.  I understand that.  I'm talking about when
13 you saw your second neurologist in November of '17,
14 and he said that you would be restricted from driving
15 when you were getting off --
16       A.  Off the Keppra.
17       Q.  -- weaning yourself off Keppra; is that
18 correct?
19       A.  I do remember that.
20       Q.  Okay.
21       A.  I do remember that.  Okay.  I don't remember
22 him saying that I necessarily couldn't drive.  I
23 remember him saying that he didn't recommend it.
24       Q.  Okay.
25       A.  Like, that's what I remember.  Because, see,

80

1  I don't even really remember him saying you couldn't,
2  you know.
3        Q.  Okay.
4        A.  That was just -- but, I mean, that was
5  because it was such a hard-core medication too.
6        Q.  I understand that you had another
7  phone call with Randy Bain on May 24th of 2017.  Do
8  you recall that conversation?
9        A.  I do.
10       Q.  Okay.  Did you call him or did he call you?
11       A.  I don't remember.  I think I called him.
12       Q.  Okay.  What do you recall from that
13 conversation?
14       A.  Being angry.
15       Q.  I don't mean what you recall feeling-wise.
16 What do you recall being said?
17       A.  I just remember him telling me that he had
18 talked -- you know, that based on what I had told him
19 before, that, you know, they were having to terminate
20 me because I was no longer going to be able to drive
21 for six months.  And I remember me telling him, you
22 mean you're firing me?  And he said, you're going to
23 have to talk to HR.  And I remember it was the most
24 awkward thing to ever do because I felt like in that
25 moment he did not like having to say what he was

81

1    saying to me.  And it was --
2    Q.  Okay.
3    A.  -- just awful.  And I wasn't expecting it,
4  and it came out of nowhere like that, like why -- why
5  would I have ever thought I was going to get fired
6  when all I'd been told the whole time was take care of
7  you.  Don't worry about your job.  Don't worry about
8  work.  Just take care of you and getting better.
9  Yeah.
10    Q.  Do you have any personal knowledge --
11    A.  I remember it was just like -- I was just,
12  like, kind of baffled by it.
13    Q.  Okay.
14    A.  And I remember getting off the phone and
15  being like, what the heck, you know.
16    Q.  How long -- do you recall how long that
17  conversation was?
18    A.  I don't remember.
19    Q.  Was it a long conversation?  Short?
20    A.  I want to say it was fairly short.  I don't
21  remember it being long.  I mean, like --
22    Q.  Was there anyone present on your end who may
23  have overheard the call?
24    A.  Yeah.  Yes.
25    Q.  Who would that have been?

82

1    A.  My husband and my mom were by me.
2    Q.  Okay.
3    A.  Because, I mean, my husband heard me say, you
4  mean you're firing me, and then I like -- my emotions
5  couldn't, like couldn't -- yeah.
6    Q.  Okay.  Do you have any personal knowledge, as
7  we sit here today, as to who at KTBS made the decision
8  to end your employment at that point?
9    A.  No.  I don't know.
10    Q.  Anything else that you remember being said by
11  either you or Mr. Bain during this May 24th, 2017,
12  phone call?
13    A.  No.  I don't remember what I said.  I think I
14  was just in shock.
15    Q.  Okay.  I'm going to show you another exhibit.
16  I'm going to mark this as Exhibit 4.
17    A.  Okay.
18      (Sullivan Deposition Ex. 4 was marked for
19    identification.)
20    Q.  And I'm going to share the screen.  Do you
21  see this letter on KTBS letterhead, and it's dated
22  May 24th?
23    A.  I do.
24    Q.  Okay.  If you could look at it and let me
25  know when you're ready.

83

1    A.  I'm ready.
2    Q.  Okay.  Do you recognize this?
3    A.  I do.
4    Q.  And is this a letter you received from KTBS
5  after your phone call with Randy Bain on May 24th?
6    A.  Yes.
7    Q.  Did Randy indicate to you during that call
8  that you would be receiving a letter?
9    A.  I believe so.  I don't remember, but I'm
10  pretty sure he did.
11    Q.  Okay.
12    A.  I don't know if he said anything about a
13  letter.  I just know he said that I could contact --
14    Q.  Okay.
15    A.  -- I just remember him saying I could contact
16  HR.
17    Q.  But you do remember receiving this letter
18  that I'm showing you as Exhibit 4?
19    A.  Yes.  Yes.
20    Q.  Okay.  Did you have any further discussions
21  with anyone from KTBS after your May 24th phone call
22  with Randy Bain?
23    A.  When I came in to the office to get stuff out
24  of my desk, I spoke -- I went in to Randy's office.  I
25  talked to him for a minute.  I don't remember what

