---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TARA BRANDO SULLIVAN  : CIVIL ACTION NO.
                      : 5:19-CV-00784
                      :
VERSUS                : JUDGE DONALD E. WALTER
                      :
KTBS, LLC             : MAGISTRATE MARK L. HORNSBY

REMOTE DEPOSITION OF TERRI GLORIOSO BRANDO
September 28, 2020

Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

---

**Page 2**

1   REMOTE APPEARANCES:
2   COUNSEL FOR PLAINTIFF:
3   ALLISON A. JONES, ESQUIRE
    Downer, Jones, Marino & Wilhite
4   401 Market Street, Suite 1250
    Shreveport, Louisiana 71101
5   318.213.4444
    318.213.4445 - Facsimile
6   jones@dhw-law.com
7
    COUNSEL FOR DEFENDANT:
8
    BRIAN R. CARNIE, ESQUIRE
9   Kean Miller, LLP
    333 Texas Street, Suite 450
10  Shreveport, Louisiana 71101
    318.562.2700
11  318.562.2751 - Facsimile
    brian.carnie@keanmiller.com
12
13  ALSO PRESENT: Mr. George Sirven
14
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

---

**Page 3**

1                   S T I P U L A T I O N S
2
3       The remote deposition of TERRI GLORIOSO
4   BRANDO, taken by counsel for Defendant, Mr Brian R.
5   Carnie, pursuant to Notice and agreement by and
6   between counsel, for all purposes as allowed by the
7   Federal Rules of Civil Procedure, before Karen Tyler,
8   Certified Court Reporter, with the parties being in
9   Louisiana, on September 28, 2020. It being stipulated
10  by and between counsel that all formalities, with the
11  exception of the swearing of the witness, are waived.
12      It being further stipulated that the reading
13  and signing of the deposition are not waived by
14  counsel nor by the witness.
15      It being further stipulated that all
16  objections, except as to the form of the question and
17  responsiveness of the answer, are reserved until the
18  time of trial.
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

---

**Page 4**

1                       I N D E X
2                                           Page
3   Examination by Mr. Carnie....................... 5
4
5                      E X H I B I T S
6   Exhibit     Description                     Page
7   Ex. 7    Terri Brando texts with Randy Bain -   20
            4 pgs.
8
    Ex. 8    Texts between Terri Brando and Randy   23
9           Bain - 5 pgs.
10
11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

### Page 13

1   Q. So she would, you know, I guess, fall down to
2   the ground, and then, you know -- but then she'd be
3   able to talk and --
4   A. Yeah. Yeah. Yeah.
5   Q. Okay. How many episodes or spells are you
6   aware of that Tara had prior to the one she had when
7   she worked for KTBS?
8   A. Just like those three or four I just
9   mentioned.
10  Q. Okay. When is the most recent episode or
11  spell that you're aware of? Obviously, you're aware
12  of the one that happened on May 2nd of 2017 --
13  A. Right. Right.
14  Q. -- with KTBS. Are you aware of any episodes
15  or spells that Tara had after that point?
16  A. Well, after it, she was -- because of the
17  headaches and the vertigo and all that -- she was very
18  not well, you know, for a while. And she would
19  have -- I don't know if you would call them the same
20  kind of spell-like, but she just was, you know, it was
21  a process. She just wasn't well.
22  Q. You heard Tara earlier testify about, you
23  know, she was having, you know, vertigo, you know,
24  trouble with balance issues, the headaches. What else
25  do you recall observing her experiencing after the

### Page 14

1   May 2nd, 2017, incident?
2   A. Well, all of that occurred. And then after
3   she was fired, as she explained to you how distraught
4   and upset all that made her for all the reasons that
5   she said, I witnessed all that for the whole time.
6   Q. Okay. Was she -- did she live at your house
7   at any point after the May 2nd, 2017, incident?
8   A. Not that I can recall, no.
9   Q. All right. But did you go over to her house
10  a lot --
11  A. Oh, yes.
12  Q. -- after that?
13  A. Oh, yes.
14  Q. Okay. Did you stay overnight there or would
15  you just visit during the day?
16  A. I might have stayed overnight to help with
17  the baby and to help Tara. I don't remember. But,
18  you know, very easily could have.
19  Q. Okay. You said a few minutes ago when you
20  were talking about, you know, the spells and the
21  problems that Tara was experiencing with respect to
22  her condition, and you said that those went on awhile.
23  How long did you -- did you notice that those things
24  went on? Like, what is awhile?
25  A. You mean still the headaches, the vertigo?

