

# PILANT
## COURT REPORTING

# Transcript of the Testimony of
# SIRVEN, GEORGE

**Date:** September 30, 2020

**Case:** TARA BRANDO SULLIVAN v. KTBS LLC

Pilant Court Reporting
Phone: (800) 841-6863
Fax: (877) 474-5268
Email: deponotice@pilant.com
Internet: www.pilant.com

TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 1

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NO.: 5:19-CV-00784

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TARA BRANDO SULLIVAN

V.

KTBS LLC


DEPOSITION OF GEORGE SIRVEN
TAKEN FOR AND ON BEHALF OF THE PLAINTIFF
AT 333 TEXAS STREET, SUITE 450
SHREVEPORT, LA  71101
ON SEPTEMBER 30, 2020
BEGINNING AT 10:30 A.M.


REPORTED BY:

MARCY BROWN, CCR
9453 ELLERBE RD, LOT 5
SHREVEPORT, LA  71106



(800) 841-6863     www.pilant.com

TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 6

1     for you?
2 A  No.
3 Q  Okay. So it's fair for me, then, to assume that if
4     you have answered a question of mine, that you
5     heard it, you understood it, you're answering it to
6     the best of your knowledge, information and belief
7     without any medical impairment?
8 A  Correct.
9 Q  Alright. Mr. Sirven, please state your current
10    position with KTBS?
11 A  I am the station manager.
12 Q  And as the station manager, who supervises your
13    performance?
14 A  The owner -- president and owner of the station.
15 Q  And that is Mr. Wray?
16 A  Edwin Wray.
17 Q  Okay. As station manager, is there a written job
18    description for your job?
19 A  No.
20 Q  Alright. You heard me, in the course of the
21    deposition with Mr. Bain, ask him frequently if
22    there was a written job description for jobs at
23    KTBS. Are there written job descriptions for each
24    job at KTBS?
25 A  When they're posted, that's where the job

Page 7

1     descriptions are.
2 Q  Alright. So, other than any posting about a job,
3     there's no written job description?
4 A  Correct.
5 Q  Okay. As station manager of KTBS, are you
6     responsible for seeing to it that KTBS is in
7     compliance with federal laws?
8 A  Yes.
9 Q  And does that include the Americans with
10    Disabilities Act?
11 A  Yes.
12 Q  And as that station manager, what do you understand
13    to be your obligations under the Americans with
14    Disabilities Act?
15 A  To follow the laws.
16 Q  And does that mean that you have -- in order to
17    follow the laws, then you need to know what the
18    laws are, correct?
19 A  Correct.
20 Q  And what is your understanding of the obligations
21    of KTBS under the Americans with Disabilities Act?
22 A  Obviously there are rules in place, and we rely
23    heavily on our counselor to give us guidance when a
24    situation occurs that these rules need to be
25    followed.

Page 8

1 Q  And that would be Mr. Carnie?
2 A  Correct.
3 Q  Okay. Any other understanding other than that
4     rules exist and that if you have a question you ask
5     your lawyer?
6 A  Yeah, I think that's the basic approach.
7 Q  Not a bad approach, but I'm asking whether you have
8     any understanding of the obligations under the
9     Americans with Disabilities Act, and if so, what is
10    your understanding?
11 A  I've got a vague understanding. I know that there
12    are guidelines, there are rules there, and that,
13    you know, you have to be respectful of ADA, you
14    know, of people with disabilities, and we try to
15    accommodate those every time.
16 Q  Do you have any understanding of the term "regarded
17    as disabled?"
18 A  Well, considering I had a mentally challenged
19    child, I've got some idea of handicapped and
20    disabilities from a personal standpoint.
21 Q  Okay. And not to go too much into your personal
22    situation, but what child is that and what's the
23    mental challenge?
24 A  That was Michael Sirven. He was our middle child.
25    He is now deceased. He was a resident at Holy