84

1  exactly was said, because it was humiliating.  I was
2  just really upset.  I don't think I cried walking in
3  there until I talked to Randy Bain.  Because it was
4  just hard.
5    Q.  And what was the purpose of that visit?  Was
6  that to return some keys -- you know, some equipment
7  or --
8    A.  I was returning the phone from, like, my work
9  phone, getting stuff from my -- like my little desk.
10  And -- yeah.
11    Q.  Okay.  Other than when you went to the
12  station to return that stuff, any -- did you have any
13  other discussions with anyone from KTBS after that?
14    A.  I talked with several -- well, you know,
15  everybody was like -- everybody saw me, and that
16  was -- yeah.  So everybody that was in there at the
17  time saw what was going on, but they didn't know what
18  was going on necessarily.  They just saw me for the
19  first time, so it was like, oh, Tara, you know, kind
20  of like, how are you, you know.
21      And then I remember telling Ms. Vicki,
22  because she was right behind me, just -- because I was
23  cleaning out my desk; so.
24    Q.  Okay.  Let me ask you this:  Other than those
25  conversations, I guess, with your colleagues and

85

1  co-workers, did you have any other further -- any
2  further discussions with anyone in management?
3      A. Yeah. I remember I talked to our executive
4  producer, Stephanie. I remember that.
5      Q. Okay. Anyone else that you remember?
6      A. No, not that I remember.
7      Q. You have any other discussions with Randy
8  Bain after you returned that stuff to him?
9      A. I just remember talking to him. I don't
10  remember what I said or, you know, exactly, or what he
11  said.
12      Q. Again, this is after -- after that date that
13  you returned that stuff. I'm trying to --
14      A. Not --
15      Q. What I'm trying to find out is --
16      A. Yeah.
17      Q. -- were there other days or other discussions
18  you had with Mr. Bain after that point?
19      A. No. Not that I -- no.
20      Q. How about with Mr. Sirven? Did you ever have
21  any conversations or communications with Mr. Sirven
22  after that point?
23      A. I'm sure I would have liked to, but I didn't,
24  no.
25      Q. Okay. How about Sherri McCallie, did you

86

1  ever have any discussions with Sherri McCallie at any
2  point after the date --
3      A. I think I --
4      Q. If you could just let me finish my question.
5      A. Sorry. Sorry. Sorry.
6      Q. That's okay. Did you have any further -- any
7  discussions with Sherri McCallie at any point, after
8  you returned your stuff to Randy?
9      A. Yeah. I remember -- I mean, the only thing I
10  know that I did -- I don't remember when it was and
11  who exactly I talked to, but I know that I talked with
12  others in management when it had to do with, like, my
13  insurance and all of that. How, like, being fired
14  would affect everything and what I had to do and,
15  like -- yeah. That's all. I don't remember anything
16  else or what exactly was said.
17      Q. This letter that I showed you a few minutes
18  ago as Exhibit 4 --
19      A. Okay.
20      Q. -- I can share it again, if you want. I
21  think it's still --
22      A. It's still up there.
23      Q. -- being shared.
24      A. It is.
25      Q. At the -- I guess it's in the third

87

1  paragraph, it says, "Once your doctors release you to
2  return to work, or permit you to drive, we invite you
3  to reapply for any positions that may be available at
4  that time."
5      Did you ever reapply for any positions after
6  you got this letter?
7      A. No. No.
8      Q. Why not?
9      A. Why would -- well, I mean, why would you
10  reapply to a place that fired you when you did nothing
11  wrong.
12      Q. Okay.
13      A. Why would you want to work for them again.
14  They just -- they could fire you again.
15      Q. Okay.
16      A. Also, who does that to family. And that's
17  how I viewed it. So I took it to heart.
18      Q. All right. I want to talk about your claims
19  against KTBS, and I'm going to show you another
20  document.
21      THE WITNESS: Brian, do you mind if I stand
22  up for a second?
23      MR. CARNIE: Absolutely. Go ahead.
24      THE WITNESS: Okay. I'm back.
25      Q. (By Mr. Carnie) All right. Let me share the