### Page 15

1   Q. Yes, ma'am.
2   A. I mean, the fall risk and stuff like that?
3   Q. Yes.
4   A. Oh, gosh. I can't remember. I guess I just
5   don't remember. It lasted awhile. I mean, I just
6   don't remember, to be exact, how long.
7   Q. Obviously, you can't give the exact dates.
8   Are we talking months? Are we talking a week? I
9   mean, can you give me any sort of time frame to help
10  me out?
11  A. Well, I don't know what you want me to help
12  you out with. I don't know what --
13  Q. Well, I'm just -- you know, you're saying
14  that she experienced these things for a while. I
15  guess I'm trying to get a better time frame as to what
16  you observed and how long you observed those things,
17  her experiencing those symptoms.
18  A. I'm just guessing. I -- I mean, that was one
19  thing. And then her depression that she talked about,
20  because of everything, how it affected her from being
21  fired, that went on for a long time. Long time. It
22  still happens today.
23  Q. When did you notice the vertigo, though? I
24  mean, you know -- I'm trying to --
25  A. That was, like, you know -- that was all,

### Page 16

1   like, happening after the May 2nd date. Wasn't it
2   May 2nd? Yeah.
3   Q. Yes.
4   A. Yeah.
5   Q. Can you give me any better time frame,
6   though, as to how long you recall her experiencing
7   those problems with the vertigo, the balance, being a
8   fall risk?
9   A. Well, I just remember that when they were
10  saying that, a lot of that was probably caused from
11  the concussion from her falling, that those effects of
12  a concussion can go on for months. I remember being
13  told that by the doctor. But, I mean...
14  Q. Did it go on for months?
15  A. I mean, two months is months. But I don't
16  know how much longer. I just don't remember.
17  Q. Okay.
18  A. I just know it seemed like a long time.
19  Q. How did you first -- Terri, how did you first
20  learn that Tara had lost consciousness on
21  May 2nd, 2017? How did you first learn about that?
22  A. I don't know if she lost consciousness.
23  Q. Okay. Tell me how you first heard about
24  something happening to Tara on May 2nd of 2017.
25  A. Randy Bain called me.

**17**

Q. Okay. And what do you recall Randy telling you?
A. That something had happened, and Tara and Trey -- isn't that his name? Trey? Trey? Isn't his name Trey?
Q. Trey Lankford, yeah.
A. Had been there, and that paramedics had come, and that she was being taken to a hospital.
Q. Okay. Anything else you recall about that discussion you had with Mr. Bain at that point?
A. Not really. I mean --
Q. Okay. Did you go to the hospital? Did you go to Texas --
A. No.
Q. -- where she was hospitalized?
A. No. I kept her baby.
Q. Okay. Did you have conversations with Tara after she was admitted to the hospital in Texas?
A. I did.
Q. And what do you recall Tara telling you about what happened?
A. She didn't remember what happened. She didn't know what happened. She just wanted to come home. She wanted to get back home.
Q. Did you have any -- were you -- you weren't

**18**

there in person, but were you present by phone, so to speak, when any of the doctors talked to Tara when she was still in the hospital in Texas?
A. No.
Q. Did you overhear any conversations that Tara had with her physicians at that point?
A. No.
Q. Okay. How long do you recall Tara being hospitalized in Texas?
A. I believe just overnight.
Q. Okay. Do you know if her doctors wanted Tara to stay longer than one night?
A. I don't know. I don't remember.
Q. Okay. Did you have -- at that point, shortly after the May 2nd incident, did you have any conversations with anyone else at KTBS other than Mr. Bain?
A. I'm sorry. Could you repeat that for me?
Q. Yeah. Other than the -- you got the initial phone call from Mr. Bain shortly after the incident happened. And, again, I'm focusing on shortly after the incident happened because I know you and Mr. Bain had some texting --
A. Right.
Q. -- several days later. But before we get to

**19**

those, I want to know if you had any other conversations or communications with anyone from KTBS about Tara?
A. I may have talked with Trey, but I'm not positive.
Q. Okay.
A. It may have been on text. I'm not positive, but --
Q. Okay.
A. Okay.
Q. That's vague to you. I mean, do you have any recollection of, you know, what you said to him or you're just not sure whether you had a conversation with him or not?
A. I'm not really sure if I had a conversation with him. It was all, like, right after it first happened, and everybody was trying to find out where, and who was going, and how she was. And Trey was very -- you know, he was very upset and concerned, as well, you know.
Q. Yeah.
A. He was frazzled.
Q. You recall having, several days later -- I think it was a period of over several days -- some text communications with Randy and yourself?