Page 9

1     Angels. He was born with hydrocephalus, and we
2     cared for him until his death about 15 years ago.
3 Q  Okay. I did not know that. As the parent, then,
4     of a child who had a disability, did you ever make
5     an effort to review or learn what the obligations
6     were under the Americans with Disabilities Act?
7 A  Obviously I was exposed to a lot of that, given the
8     role that I played with my son. I tried to learn
9     as much as possible, but when it came to the work-
10    related aspect of it, I really didn't focus as much
11    on that because I knew I could rely on counsel.
12 Q  Okay. Alright. So, I think I understand, then,
13    your personal knowledge.
14     Was it your decision to terminate the
15    employment or Tara Brando Sullivan?
16 A  Yes.
17 Q  Alright. And upon what did you base that decision?
18 A  That decision was based on information that was
19    provided to Sherrie, Winnie and myself from Randy
20    Bain.
21 Q  Did you ever receive any information from Tara
22    Brando Sullivan's healthcare provider?
23 A  No.
24 Q  Did you ever inquire of Mr. Randy Bain where he
25    received his information?



### Page 10

1  A  Randy would tell us directly he was talking to Tara
2     and her mother or Tara's husband.
3  Q  And you sat through the deposition of Mr. Bain
4     today. Were there any conversations that Mr. Bain
5     had with you that he didn't tell me about?
6  A  No.
7  Q  Okay. And we'll go through some of this in more
8     detail, but if I understand your position, then,
9     the decision to terminate Tara Brando Sullivan's
10    employment was based upon information provided
11    solely by Randy Bain?
12 A  Coming directly from Tara, her mother, and her
13    husband.
14 Q  As Mr. Bain reported it to you?
15 A  Correct.
16 Q  Did you ever have any personal discussions with
17    Tara Brando Sullivan?
18 A  No.
19 Q  Did you ever have any personal discussions with
20    Terri Brando?
21 A  No.
22 Q  What about Mr. John Sullivan?
23 A  No.
24 Q  And you've already testified you had no information
25    provided by Tara Brando Sullivan's healthcare

### Page 11

1     provider?
2  A  Correct.
3  Q  Okay. What role, if any, did you have in hiring
4     Ms. Sullivan?
5  A  Other than agreeing to the hire based on Randy's
6     recommendation and feedback, that was it.
7  Q  Did you ever conduct any personal interview of her?
8  A  I don't believe I did.
9  Q  During the course of her employment with KTBS, did
10    you ever have the opportunity to review her job
11    performance?
12 A  No.
13 Q  You heard Mr. Bain testify earlier today that he
14    was complimentary of her job performance and her
15    ability to get along with KTBS employees, correct?
16 A  Yes.
17 Q  Do you have any reason to believe that that's not
18    accurate?
19 A  No.
20 Q  Did you ever personally observe Ms. Sullivan during
21    the performance of her job?
22 A  Other than watching the on-air at work.
23 Q  And work was that, if you recall?
24 A  Whatever story she was doing at the time. I'm
25    constantly monitoring and watching our news, so

### Page 12

1     when her story was on I would watch it.
2  Q  And do you recall any impressions of her stories?
3  A  No.
4  Q  Negative or positive?
5  A  Correct.
6  Q  When did you become aware of the fact that Ms.
7     Sullivan had a medical incident while working for
8     KTBS?
9  A  I believe the afternoon that it happened when Randy
10    notified us of the incident.
11 Q  And if you look at the documents in front of you,
12    the email that's marked Exhibit #9 in this case has
13    been previously identified as an email that Mr.
14    Bain sent to you, Ms. Scott, and Ms. McCallie,
15    correct?
16 A  Correct.
17 Q  And was this your first notification of the issue?
18 A  Yes.
19 Q  Did you ever have or reach out to any of the family
20    members of Ms. Sullivan at this time?
21 A  No.
22 Q  So everything, once again, you received with
23    respect to Ms. Sullivan was reported to you by Mr.
24    Bain -- is that correct?
25 A  Correct.