88

1  screen with you on this, and I'm going to mark this as
2  Exhibit 5.
3      (Sullivan Deposition Ex. 5 was marked for
4  identification.)
5      A. Okay.
6      Q. And this is actually a two-page document, so
7  I'm going to let you look at the first page first, and
8  then you tell me when you're ready for me to scroll to
9  the second page.
10      A. Okay.
11      (Document(s) reviewed by the witness.)
12      A. Okay.
13      (Document(s) reviewed by the witness.)
14      A. Okay. I'm ready.
15      Q. Okay. Do you recognize this document? This
16  exhibit?
17      A. I do.
18      Q. And this is -- as I understand, is your
19  charge of discrimination that was filed with the
20  Louisiana Commission on Human Rights and the U.S.
21  EEOC; correct?
22      A. Yes.
23      Q. And on the first page of Exhibit 5, is that
24  your signature and handwritten date at the bottom
25  left?

TARA BRANDO SULLIVAN                                                9/28/2020

---

89

1    A. It is.
2    Q. Okay. And I assume -- I believe this may
3 have been something that was prepared by your
4 attorney, but did you have a chance to review this
5 before it was filed?
6    A. Yes.
7    Q. Okay. You mention in the typed narrative
8 that's on the second page -- and, again, it's really
9 the -- near the bottom there in the paragraph that
10 starts off with finally --
11    A. Right.
12    Q. -- or, actually, it's in the paragraph above
13 that --
14    A. Uh-huh.
15    Q. -- actually. You mention in the charge that
16 you believe that KTBS failed to engage in the
17 interactive process that's required under the ADA.
18    I don't expect you to be a lawyer, and I
19 don't want you to tell -- you know, share any
20 conversations that you had with your attorney, but can
21 you just tell me, as you sit here today, what is your
22 understanding as to what the ADA requires regarding
23 the interactive process?
24    A. That you have to do your best to make
25 reasonable accommodations for someone to be able to

---

90

1 possibly -- do everything you can to allow them to
2 still be able to work. That's what I believe it is.
3    Q. Okay. And what is the basis of your
4 understanding? Is it based on conversations you had
5 with your lawyer or did you do independent research
6 about that?
7    A. I actually -- I mean, I've spoken, yes, with
8 Allison.
9    Q. Don't share with me, you know, what you told
10 Ms. Jones.
11    A. Right. Right. But I also -- I mean, I --
12 you know, through all of this, I had lots of emotions
13 and lots of things, and, you know, it wasn't until
14 you know, I was in the grocery store and people were,
15 like -- you know, people would see me and be like, oh,
16 miss you on television. Oh, you're doing great. Love
17 you, da-da-da-da-da-da. I mean, it happened multiple
18 times, and every time I just was like, yeah, I'm, you
19 know, being a mom now. And that was the thing that
20 got me to where I was -- where I was, like, this isn't
21 right. Because you're saying -- yeah, I was enjoying
22 being a mom. My daughter was literally like -- you
23 know, is the sunshine of my life and helped me through
24 all this. But, truthfully, it was in that moment
25 where I was, like, saying that I was enjoying being a

---

91

1 mom because I was humiliated because I didn't want to
2 tell people I was fired. Like, you're fired. Then
3 people view you like you did something wrong or you're
4 bad. You did something, you know, poorly, bad. And I
5 didn't do anything wrong.
6    And so, you know, I would just, like, kind of
7 go along with, you know, yeah, I'm enjoying being a
8 mom. You know, just, like, not talk about the whole
9 TV thing, because it was embarrassing. I also didn't
10 under -- like, it frustrated me because I was proud to
11 be a working mom, you know.
12    Q. Let me ask you: What do you believe KTBS
13 should have done before they ended your employment?
14    A. Tried to do something.
15    Q. When you say try to do something, what -- I
16 mean, is there anything --
17    A. You know, give me the option of, like, you
18 know, paying for a driver. You know, who's to say
19 that I wouldn't have driven? You know, I didn't drive
20 because I didn't drive because I had no place to go.
21 So I wasn't going to drive because why would I drive.
22 I didn't have to be driving. I was never given the
23 opportunity to go to work. Get up, drive, go to work.
24 So, without having a job, I didn't drive.
25    Q. Okay.