**20**

A. Right.
Q. Was that the next time you had any communication with Randy from his initial phone call until these texts?
A. Yes. I don't remember when they actually started --
Q. Okay.
A. -- how many days later.
Q. And I'm going to mark as Exhibit 7 the text messages that we received from Tara's lawyer earlier this morning. I want you to just take a look at those --
A. Okay.
Q. -- once I get them up on your screen.
(Brando Deposition Ex. 7 was marked for identification.)
Q. And there are a couple of pages, so I'm just going to go page by page. You tell me when you're ready to go to the next page.
A. Let me get my glasses. Hold on. Okay. I'm going to try to see this. Which is better, with or without? Let's see. Okay. I can see.
Q. And if you need me to blow up and zoom them out, I can do that, too.
A. I think I can see it okay.

21

1   Q. Okay. Just tell me when you're ready to go
2   to the next page.
3       MS. JONES: Are you -- have you marked this?
4       MR. CARNIE: Yeah. I'm going to mark this as
5   Exhibit 7.
6       MS. JONES: I think you already had a 7.
7   7 was initial disclosures?
8       MR. CARNIE: No, I didn't mark the initial
9   disclosures. I just talked about them.
10      MS. JONES: Okay. All right.
11  A. So you want me to read this? Is that what
12  you said before --
13  Q. (By Mr. Carnie) I don't really need you to
14  read it. My question to you -- I'll give you my
15  question in advance -- is, do you recognize these, and
16  what are these?
17  A. Yes. Yes.
18  Q. Okay. I'm just going to go to -- let's see.
19  It's the next page.
20  A. Okay.
21  Q. The next page.
22  A. Okay.
23  Q. And then that's the last page.
24  A. Yes. Okay.
25  Q. Okay. And my question to you is, do you

22

1   recognize these?
2   A. Yes.
3   Q. And what are these?
4   A. Text messages.
5   Q. And these -- it looks like these are
6   screenshots that were taken from your cell phone of
7   text messages between you and Randy Bain on these
8   dates?
9   A. Correct.
10  Q. And this would have been from the 2017 time
11  period; correct?
12  A. Right. Uh-huh.
13  Q. Did Tara ask you to provide updates to
14  Mr. Bain?
15  A. Yes. She did.
16  Q. Because, at this point, she would have been
17  home from the hospital; correct?
18  A. Right. Yes.
19  Q. Okay. And, yes, she asked you to kind of
20  keep him updated about her status?
21  A. Yes. Uh-huh.
22  Q. And then that's what you did; correct?
23  A. Right.
24  Q. And everything -- you would have no reason --
25  you know, everything that you told Randy is -- would

23

1   be accurate?
2   A. Yes.
3   Q. As far as you know; correct?
4   A. Yes.
5   Q. And I'm going to show you -- and these you
6   may not have seen before -- I will stop sharing that.
7       And do you happen to have -- and before I
8   show you the next exhibit that I'm going to mark -- do
9   you happen to have a hard copy of those texts that we
10  were just looking at on the screen?
11  A. Yes.
12  Q. Do you guys have that in the room? If you
13  could just get those and have those handy for you, the
14  hard copy.
15  A. Okay.
16  Q. Because I'm now going to mark as Exhibit 8,
17  these would have been screenshots from Mr. Bain's cell
18  phone, you know, with respect to the text
19  conversations that he had with you.
20  A. Okay.
21      (Brando Deposition Ex. 8 was marked for
22  identification.)
23  Q. Have you ever -- have you seen these before,
24  what I'm now showing you on the screen as Exhibit 8?
25  A. Yes. Oh, wait. I'm sorry. What you're

24

1   showing me on the screen. What did you say?
2   Q. Yeah. Have you seen what I'm now showing you
3   on the screen, which I've marked as Exhibit 8? Have
4   you seen these before?
5       MS. JONES: So I can help her, I'm going to
6   show her what you've marked as Exhibit 7 in hard copy.
7   Okay?
8       MR. CARNIE: Yeah. That's fine. Because
9   what I want her to do is be able to look at Exhibit 7,
10  hard copy, compared to what she's seeing on the screen
11  as Exhibit 8.
12      MS. JONES: Okay. So I think that's what she
13  has now in front of her.
14      MR. CARNIE: Okay.
15  A. Okay.
16  Q. (By Mr. Carnie) But, Terri, what I'm asking
17  you is, what you're seeing on the screen right now,
18  which is what I've marked as Exhibit 8, have you ever
19  seen these before?
20  A. Yes.
21  Q. Okay. And it's five pages. And I will
22  represent to you that these are screenshots that Randy
23  Bain gave us from the text communications that he had
24  with you --
25  A. Okay.