### Page 13

1  Q  After you became aware of the medical incident,
2     what discussions did you have with Mr. Bain, Ms.
3     McCallie, or Ms. Scott?
4  A  Well, we were concerned for her well-being. And
5     her health.
6  Q  And who made the decision to place Ms. Sullivan on
7     unpaid leave?
8  A  Given that the information that we had at the time
9     was that it was just there were a lot of unknowns,
10    I decided, along with Sherrie and, again, feedback
11    from our counselor, that -- recommendation from
12    counselor, that this would be the appropriate thing
13    to do until we gathered more information.
14 Q  Alright. So if we look, then, at the document
15    that's been marked Exhibit #3 in this case, at some
16    point this letter was sent on May 11. So between
17    May 2 and May 11, what conversations did you have
18    with Ms. McCallie, if you recall?
19 A  I do not recall the conversations that we had
20    specific to this issue.
21 Q  Okay. What about Mr. Bain?
22 A  At the same time, we just wanted to constantly get
23    updates on her health and well-being.
24 Q  Okay. And is that the same answer with respect to
25    conversations you may have had with Ms. Scott?



TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 14

1   A   Yes.
2   Q   Okay. Who authorized Ms. McCallie sending the
3       letter that's has been marked as Exhibit #3 and
4       dated May 11, 2017?
5   A   I did.
6   Q   And did you review this letter before it was sent?
7   A   Yes.
8   Q   Alright. Did you make the decision that the health
9       insurance for the month of May was going to be
10      paid?
11  A   Yeah.
12  Q   For the whole month?
13  A   Yes.
14  Q   And in this letter it says that you, "... made
15      contact to make arrangements for the remaining
16      $112.50 you owe for May, as well for future
17      months."
18          Was it understood that the condition that Ms.
19      Sullivan may have may continue for future months?
20  A   Given where we were at that stage on May 11 and the
21      information that we had at the time, which was
22      there was a lot of unknown at the time, that's what
23      we felt was the right thing to do.
24  Q   Okay. And you requested, did you not, that Ms.
25      Sullivan provide you information at least on a

Page 15

1       weekly basis, correct?
2   A   Correct.
3   Q   And is it your understanding that she did so?
4   A   Yes.
5   Q   The letter also says: "We will need a fitness-for-
6       duty from your healthcare provider before you're
7       allowed to return to work."
8           Did you ever receive that fitness-for-duty?
9   A   No.
10  Q   In fact, you never reviewed any information by her
11      healthcare provider, correct?
12  A   Correct.
13  Q   After the May 11, 2017 letter was sent, what
14      conversations, if any, did you have with either Ms.
15      McCallie, Mr. Bain, or Ms. Scott about Tara Brando
16      Sullivan?
17  A   I think after the May 11 we were waiting on more
18      information, and that information started arriving,
19      I believe, following Tara's or Tara's mother's
20      conversation with Randy in regards to her inability
21      to drive or restrictions to drive for six months or
22      longer.
23  Q   Alright. So if we look at what's been marked as
24      Exhibit #10, which is an email from -- I think it's
25      gonna be in this next group right here.

Page 16

1   A   Okay.
2   Q   Are you with me?
3   A   Yes.
4   Q   Okay. It's an email dated May 10. At least as of
5       May 10 you had information that Mr. Bain was
6       reporting to you from Ms. Sullivan and her mother,
7       correct?
8   A   Correct.
9   Q   And nothing in this particular email indicates that
10      there was any sort of driving restriction -- is
11      that correct?
12  A   Correct.
13  Q   Also, at the top of this on the subject line it
14      says: "Producer/MMJ." Did you understand that
15      Tara Sullivan also performed job duties as a
16      producer?
17  A   That was pretty common. It still is.
18  Q   To have both positions?
19  A   Correct.
20  Q   Okay. If you look at the document that's marked
21      Exhibit #11, dated May 19 -- do you see this?
22  A   Yes.
23  Q   Is this the first notice that you had from Mr. Bain
24      where he reports to you that Tara's driving would
25      be restricted?