---

92

1    A. Why drive if you don't have to drive. You've
2 got nowhere to go.
3    But, also, I mean, I could have driven;
4 right? I could have. Never given the opportunity.
5 But more so than that, I could have hired a driver out
6 of my own paycheck. They didn't have to pay for that.
7 I could have done that. They could have put me on,
8 like, unpaid leave for six months, if they were, like,
9 afraid of me. You know, like, oh, you know, she won't
10 be able to drive, so just put her here. You know,
11 they could have done that. Instead of, like, oh,
12 you're fired; we're terminating you. I mean, for
13 somebody that did nothing wrong.
14    And I'm like, I mean --
15    Q. Anything else --
16    A. Not one person would that happened. Like,
17 forever I'd have a mark that I was fired on every job
18 application, regardless of what field it is in. Well,
19 I can tell you, I've been in the position of hiring.
20 I know when I was working, you know, other positions
21 where I was hiring, I didn't even look at the people
22 that marked where they had been fired, because you've
23 already got this other great -- you've got so many
24 applicants for different jobs, well, that's like an
25 automatic, you don't have to look at them because

---

93

1   they've been fired.  So why do you want to hire
2   somebody that's been fired.
3        Q.  Anything else that you -- other than what
4   you've told and shared with me, anything else that you
5   think KTBS should have done?
6        A.  I just think that, you know, I'm a person.  I
7   was a hard worker.  And, you know, I just -- I
8   don't -- I don't understand why they didn't, you
9   know -- I mean, what was I -- what was I doing when I
10  first started working there.  Like, I literally --
11  they were training me to do something I've never done
12  before, that I ultimately enjoyed, you know.  I could
13  have been producing, and yet they say, like, all
14  newsrooms jobs must be required to drive.  Okay.
15  Well, I could have done the same thing even as a
16  producer.  Even if I wasn't going to drive for six
17  months, as a precaution, I could have had a driver
18  drive me.  I could have called an Uber.  But I could
19  have got a driver.  I could have set up something.
20  But I also know that those producers did not leave to
21  go cover things all the time.  They could have done
22  something, you know.  I don't know.  I just...
23       Q.  I assume -- but I'm going to ask this just to
24  make sure I'm correct -- that you don't have any
25  personal knowledge as to whether -- you know, who

94

1   Mr. Bain spoke with or what was discussed when the
2   decision was being made as to what to do with respect
3   to your employment; correct?
4        A.  No.  I don't know.
5        Q.  During the time that you worked for KTBS, do
6   you have any personal knowledge of any other MMJ who
7   was allowed to continue to work, even though they were
8   not able to drive, for any reason?
9        A.  No, not to my knowledge.  But, I mean, when
10  you have a newsroom with so many things to get done,
11  you could have made a little exception for somebody
12  to, like, oh, here's a little thing.  You could have
13  docked my pay.  You could have done whatever you
14  wanted to do to change -- but the thing is, like,
15  there was never even any talk.
16       Q.  Okay.
17       A.  You know.
18       Q.  Do you have any personal knowledge of any
19  other MMJ at KTBS who was prevented from driving for
20  any extended period, for any reason?
21       A.  Say that again?  I'm sorry.
22       Q.  Yeah.  Do you have any personal knowledge of
23  any other MMJ who was prevented from driving for any
24  extended period?
25       A.  Not to my knowledge.

95

1        Q.  Okay.  I'm going to pull up another exhibit
2   which I'm going to mark as Exhibit 6.
3            (Sullivan Deposition Ex. 6 was marked for
4   identification.)
5        A.  I mean, the other thing -- the other thing --
6   and I think, like, this is, like, and I'm just going
7   to say it.  Had they not wanted to put me on unpaid
8   leave, had they not wanted to do any -- you know,
9   not -- they were saying, oh, no, you can't do this
10  because all newsroom, you know, they all have to
11  drive, blah-blah-blah-blah.  Well, you know, you could
12  have given me the decency to be able to resign and
13  give me a good recommendation.  But, no, no.  You're
14  fired, and you're under a non-compete.  Like, so
15  forever, here you go, Tara, you're doing a great job
16  but forever, mark.  No, you've been fired.  You know.
17       Q.  Okay.
18       A.  And I have to explain to everybody what
19  happened.
20       Q.  I'm showing you what I've marked as
21  Exhibit -- I guess this would be Exhibit 6.
22           (Sullivan Deposition Ex. 6 was marked for
23  identification.)
24       A.  Okay.
25       Q.  Now, this is a six-page document.  I don't

96

1   know if you want to read it all.  I'm sure you've seen
2   a copy of this before.
3        A.  I have.
4        Q.  I'm just going to scroll through it --
5        A.  Okay.
6        Q.  -- real -- so you see what the exhibit I
7   have.
8        A.  Yes, sir.
9        Q.  But, obviously, I will represent to you that
10  this is a copy of the complaint that was filed in the
11  instant Federal Court lawsuit.
12       A.  Uh-huh.
13       Q.  I assume that you've seen this document
14  before.
15       A.  I have.  Uh-huh.
16       Q.  And did you review this before it was filed?
17       A.  Yes.
18       Q.  Okay.  And I'll just -- I will ask:  Do you
19  see the page that should be in front of you, the
20  verification page, which is the last page of this
21  exhibit?  Is that your signature under the signature
22  line?
23       A.  It is.
24       Q.  Okay.  I'm going to go and just -- I want to
25  direct your attention, Tara, to Paragraph 16.