25

1   Q. -- during this same time period. And really,
2   my only question to you is, comparing the ones that
3   your lawyer gave us this morning with the ones that
4   Randy, they appear to be the same. It just looks like
5   Randy has a different kind of iPhone.
6   A. Okay.
7   Q. Would you agree with that?
8   A. Yes.
9   Q. Okay. It looks like the last text message
10  that we have from you to Randy was May 11th, 2017, at
11  7:59 p.m., and then he responded to you on May 12th of
12  2017, at 4:44. Did you have any other text
13  communications with Mr. Bain, outside of what you've
14  given us and what's been provided, after this date?
15  A. Can you repeat that to me?
16  Q. Yeah. I mean, I'm just -- what I'm trying to
17  ask, Terri, is just -- were there any other text
18  communications that you had with Mr. Bain other than
19  the ones that you've given me and what he's given me?
20  A. Not that I remember.
21  Q. Okay. After your text -- your last text to
22  Mr. Bain -- like I said, it looks like it's from
23  May 11th --
24  A. Okay.
25  Q. -- of 2017 -- did you have any other phone

26

1   calls with Mr. Bain after that period?
2   A. I don't remember.
3   Q. Okay. Did you speak to anyone else at KTBS,
4   other than Trey, shortly after the May 2nd incident
5   and then your text with Mr. Bain?
6   A. No.
7   Q. Okay. Do you know if anyone else, other than
8   Tara, anyone else in your family, had any
9   communications with anyone, at least in KTBS
10  management, about Tara's condition, other than you and
11  Tara, and maybe John? I think John might have had
12  some shortly after.
13  A. No. No.
14  Q. Tara testified earlier this morning that
15  after she was discharged from the hospital in Texas,
16  you know, she said that she was -- Dr. Haynie had
17  hospitalized her at Christus Schumpert Highland. Do
18  you recall that?
19  A. Yes.
20  Q. Do you recall how long she was hospitalized
21  inpatient then?
22  A. No.
23  Q. Okay. Tara testified earlier this morning
24  that she recalls you attending virtually all of the
25  doctor appointments that she had after she was

27

1   discharged from Sulfur Springs, Texas, when she came
2   back here; is that correct?
3   A. Yes.
4   Q. She told me this morning that she saw
5   Dr. Haynie on several occasions; Dr. Blake Thornton,
6   who was an ENT; and then, obviously, the neurologist,
7   Dr. Sikand, in May of 2017. Any other doctors that
8   you recall, and that you went with Tara to visit,
9   other than those three in May of 2017?
10  A. No.
11  Q. Okay.
12  A. I mean, I don't remember anybody else right
13  off.
14  Q. Okay. And I understand from Tara's testimony
15  earlier today -- and, obviously, since you attended
16  the doctors' appointments with her, it is -- is it
17  correct that during this time period her doctors were
18  still trying to figure out what caused her to have
19  that incident on May 2nd?
20  A. Yes. Yes.
21  Q. Was Tara ever treated for anxiety as a child
22  that you remember?
23  A. No.
24  Q. You ever recall her being treated for
25  anxiety, as a child or adult, before the, you know,

28

1   before she started work at KTBS?
2   A. Just what she told you about from -- is that
3   all?
4   Q. Yeah. So what you're talking about is you do
5   recall her getting treated for anxiety, I guess it
6   was, in the 2015 time period?
7   A. When she worked at LSUS, yes.
8   Q. All right. As a child, do you ever recall
9   Tara getting treatment or seeking counseling for
10  depression?
11  A. No.
12  Q. How about any other mental impairments?
13  A. No.
14  Q. Okay.
15      MR. CARNIE: Why don't we take a five-minute
16  break, and I think, you know, I'll be about to wrap up
17  with you.
18      THE WITNESS: Okay. Thank you.
19      (Recess taken from 12:14 p.m. to 12:19 p.m.)
20  Q. (By Mr. Carnie) All right. Back on the
21  record.
22  A. Okay.
23  Q. I just have two questions, actually. Terri,
24  when you were sitting in on Tara's deposition earlier,
25  did you hear her deposition testimony when she