Page 17

1   A   Correct.
2   Q   So prior to May 19, 2017, that was not an issue --
3       driving was not an issue?
4   A   Correct.
5   Q   Okay. Did you participate in the conversation that
6       Mr. Bain had with Ms. Sullivan?
7   A   No.
8   Q   So you relied entirely upon the email that he sent
9       you, correct?
10  A   Correct.
11  Q   Did you ever request information from Ms.
12      Sullivan's healthcare provider?
13  A   No.
14  Q   At the point in time that you received the May 19,
15      2017 email, what did you do?
16  A   Well, when we noticed the -- when we learned that
17      she would be restricted for up to six months, that
18      really was, in our opinion, the game changer,
19      because prior to that we did not have that
20      information. Prior to that we felt that this would
21      be short-term. Six months started to become a
22      hardship on the work that's being done in the news
23      department, so we decided to move to the next step.
24  Q   Which was what?
25  A   In this case it was termination until she gets to



TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 18

1 feeling better, and then she can reapply at the
2 station when she's back up to speed.
3 Q Did you consider any accommodations that could be
4 made for Ms. Sullivan with respect to driving?
5 A We did.
6 Q And what accommodations did you consider?
7 A We looked at different positions, specifically the
8 producer positions on down, but what we found was
9 that all the open positions at that time required
10 driving.
11 Q With respect to driving -- this essential function
12 of driving -- did you consider accommodations that
13 could be made that would allow Ms. Sullivan to meet
14 that essential function?
15 A No.
16 Q So other than looking for other positions, no other
17 accommodations were considered?
18 A Well, there were really no other accommodations
19 because any other accommodations would mean having
20 somebody else to do the driving for you, and as one
21 understands that without driving you lose that
22 freedom, that flexibility to move from point A to
23 point B. And in this business you're having to go
24 where the news is, so you're losing some of that
25 freedom.

Page 19

1 Q Well, let's just assume for purposes of argument --
2 A Sure.
3 Q -- that there was a driving restriction -- and you
4 know that's a contested issue in this case.
5 Couldn't Ms. Brando at her own expense have hired a
6 driver?
7 A She could, but I think that would impose -- in my
8 opinion, it would impose a hardship on the station.
9 Q How so?
10 A In many ways. Would that driver be available when
11 she needs them and when the station needs her to
12 drive? And as news happens -- we don't know when
13 -- she may have to go to a press conference
14 immediately. Is the driver sitting by her side at
15 all times? And what would that do from a liability
16 standpoint -- as she is an employee of the station
17 and she is on work -- how would that reflect with
18 insurance and liability issues? I think it would
19 create a host of other problems. That's why I
20 think it would be more of a hardship.
21 Q And was that hardship considered by KTBS --
22 A (INDISCERNIBLE)
23 Q -- at the time?
24 A We consider all of these things.
25 Q What other accommodations were considered, if any?

Page 20

1 A Those were the ones because it was really focused
2 on the driving.
3 Q But once again, you had never received anything
4 from a healthcare provider that said she was
5 restricted from driving, correct?
6 A We didn't feel that we needed that because we were
7 getting the information directly from the patient
8 and her mother. The patient herself was giving us
9 this information. Why wouldn't we believe her?
10 Q You didn't get that information directly?
11 A No, but Mr. Bain did, and he was the central point
12 of communication.
13 Q And you heard him testify earlier today that he's a
14 human being and he may have made a human error in
15 what he heard, correct?
16 A Correct.
17 Q So, if I were to tell you that the conversation
18 that Ms. Sullivan had with Mr. Bain was overheard
19 by Terri Brando and John Sullivan and that all
20 three of those dispute what Mr. Bain reported to
21 you, and he admits that he may have made an error,
22 would that put some doubt in your mind as to
23 whether or not she really had a driving
24 restriction?
25 A Again, I have to rely on the employee that was my

Page 21

1 main source of communication at that time, Randy
2 Bain.
3 Q Or, you could've asked for a healthcare provider
4 return-to-work form, correct?
5 A I believe it was stated in the letter, as well.
6 Q But did anybody ever ask her to provide that
7 information to KTBS?
8 A Not that I'm aware.
9 Q Based upon, then, the information that was reported
10 to you by Mr. Bain, you made the decision to
11 terminate her employment, correct?
12 A Correct.
13 Q Was there ever any consideration given to allow her
14 to resign?
15 A No.
16 Q Was there ever consideration given to any
17 participation in the interactive process under the
18 Americans with Disabilities Act?
19 A Can you be more specific?
20 Q Well, after Mr. Bain reported to you what he
21 believed he heard, did you have any conversations
22 with Ms. Tara Sullivan or anyone on her behalf to
23 discuss potential accommodations?
24 A We actually looked internally, talking to Sherrie
25 and Randy, to see what positions may be available,



TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 22

1 if there were openings and positions that would
2 require this restriction not be there. There were
3 none, so --
4 Q (CROSS-TALK) I understand that answer --
5 A -- that was --
6   MR. CARNIE:
7     Let him finish.
8 BY MS. JONES continuing: (witness answering)
9 A -- what we (INDISCERNIBLE) internally.
10 Q I understand that answer, but that wasn't my
11 question.
12 A Okay.
13 Q My question was: What conversations, if any, did
14 you have with Ms. Sullivan or anyone on her behalf,
15 to discuss whether or not this was a restriction or
16 what accommodations could be made available?
17 A As I mentioned earlier, I did not have any
18 conversations with Ms. Sullivan.
19 Q So there was no interactive process?
20 A No.
21 Q After you made the decision to terminate Ms.
22 Sullivan's employment, did you participate in that
23 termination process?
24 A No.
25 Q You relied upon Mr. Bain --

Page 23

1 A Correct.
2 Q -- to deliver that news? Did you have any input
3 into the preparation of the separation notice?
4 A Other than calling counsel.
5 Q Alright. So --
6 A It was prepared for us.
7 Q When you look at Exhibit #13?
8 A Correct.
9 Q That was prepared for you by your counsel?
10 A Yes.
11 Q And did you review it before it was signed by Ms.
12 Scott?
13 A I did not.
14 Q Okay. And I think you've already told me that
15 there was no consideration given for allowing Ms.
16 Sullivan to resign, correct?
17 A No.
18 Q That's not correct, or there was no consideration?
19 A There was no consideration.
20 Q Sometimes I just have to make sure it reads.
21 A Okay.
22 Q You were aware, were you not, that Ms. Sullivan had
23 signed a non-compete agreement?
24 A Yes.
25 Q And that the termination of her employment would

Page 24

1 prohibit her from working for two years, correct?
2 A Correct.
3 Q Was there ever any consideration given for
4 releasing her from that non-compete agreement?
5 A She can always come back to work at KTBS.
6 Q Would you go back to work for somebody who fired
7 you?
8 A Given these circumstances, she was not terminated
9 for, you know, other than not being able to drive.
10 That was the only reason she was terminated.
11 Q Well, let's go back to the separation notice. It
12 says, "Termination/fired" --
13 A Okay.
14 Q -- does it not?
15 A Yes.
16 Q And it says: "Employee can no longer meet the
17 requirements of her job."
18 A Correct.
19 Q It doesn't say anything about her not being able to
20 drive, right?
21 A But that was one of the requirements of her job.
22 Q I understand that's your position --
23 A Yeah.
24 Q -- and that you testified that without receiving
25 any information from her healthcare provider, you

Page 25

1 thought that was a restriction. But this
2 particular separation notice that's a public
3 document doesn't say anything about that, does it?
4   MR. CARNIE:
5     Objection as to form. You can answer
6 it.
7 BY MS. JONES continuing: (witness answering)
8 A Actually, it says she's not meeting the
9 requirements of her job. I mean, we're being
10 accurate.
11 Q Alright. So, if she chose not to reapply at KTBS
12 because her employment had been terminated at a
13 time in life that was upsetting to her, could she
14 have applied anywhere else?
15 A Yes.
16 Q In Caddo or Bossier Parishes?
17 A Yes.
18 Q Where could she have applied?
19 A KTAL.
20 Q And where is that located?
21 A Shreveport.
22 Q How could she do that under a non-competition
23 agreement?
24 A That station is licensed to the Texarkana area.
25 Q Do you know if she was aware of that fact?