TARA BRANDO SULLIVAN                                    9/28/2020

97

1     A.  Okay.
2     Q.  Which should be on your screen.  Why don't
3   you take a second and read it, and then let me know
4   when you're ready.
5     A.  Okay.  Number 16 you said?
6     Q.  Paragraph 16, yes.
7       (Document(s) reviewed by the witness.)
8     A.  Okay.
9     Q.  Okay.  You say in this paragraph that your
10   condition was controlled and that you were able to
11   perform the essential functions of the job upon the
12   release to return to work.
13     A.  Right.
14     Q.  When did the doctors release you to, I guess,
15   return to work?
16     A.  They didn't, because they weren't -- there
17   was no need.  I was fired before they could do it.
18     Q.  Okay.  In this lawsuit, your attorney shared
19   with us something called initial disclosures, which is
20   something that both sides file at the early stages of
21   the case.
22     A.  Uh-huh.
23     Q.  You indicate that your -- as part of your
24   damages in this lawsuit, you're seeking compensatory
25   damages for emotional pain and suffering.

98

1     A.  Uh-huh.
2     Q.  Could you tell me -- you know, give me some
3   details about how you believe the actions of KTBS have
4   caused you this emotional pain and suffering?
5     A.  Well, you take a firecracker person, and then
6   you put them on the ground, and then you stomp all
7   over them, and then they don't talk.  And they just,
8   like, don't understand what happened to them.  You
9   take away a mother and a wife.  I did nothing wrong.
10     Q.  Okay.
11     A.  I mean, that's the reality.  I did nothing
12   wrong.  I was always doing my best.  I put things -- I
13   put everything -- everything for work, you know.  I
14   did everything.  I was doing everything I could do
15   to -- to be the best for KTBS.  Like I -- I wanted
16   people to know their anchors.  That's why I wanted to
17   work there.  You know, I grew up loving Sonja Bailes.
18   Loving her.  I idolized her.  You know, Sherri Allen,
19   Sherri Talley, I mean, I grew up loving them, you
20   know.  And I wanted people to know their people.  And
21   I was proud to be that person.  And I would have been
22   there to this day had that not happened on May 2nd.
23     Q.  Okay.
24     A.  I mean...
25     Q.  Anything else that you can tell me about this

99

1   emotional pain and suffering that you're alleging you
2   suffered as a result of what KTBS did?
3     A.  You know, I -- I went through depression.  I
4   battle depression every day.  I know what works for
5   me.  I never realized that hearing promos -- when
6   you're watching a show and hearing promos could upset
7   you so much.  But, like, every time I would hear, on
8   your side, on your side, I would just get mad.
9   Because I was like, they weren't on my side.  Like,
10   what a joke.  You're telling, like, all these people
11   that you really give -- you know, you really care, and
12   then look at what you did to your own.
13       I mean, it just didn't make any sense to me.
14   But I didn't realize that.  I had never struggled with
15   depression.  I mean, I was just -- and it's like --
16   it's kind of like when you lose a loved one.  Well, I
17   had lost my job.  I mean, that was -- like, to me,
18   like, my job was like my -- you know, my happy.  My
19   life.  I was proud to do it.  You know, I was proud to
20   get up and go every day.  And so then you take
21   somebody -- you take that away, and it's just really
22   hard.  And I didn't know how it was going to affect me
23   until it affected me.  And then I had to get help.
24       You know, it took holding my daughter and
25   realizing that I wasn't right.