TARA BRANDO SULLIVAN v. KTBS LLC
SIRVEN, GEORGE

Page 30

1   that he was -- he worked or was associated with
2   KTBS in the early days.
3  Q  And how do you know that?
4  A  Just by looking at some of the history, talking to
5   some of the past employees, and hearing the name.
6  Q  Has KTBS ever worked with Tim Brando?
7  A  I don't think so. He may have helped out with
8   either being an emcee or something like that, but
9   as far as an employee -- an employee of KTBS, no.
10 Q  But he performed some services for KTBS, correct?
11 A  Again, that is -- I could not accurately say yes or
12   no to that.
13 Q  Okay. Have there ever been any employees of KTBS
14   who have requested leave as an accommodation for
15   their disability?
16 A  Who have requested leave?
17 Q  Mm-hmm.
18 A  I would have to check into that. I don't know that
19   offhand.
20 Q  Have there ever been any employees of KTBS who were
21   restricted with respect to driving?
22 A  That came up two times, and unfortunately they were
23   term -- one was terminated; the other one, it took
24   them two weeks to resolve the issue and they were
25   put on leave for two weeks without pay until that

Page 31

1   issue was resolved.
2  Q  And who was that employee?
3  A  One of them was a local sales account executive
4   recently who was in a car accident and was -- did
5   not have transportation, and so she went on unpaid
6   leave until she could resolve the transportation
7   issue. And two weeks later she did, and she's back
8   at work.
9  Q  How did she resolve the transportation issue?
10 A  She purchased a car.
11 Q  So she could drive herself?
12 A  Correct.
13 Q  Does an employee have to own a car?
14 A  No.
15 Q  So if they don't own a car but they can drive --
16 A  They could lease the car. As long as they have
17   transportation, that's what I'm interested in, and
18   they have the flexibility to go where they need to
19   at whatever time they need to go.
20 Q  And you don't know whether Tara Brando Sullivan
21   didn't have that, right?
22 A  Based on what she told us, that she would not be
23   able to drive for six months, that's what I knew.
24 Q  She never told you anything.
25 A  I said based on what I was told, then, what I knew

Page 32

1   was six months.
2  Q  And that was based on information that was not
3   provided by her healthcare provider?
4  A  Provided directly by Tara and her mother to Randy
5   Bain.
6  Q  When did her mother ever tell Randy Bain that there
7   was some sort of driving restriction?
8  A  Again -- and/or her mother. I know that those two
9   stayed in constant communication.
10 Q  But you don't know what the substance of those
11   communications actually were, correct?
12 A  Other than the memos and the information that Randy
13   communicated to me and he has shared with you.
14 Q  And none of that information includes any
15   information from Tara Brando Sullivan's healthcare
16   provider, correct?
17 A  Correct.
18 Q  Okay. Have you reviewed the complaint filed in
19   this case?
20 A  Yes.
21 Q  Direct your attention to Exhibit #6, please. And
22   direct your attention to paragraph eight. Is that
23   paragraph accurate?
24 A  "Plaintiff at all times kept defendant informed of
25   her medical care, and on May 17, plaintiff received

Page 33

1   a certified letter from defendant placing her on
2   unpaid leave as an accommodation due to her
3   disability" -- is that the one you're asking about?
4  Q  Yes sir.
5  A  Correct.
6  Q  Alright. So, that paragraph is accurate, correct?
7  A  Yes.
8  Q  Alright. And it's true on paragraph nine where it
9   says: "Plaintiff contacted Mr. Randy Bain and
10   continued to inform him of her status of return to
11   work." She says here, "... stating that she
12   expected to be released to return to work in a
13   week."
14 A  I had never heard that.
15 Q  Mr. Bain never told you that?
16 A  No.
17 Q  Do you have any reason to dispute that that's what
18   Ms. Sullivan told Mr. Bain?
19 A  I'm just going on what Mr. Bain told me.
20 Q  Alright. So, no personal knowledge that you could
21   use to dispute that statement?
22 A  No.
23 Q  Paragraph 10: "Prior to being released to return
24   to work, however, plaintiff was informed that on
25   May 24, 2017 she was terminated from employment."