100

1     Q.  Okay.
2     A.  Because -- because it wasn't fair to me to
3   say -- to use her as an excuse because I was
4   humiliated.  It wasn't fair to use her as the excuse,
5   like, it's a bad thing that I'm at home with my
6   daughter.  Like, that's what I was doing.  People were
7   asking me, and that's what I was saying.  And that's
8   when I realized it was wrong.  Like, how could you do
9   that to a person.
10     Q.  You mentioned --
11     A.  So I'm, like, no.  Like, no.  It's
12   ridiculous.
13     Q.  Okay.  You mentioned getting -- seeking help
14   from others.  Who did you seek help from with respect
15   to this alleged emotional pain and suffering?
16     A.  I saw Dr. Vigen.  And then I went on to see
17   another doctor that he recommended, and I honestly --
18   I'm blanking.  I can't remember his last name right
19   now.  But I saw Dr. Vigen mostly.
20     Q.  Okay.  And it looks like from the records we
21   got from Dr. Vigen's office, you started seeing him in
22   March of 2018.  Does that sound correct?
23     A.  It is.
24     Q.  All right.
25     A.  Yeah.  It took a long time to, like, gain the

109

1    Number 3.
2        MR. CARNIE:  And remind me again, Allison,
3    what is Exhibit 3?
4        MS. JONES:  That's the May 11, 2017, letter.
5        MR. CARNIE:  You want me to pull it up on the
6    screen?
7        MS. JONES:  If you want to, that would be
8    great.  And then you're going to have to teach me how
9    to do that.
10       MR. CARNIE:  And it should be in front of
11   everybody; right?
12       MS. JONES:  Right.
13       Q.  (By Ms. Jones)  And if we could, go to the
14   third paragraph of this letter where it says, "Please
15   continue to keep us updated about any changes in your
16   status as it relates to when you might be able to
17   return to work."  Do you see that, Tara?
18       A.  Uh-huh.  Yes.
19       Q.  Okay.  "And we would appreciate at least
20   weekly status updates."  Did you comply with KTBS's
21   directive?
22       A.  Yes.
23       Q.  The next paragraph says, "We will need a
24   fitness-for-duty from your healthcare provider before
25   you are allowed to return to work."  Were you ever

110

1    given the opportunity to provide that fitness-for-duty
2    for your -- from your healthcare provider before the
3    termination of your employment?
4        A.  No.
5        Q.  So the termination of your employment, with
6    respect to your condition and any restrictions, were
7    based solely upon conversations that KTBS had either
8    with you, your mother, or your husband.
9        A.  Yes.
10       Q.  Did you ever allow KTBS to speak directly to
11   your doctor?
12       A.  No.  There was never a chance for that.
13       Q.  And so you never did get a return-to-work
14   form to provide that as a fitness-for-duty for KTBS,
15   nor were you ever provided that opportunity?
16       A.  No.
17       MS. JONES:  Thank you.  No further question.
18   EXAMINATION
19   MR. CARNIE:
20       Q.  I just have one question, Tara.  In the
21   May 2017 time period, you've indicated you were still
22   having vertigo --
23       A.  Hold on.  Hold on one second.
24       Q.  Okay.
25       A.  Okay.  My volume was down for some reason.  I

111

1    was like, I cannot hear.
2        Q.  Okay.  Can you hear me now?
3        A.  I can.
4        Q.  I sound like the guy in the Verizon
5    commercial.
6            In the May 2017 time period, when you were
7    still visiting your doctors, and I think earlier you
8    indicated you were still having headaches, the
9    vertigo --
10       A.  Right.
11       Q.  -- some of the spells, did you have any
12   discussions with any of your doctors at that point,
13   before your employment ended at KTBS, about if you can
14   go back to work at that time?
15       A.  Not that I remember.  I just remember we were
16   taking time to see if the medicine -- if the medicine
17   was working.  But not to my knowledge.  We -- we
18   didn't talk about going back to work because, you
19   know, I wasn't given the opportunity.
20           I was -- during that time frame, I was still,
21   you know, seeing doctors and getting different
22   opinions and, you know, I gave that update, and I said
23   what was going on after that last appointment, you
24   know, that I had had with Dr. Sikand and what he
25   thought.  And then, you know, that following Monday, I

112

1    was fired.  So there was never -- you know, I never
2    got the opportunity to get the release to work so that
3    maybe we could even have a discussion about what we
4    could do.  You know.  That didn't even happen.  It was
5    just...
6        MR. CARNIE:  I don't have any other
7    questions, Allison.
8        MS. JONES:  No other questions.
9        MR. CARNIE:  You guys want to read and sign?
10       MS. JONES:  We do, and I'll coordinate it.
11       MR. CARNIE:  Okay.  With that, that will
12   conclude Tara's deposition.
13           (Whereupon, the witness was excused and the
14       deposition concluded at 11:35 a.m.)
15   ///
16   ///
17   ///
18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///