Page 34

1  And that was your decision to do so, correct?
2  A  Correct.
3  Q  Based upon the information that was reported to you
4     by Mr. Bain, correct?
5  A  Correct.
6  Q  And then we see the certified letter in paragraph
7     11, and we've looked at that letter. That was the
8     actual letter that was sent to her, correct?
9  A  Correct.
10 Q  And then if we look at paragraph 12, it says,
11    "Plaintiff's doctor never provided any information
12    to defendant, nor was there ever any fitness-for-
13    duty from any healthcare provider provided to
14    defendant." And that's accurate, correct?
15 A  Correct.
16 Q  And then paragraph 13: "Defendant failed to engage
17    in any interactive process or to obtain any
18    independent assessment as required by the Americans
19    with Disabilities Act as amended in 2008 to
20    determine what, if any, reasonable accommodations
21    were available."
22    You had no conversations with Ms. Sullivan to
23    discuss possible accommodations?
24 A  I did not.
25 Q  And you don't know of anyone at KTBS who did -- is

Page 35

1     that correct?
2  A  We had internal discussions but not with Ms.
3     Sullivan.
4  Q  Okay. So if there was an interactive process, to
5     the extent there was one, Ms. Sullivan wasn't a
6     participant in that interaction, correct?
7  A  No. Because there was no opportunity there.
8  Q  Okay. Alright. Have you told me everything that
9     you recall regarding your participation in the
10    decision to terminate Ms. Sullivan's employment?
11 A  To the best of my ability, yes.
12 Q  Are there any other documents that exist that we
13    haven't reviewed that you believe are in existence
14    regarding the decision to terminate Ms. Sullivan's
15    employment?
16 A  Not that I'm aware of.
17 Q  I have no further questions.
18 EXAMINATION BY MR. CARNIE:
19 Q  Okay. I do have one question.
20 A  Sure.
21 Q  If you could, turn to Exhibit #3 in the packet,
22    which is that May 11, 2017 letter that was sent
23    from Sherrie to Ms. Sullivan.
24 A  Hang on, let me get it. Yes sir.
25 Q  I want to direct your attention to the fourth

Page 36

1     paragraph about that where it says: "We will need
2     a fitness-for-duty from your healthcare provider
3     before you are allowed to return to work."
4     Could you please explain to us what your
5     understanding is as to what the station was asking
6     for?
7  A  We're asking for a physician's letter stating she
8     could return back to work. That's pretty common
9     procedure for us at the station. Again, we do not
10    pretend to be Doctor, don't want to be, but we want
11    the physician to be able to give the patient or the
12    employee the green light to return back to work.
13    And that's what we were looking for.
14 Q  And I don't want to put words in your mouth, but
15    I'm gonna rephrase it just so I make sure I'm
16    understanding.
17    So, am I correct, then, that when KTBS is
18    using this fitness-for-duty in this letter here,
19    basically that's -- what you mean is, when Tara
20    says she's ready to come back to work, you just
21    need some sort of release from her doctor saying
22    it's okay for her to do so?
23 A  We --
24    MS. JONES:
25    I'm gonna object to the form. You can

Page 37

1     answer.
2  BY MR. CARNIE continuing: (witness answering)
3  A  okay. We want the physician to give us the green
4     light that she's good to go back to work.
5  Q  Okay. That's all.
6  RE-EXAMINATION BY MS. JONES:
7  Q  I have just a few questions. If, as Ms. Sullivan
8     testifies, she told Mr. Bain that she was going to
9     return to work in a week and her doctor had
10    provided you a return to work without restrictions,
11    would Ms. Sullivan still be employed at KTBS?
12 A  Yes.
13 Q  And she was never given that opportunity, correct?
14 A  Based on the information that she shared with us,
15    that she shared with Randy that it would be six
16    months or longer, in my opinion, that's what
17    changed things.
18 Q  Nothing came to you or Mr. Bain from a healthcare
19    provider?
20 A  No, it came directly from Tara through Mr. Bain.
21 Q  And you have no personal knowledge of what Ms.
22    Sullivan actually told Mr. Bain, correct?
23 A  Correct.
24 Q  Okay. No further questions.
25    MR. CARNIE:

