

# Transcript of the Testimony of
# BAIN, RANDY

**Date:** September 30, 2020

**Case:** TARA BRANDO SULLIVAN v. KTBS, LLC

Pilant Court Reporting
Phone: (800) 841-6863
Fax: (877) 474-5268
Email: deponotice@pilant.com
Internet: www.pilant.com

TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 1

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NO.: 5:19-CV-00784

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TARA BRANDO SULLIVAN

V.

KTBS LLC


DEPOSITION OF RANDY BAIN
TAKEN FOR AND ON BEHALF OF THE PLAINTIFF
AT 333 TEXAS STREET, SUITE 450
SHREVEPORT, LA  71101
ON SEPTEMBER 30, 2020
BEGINNING AT 9:00 A.M.


REPORTED BY:

MARCY BROWN, CCR
9453 ELLERBE RD, LOT 5
SHREVEPORT, LA  71106



Page 6

1  A  Yes.
2  Q  Alright. Then we won't waste time with that today
3     -- how 'bout that? Alright?
4  A  That's good.
5  Q  Alright. I assume that because you've been
6     previously deposed -- well, let me ask you this
7     question before we go further. Other than that
8     deposition that I took of you, have you been
9     involved in any other depositions that you didn't
10    identify for me in your previous deposition?
11 A  I have been, I think, part of an additional -- I
12    can't remember if the one I had with you was before
13    or after a separate one that I had, but I --
14 Q  I almost forgot that I had deposed you before.
15 A  Yeah. But I just remember -- I really remember a
16    specific one. The other one was, I think, pretty
17    -- one that, you know, was civil. But, you know, I
18    don't have a real good recollection of that. I
19    know that there were two cases, and my perception
20    is that in both of them that I was part of, in some
21    form or fashion, being deposed. But there were two
22    different cases.
23 Q  Okay. Because you had identified an earlier case
24    in your deposition in the one that I took your
25    deposition for.

Page 7

1  A  Right.
2  Q  So you only have been deposed twice?
3  A  That's correct.
4  Q  Okay. And you just don't remember the timing?
5     Well, just for purpose of this record, we're not
6     gonna review what was covered about your history in
7     previous depositions, and I'll rely upon that -- is
8     that fair?
9  A  Yes.
10 Q  Alright. And is it also fair, then, to assume that
11    I don't have to repeat all of the instructions of a
12    deposition, that if you answer my question that you
13    heard it, you understood it, you're answering to
14    the best of your knowledge, information and belief
15    without any medical impairment?
16 A  Yes, I'm clear on that.
17 Q  Okay. So then we're just gonna cut to the chase,
18    all right?
19 A  (INDICATES YES)
20 Q  We're here today because of a lawsuit that was
21    brought by Ms. Tara Brando Sullivan with respect to
22    her employment at KTBS. Let me ask you, sir, who
23    made the decision to hire Ms. Sullivan?
24 A  I did, working with George. We both do -- we make
25    hires together.

Page 8

1  Q  Do you have actual/firing authority?
2  A  I do.
3  Q  And so did you make a recommendation to Mr. Sirven
4     and he accepted that recommendation, or did you
5     make the decision to hire her?
6  A  Well, I made the recommendation.
7  Q  And he made the final decision authority?
8  A  I pretty much made the final decision. I mean, I
9     just -- it's my job to communicate to George what
10    I'm doing to make sure that he and I are on the
11    same page. We work together as a team. And I want
12    to make sure that he knows what I'm doing, you
13    know. So, I clearly communicate with him to the
14    best of my ability.
15 Q  Alright. So, then, would it be fair for me to say
16    it was a joint decision between you and Mr. Sirven?
17 A  I would say that I wanted to hire, I communicated
18    to George, and he was -- fully backed me. But I
19    made the decision to hire her. I wanted to hire
20    her. I had been working with her and communicating
21    with her. And so I think I made the decision and
22    then I brought it to George's attention.
23 Q  Okay. Who made the decision to terminate her
24    employment?
25 A  George, basically, and I work together to

Page 9

1     communicate with -- also with our HR department.
2     And as we progressed through the communication
3     stage, George sought counsel and based on the
4     information he was provided, made the best decision
5     he could. But in the end it was -- he made the
6     final decision.
7  Q  Okay. And we're gonna talk about all of that some
8     more during the course of the deposition, but I
9     wanted to know who the decision-makers were.
10       Let me ask you, sir, what is your title at
11    KTBS?
12 A  News director.
13 Q  Alright. And as news director, do you have a
14    written job description?
15 A  I believe I do.
16 Q  And is that something that's kept in the regular
17    course of business at KTBS?
18 A  You know, the last time I saw anything that would
19    describe my position is when we were creating the
20    website and we wrote a quick profile of some of the
21    jobs in the newsroom. But I'm not aware other than
22    when the position was advertised that an effort was
23    made to define the position.
24 Q  So when I'm talking about a written job
25    description, I'm talking about something that would



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 10

1    be kept in your personnel file. It would say these
2    are your job duties and your job requirements.
3  A I'm not aware that.
4  Q Okay. Do you know if written job descriptions
5    exist at KTBS for other positions -- let's say, for
6    the position of a producer?
7  A My perception is yes, and most of that is based on
8    the hiring process. We define the position based
9    on our ability so that the person applying for the
10   position will have an understanding of what the
11   position requires and what it's specific to.
12 Q Is that written description that you're
13   referencing, does it also include what the
14   essential functions of the job are?
15 A To some degree, yes.
16 Q And when you say "to some degree," what do you
17   mean?
18 A Well, we cross-train staff, and we also -- and, you
19   know, when you're in the television business, it's
20   a very complex business. It's very hard to define
21   everything you might have to do. So I think that
22   it probably defines the general focus of the
23   position.
24 Q And so what I'm asking you -- and I want to be
25   really, really clear -- in a lot of corporations or

Page 11

1    companies, in every person's personnel file they
2    have a written description of their job along with
3    the requirements for the job and the essential
4    functions of the job. Have you ever seen one of
5    those for the producer or the MMJ position?
6  A Don't think so.
7  Q Now, tell me more about this cross-training.
8    Believe it or not, when I was in high school I used
9    to say I wanted to be a broadcast journalist -- not
10   anymore -- but if I were to apply at the station
11   for a position such as producer or MMJ, would those
12   be the only job duties that I would have, or would
13   I be cross-trained on other positions?
14 A It depends on the skill set of the employee and --
15   but basically when I say "cross-training," a lot of
16   the different -- a lot of the different things you
17   do in the newsroom are -- different positions use
18   the same equipment and computer and software. So,
19   you know, that's kind of more what I'm talking
20   about. When you learn to be a content creator,
21   you're writing and you're creating content. That's
22   what a producer does. That's what an MMJ does.
23 Q Alright. So, how would we distinguish the
24   positions of producer from the position of an MMJ?
25 A The producer role is more in the crafting and the

Page 12

1    stacking of the show and being a part of, you know,
2    the leading -- the formatting of the newscast,
3    whereas the MMJ to a great degree would be more the
4    person who would be an electronic news gatherer
5    that would go out in the field. But the producer
6    also goes out in the field in situations.
7  Q Okay. And once again, you're not aware of any
8    written job descriptions for those positions -- is
9    that right?
10 A I know that they go through a process when they're
11   hired, but I'm not sure that there is some
12   comprehensive -- no.
13 Q Okay. You referenced earlier an HR department.
14   Who makes up the HR department at KTBS?
15 A When I refer to the HR department, it's really --
16   you know, there's two people -- our comptroller,
17   which is Sherrie, and then Winnie, who recently
18   left us. She does payroll and similar.
19 Q And that's Sherrie McCallie --
20 A Correct.
21 Q -- who I'm deposing later today? Does she have any
22   training in human resources?
23 A I don't know.
24 Q And what about Ms. Scott?
25 A I don't know.

Page 13

1  Q As news director -- I think you said your title was
2    -- does that differ from station manager?
3  A Yes.
4  Q Who is the station manager?
5  A George Sirven.
6  Q Okay. And as news director, then, do you have any
7    responsibility to see that KTBS complies with
8    federal laws such as the Americans with
9    Disabilities Act?
10 A Yes, I believe I play some role in it.
11 Q And could you describe for me what you believe your
12   role is with respect to that compliance?
13 A To communicate and follow the direction based on --
14   I communicate and follow the directions that are
15   given by our legal counsel as we follow the law.
16 Q Do you have any specific training as it relates to
17   KTBS and an understanding of what its obligations
18   are under the Americans with Disabilities Act?
19 A No.
20 Q With respect to the decision to terminate an
21   employee, I think you described that as sort of a
22   team approach -- is that a fair statement?
23 A I'm the one who communicates -- they're my
24   employees. They communicate to me. I take that
25   communication and I bring it to George and/or



Page 14

1   Sherrie and/or at the time, Winnie -- usually all
2   three. So I am the person -- they're my employee;
3   they know me; I hire them; I take care of them.
4 Q Do you have the authority as news director to
5   countermand a decision not to terminate an
6   employee?
7 A No.
8 Q Do you have the authority to countermand a decision
9   to terminate an employee?
10 A No.
11 Q Okay. As I understand it, Ms. Sullivan came to
12   work at KTBS in -- I think it was January 19, 2018
13   -- is that correct?
14 A Sounds correct.
15 Q Okay.
16 A I'm not sure of the exact date.
17 Q And I said 2018 -- it was 2017.
18 A Okay.
19 Q Years fly by. Prior to Ms. Sullivan being hired,
20   did you know Ms. Sullivan?
21 A I did.
22 Q And how did you know her?
23 A She had contacted me and was interested in working
24   at Channel 3.
25 Q And did you interview her prior to January 2017?

Page 15

1 A Interview sounds formal. We discussed positions
2   that were open.
3 Q And what positions did you discuss?
4 A In the beginning, anchor position.
5 Q And what anchor position was open in twenty- -- or,
6   at the time? When did you have these discussions?
7   -- let's clarify that.
8 A It was before 2017. I don't remember the exact
9   year. It was probably 2015, 2016, right around
10   there. There really weren't any positions open.
11   She was just calling me, talking to me, telling me
12   her interest in the business, and she and I were
13   discussing what opportunities she might -- that we
14   might be able to make available to her. And at the
15   time I think she was gainfully employed, so it
16   wasn't like there was any rush. And then, you
17   know, I think at the time when we discussed it
18   there was nothing that was open that she was
19   specifically interested in. It wasn't until later
20   that she became interested in something that was
21   available.
22 Q And did she reach out to you again, or did you
23   reach out to her?
24 A I don't remember.
25 Q What do you remember about the hiring of Ms. Tara

Page 16

1   Brando Sullivan?
2 A I just remember that during the process when we
3   were discussing the anchor position, that she was
4   also in the process of having a child, and I
5   remember that was a small part of the discussion.
6   We discussed the anchor position, and then we also
7   discussed the MMJ position. I was more interested
8   in bringing her on board as an MMJ, she was more
9   interested in being an anchor, and we worked to
10   compromise on that.
11 Q Was there something wrong with her being pregnant
12   as an anchor of KTBS?
13 A No, absolutely not.
14 Q So that didn't play a role at all?
15 A Not at all.
16 Q Was there not an opening for an anchor position?
17 A Correct.
18 Q Okay. When Ms. Brando was hired, what position was
19   she hired for?
20 A Multimedia journalist.
21 Q And describe, if you will -- I know you said you
22   don't know if there's a written job description,
23   but describe if you will what you believe the job
24   duties of a multimedia journalist are?
25 A To -- basically to turn stories each day, and that

Page 17

1   would be setting up -- first of all, finding out,
2   working with managers in the newsroom to determine
3   what story would be covered, then making the calls
4   and setting up the story, and then going out in the
5   field and covering, you know, that story, which
6   means shooting B-roll, getting interviews, and then
7   coming back and of course writing, editing, and
8   then in a lot of situations presenting that content
9   in what we refer to as a standup live or a debrief.
10 Q What would you describe as the essential functions
11   of that job, as you understand them?
12 A As I understand them?
13 Q Yes sir.
14 A You need to be able to shoot, edit, write. You
15   need to be able to function -- you know, work in
16   front of a camera.
17 Q Any others?
18 A Well, they're the most absolute basic ones, which
19   is, of course, they would need to be able to drive.
20 Q And why would they need to be able to drive?
21 A Well, to go out and gather those interviews and
22   similar and B-roll.
23 Q And when you say "drive," would they need to be
24   able to get to the place that the story is?
25 A Correct.



Page 18

1  Q  And why would they personally need to be able to
2     drive in order to do that as opposed to perhaps
3     getting a ride somewhere?
4  A  The norm is for the person to drive and carry our
5     equipment in our news unit, but I don't know. I've
6     never even thought about that.
7  Q  Okay. And so, have you described for me, then,
8     what you believe the job description of an MMJ is?
9  A  In basic terms, yes.
10 Q  Okay. And when I looked through the various
11    documents -- and I'll show you in a minute -- there
12    are times when Ms. Sullivan is referenced as a
13    producer/MMJ. Did Ms. Sullivan also have job
14    duties that were that of a producer?
15 A  Yes, she was --
16 Q  (CROSS-TALK) Can you -- can you describe those for
17    me?
18 A  The producer would come in, work through the day.
19    They're a part of the same editorial meeting.
20    They, except instead of having one specific story
21    or two to three specific stories, they of course
22    are listening to what everybody is doing so that
23    they know what's available to go in their newscast,
24    and then they make decisions about what stories are
25    gonna go in their newscast, not only local stories

Page 19

1     but also stories that are regional and national and
2     sometimes world. And during that process they
3     build the newscast that you see on the air -- build
4     and write.
5  Q  So they use the software, they obtained the B-
6     footage, and they put the story together -- is that
7     right?
8  A  Correct.
9  Q  Do they ever rely upon the MMJ to provide them the
10    B-footage?
11 A  Right. MMJs -- and we still have some legacy
12    photographers, but we refer to them now as MMJs --
13    so, yes -- yes, they do.
14 Q  Okay. What are the essential functions of the job
15    of a producer as you understated them?
16 A  Well, the producer once again needs to be able to
17    write. They need to be able to of course make good
18    heavy -- good news judgment. They need to be able
19    to make decisions about what's gonna go in the
20    show. They need to be able to create graphics.
21    They need to have some leadership skills so that
22    they can convey what the need to the different
23    people who are participating in creating that
24    newscast. And at different times like elections,
25    specials, or when we have severe weather or

Page 20

1     similar, they'll go out in the field and field
2     produce. And when they field produce, they work
3     alongside with the MMJs to cover whatever's going
4     on like in a -- it would be the 4th of July
5     festival that we do. It would be for elections.
6     Sometimes it's for severe weather. We had several
7     weeks' worth of concerts that we had field
8     producers at. It just -- in many different
9     occasions they go out in the field because we have
10    what we call a live broadcast or special, and they
11    participate in making sure that happens -- like
12    Mardi Gras parades. There's a whole lot of
13    different things. We're an extremely aggressive
14    television station when it comes to our community
15    involvement, and so many, many of those things,
16    they're required to go out and help.
17 Q  And as with the MMJ position, you're not aware of
18    any written job description for the producer slot
19    -- is that correct?
20 A  For the purpose of employment, yes.
21 Q  Okay.
22 A  There is a job description that is put out there
23    when we advertise the position, but as far as a
24    comprehensive one, I'm not aware of that.
25 Q  Now, when Ms. Brando was hired in January 19, 2017,

Page 21

1     were you her supervisor?
2  A  Yes, I was.
3  Q  And describe, if you will, her job performance.
4  A  Very good.
5  Q  And I think -- did she ever receive any written job
6     performance reviews?
7  A  I don't know -- don't remember.
8  Q  What is the policy of KTBS as it relates to written
9     job performance reviews?
10 A  We do a yearly review. I also do a lot of verbal
11    reviews and coach them a good bit.
12 Q  Well, since Ms. Brando or Ms. Sullivan wasn't there
13    for an entire year, is it possible that she didn't
14    receive an annual review?
15 A  It is possible. I do not remember.
16 Q  Do you remember any verbal reviews or coachings
17    with respect to Ms. Sullivan?
18 A  Not specifically. I do not remember specifically.
19    It would be a norm, but I do not remember,
20    specifically, you know, with her.
21 Q  Did you have any complaints regarding her job
22    performance?
23 A  No.
24 Q  Was she well-liked among the staff of KTBS?
25 A  Yes.



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 22

1  Q  When did you first become aware of the fact that
2     Ms. Sullivan had a medical incident on the job?
3  A  Probably minutes after she fell out. As soon as
4     Trey was able to make her comfortable, he
5     immediately called me. But I believe that Trey had
6     before then gotten her situated and called 911.
7     And then once he knew an ambulance was coming, he
8     then called me.
9  Q  Lets go through some of the documents if we can to
10    see if we can identify them.
11    MS. JONES:
12        And I'm not going to renumber
13        documents, Brian.
14    MR. CARNIE:
15        Okay.
16    MS. JONES:
17        I'm gonna keep your sequential
18        numbering just so we -- I don't even know
19        which one our judge is. Judge Walter? Oh
20        my God, we're gonna keep our sequential
21        numbering. Okay. I hope he doesn't read
22        the transcripts. (LAUGHS). So, I have
23        the next number being #9 -- is that
24        accurate?
25    MR. CARNIE:

Page 23

1        Yeah, that's correct.
2  BY MS. JONES continuing:
3  Q  Okay. So, I'll ask the court reporter to mark this
4     document as Exhibit #9. Here -- didn't do a very
5     good job of that -- provide you -- you can look at
6     it before, if you want, and we'll try to keep these
7     in order.
8     MR. CARNIE:
9        Could you pass that to me? Thank you.
10 BY MS. JONES continuing:
11 Q  I'm looking at a document that has been produced
12    during this -- discovery during this case -- and it
13    appears to be an email from you to Ms. Sherrie
14    McCallie, Winnie Scott, and George Sirven dated May
15    2, 2017 at 4:10 PM. Do you recall drafting this
16    email, Mr. Bain?
17 A  I do.
18 Q  Alright. It indicates here that at 1:50 PM you
19    received a call from Trey Lankford -- is that
20    correct?
21 A  Yes.
22 Q  Does that correspond with your memory?
23 A  Yes.
24 Q  Was this your first knowledge of the incident that
25    occurred with Ms. Sullivan when you received that

Page 24

1     phone call?
2  A  Yes.
3  Q  Why were you sending this to Ms. McCallie, Ms.
4     Scott, and Mr. Sirven?
5  A  I've learned to be very formal in my communication
6     for the purpose of making sure that, you know, that
7     whatever I -- whatever's fresh in my mind, I go
8     ahead and get it in writing and send to them. So,
9     I stay very busy. So, I wanna make sure -- I've
10    learned never put anything off. When something
11    happens, as soon as you know that it's a stable
12    situation, go ahead and create the communication.
13    Of course verbal is first, and then verbal is
14    followed by written communication so that -- really
15    based on clarity. As a manager, I try to make sure
16    that there's clarity when I communicate with
17    people.
18 Q  Okay. And Ms. McCallie is controller of KTBS?
19 A  My understanding is she's called the comptroller.
20 Q  Comptroller? It's listed various ways in --
21 A  Yeah.
22 Q  -- the documents.
23 A  Yeah.
24 Q  Okay. And Ms. Scott is the personnel manager?
25 A  Yes.

Page 25

1  Q  That's how I saw it listed in the documents. Are
2     you aware of any other title that she holds?
3  A  No. No, that sounds correct.
4  Q  And do you know of any human resource training that
5     she's ever received?
6  A  You know, when you asked me that question my answer
7     would be yes because I know in my mind that she has
8     had training. I don't know what type of training,
9     nor did I participate in it, so I'm basing -- it's
10    really an assumption on my part. So I feel --
11 Q  And we'll ask her if we need to --
12 A  Right.
13 Q  -- depose her.
14 A  Okay.
15 Q  And I'm deposing Ms. McCallie. We'll find that
16    out.
17 A  Okay.
18 Q  And you sent this also to the station manager,
19    George Sirven, correct?
20 A  Yes.
21 Q  Alright. So is it fair to say that if I look at
22    this document that's been marked Exhibit #9 in this
23    case, that that summarizes your first knowledge of
24    the medical incident with Ms. Tara Brando Sullivan?
25 A  Yes.



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 26

1  Q  Now, after you drafted this email, it appears
2     during this time period you were attempting to
3     notify Ms. Sullivan's husband and perhaps her
4     parents -- is that correct?
5  A  That was my first priority.
6  Q  And you did so, correct?
7  A  That's what I remember. I remember just making a
8     lot of calls and getting a-hold of many people.
9     And the two people that I think I remember being in
10    touch with was the husband and the mother. But at
11    the same time, Trey may have made a phone call, but
12    -- but I'm not sure.
13 Q  Did either you or someone on behalf of KTBS remain
14    in contact with either Ms. Sullivan or her husband
15    or her parents regarding her condition?
16 A  Well, when it initially happened, I told Trey to
17    stay with her, so he followed her to the hospital.
18    I can't remember if he rode in the ambulance or
19    followed in his car. I think he rode -- I mean, I
20    think he followed in his car because he had a bunch
21    of gear. And so then from that point on, I, of
22    course, checked on her and then, you know, I told
23    them that, you know, I wanted to know that she was
24    okay. And so they also communicated to me as she
25    progressed.

Page 27

1  Q  Okay. During the course of this litigation there
2     have been some text messages --
3  A  Mm-hmm.
4  Q  -- produced.
5     MS. JONES:
6         And what I'll do, I'm going to attach
7     in globo, Brian, #1 through #8, just so we
8     can reference those, and we'll use these
9     same exhibits for all the depositions --
10    MR. CARNIE:
11        Okay.
12    MS. JONES:
13        -- okay? Do you have copies of those,
14    or do you need --
15    MR. CARNIE:
16        I have got copies of those.
17    MS. JONES:
18        You do?
19    MR. CARNIE:
20        Yeah.
21    MS. JONES:
22        Alright.
23    MR. CARNIE:
24        And that's gonna be Exhibit #10 in
25    globo?

Page 28

1  MS. JONES:
2      Or, let's just reference them #1
3  through #8 --
4  MR. CARNIE:
5      (CROSS-TALK) Or, no -- okay -- I get
6  it. I see what you're doing.
7  MS. JONES:
8      We're gonna attach them, but I'm gonna
9  reference them #1 through #8.
10 MR. CARNIE:
11     Got it. I get it.
12 BY MS. JONES continuing:
13 Q  Okay. We'll give you a copy. You're entitled to
14    look at the document. (LAUGHS)
15 A  Okay.
16 Q  Alright. So, looking at, if you will, the document
17    that is Bates-stamped, I believe, Exhibit #2 in
18    these documents --
19 A  Mm-hmm.
20 Q  -- it appears that the incident occurred on May 2,
21    2017, correct? If we look at Exhibit #1 -- I mean
22    Exhibit #9, your first email?
23 A  Right.
24 Q  Just to put it in context, okay?
25 A  Yes.

Page 29

1  Q  And then if I look at this, it appears that
2     somebody is in communication with you, and it looks
3     like it's Tara Brando Sullivan, at 7:31 the next
4     day -- is that correct?
5  A  Yes.
6  Q  Alright. And you respond to her, do you not, "I'm
7     glad you're feeling like yourself again. Let me
8     know if I can do anything for you," correct?
9  A  Yes.
10 Q  So, Ms. Sullivan at least made an effort to let you
11    know what was going on with her medically, correct?
12 A  Yes.
13 Q  And that's also true, is it not, of her husband and
14    her mother, correct?
15 A  Yes.
16 Q  If you look at these documents, Exhibit #7, it's
17    been marked -- these have been text messages that
18    were produced both by your lawyer and by Ms. Terri
19    Brando about communications that she had with you,
20    and it appears beginning on May 8 through Friday,
21    May 12, she had communications with you regarding
22    Ms. Tara Brando Sullivan's condition, correct?
23 A  Yes.
24 Q  And are these all of the text messages that you
25    recall occurring between you and either Ms. Tara



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 30

1 Brando Sullivan or her mother?
2 A Yes.
3 Q Did you ever have any text messages with her
4   husband?
5 A Yes.
6 Q Alright. Do you know where those text messages
7   are?
8 A It was an extremely brief one. It's right here on
9   my phone, I mean. Let me see. So, it's kind of a
10   bizarre one because I don't know what was wrong,
11   but it says -- I'm gonna read this exactly to you.
12 Q And then I'm gonna ask for it to be produced.
13 A That's fine.
14 Q Okay.
15 A From Randy Bain: "Can you talk?" And then it
16   starts off, it says "Tara" --
17 Q Can I interrupt you for a minute?
18 A You can.
19 Q What's the date of this text message?
20 A 5/3/17 5:55 PM.
21 Q Okay.
22 A And there's one at 9:29 PM, so that was just right
23   afterwards, and it's very, very minimalistic. But
24   do you want me to go ahead and finish?
25 Q Yes, sorry. I just wanted to put it in timeframe.

Page 31

1 A "Tara's mom left a voicemail for you, I believe,
2   giving a update on Tara. I apologize. I am just
3   now seeing this, but was fairly busy this afternoon
4   catching up from yesterday. I'm sure you have
5   probably already heard it, but" and then it says
6   "T" and it just stops.
7     So basically this was just something that he
8   -- I think he basically was saying, "Go listen to
9   your voicemail if you haven't already." And that
10   was -- that was it. That was all I got out of him.
11   I think he was pretty much hyper-focused on Tara.
12 Q Okay. And we'll ask for that text message to be
13   produced, please.
14   MR. CARNIE:
15     Okay.
16 BY MS. JONES continuing:
17 Q Did you get a voicemail message?
18 A I don't remember, but I assume that I did --
19 Q Okay.
20 A -- based on the communications that came back and
21   forth. But I don't really -- I'm not here looking
22   at it and say "yes" because I don't remember.
23 Q Okay. So when we're looking at the text messages
24   that have been identified and the one that you've
25   now added from her husband, are those all the

Page 32

1   text --
2 A Yes.
3 Q -- let me finish.
4 A Oh, I'm sorry.
5 Q That's alright. I didn't give you the instructions
6   this morning because I thought you knew 'em. Are
7   those all of the text messages that occurred
8   between you, Ms. Brando/Tara's mother, Tara, and
9   her husband?
10 A Yes.
11 Q Are there any other text messages that exist with
12   respect to communications about Tara Brando
13   Sullivan and her medical condition?
14 A Not to my knowledge.
15 Q Okay. Now I'm gonna show you a document that we'll
16   mark as Exhibit #10. I'm gonna fold it up in
17   airplane fashion and send it to you.
18   MR. CARNIE:
19     I guess we'll need one for the court
20   reporter. So, do you have another copy?
21   MS. JONES:
22     Thank you.
23 BY MS. JONES continuing:
24 Q Do you recognize this document, Mr. Bain?
25 A Yes.

Page 33

1 Q And what do you recognize it to be?
2 A My communication related to the text messages, the
3   information I thought was relevant.
4 Q Okay. And it appears that this information is
5   communicated to Mr. Sirven, Ms. Scott, and Ms.
6   McCallie on May 10 at 2:09 PM, correct?
7 A Yes.
8 Q When I look at the subject line, on the subject
9   line it says "producer/MMJ Tara update." Was that
10   Ms. Sullivan's title?
11 A Her core title was MMJ, but she did both, so it's
12   very likely that that's what I would commonly refer
13   to her as.
14 Q Okay. In the -- you purport to list the text
15   messages, and I know they're not all of them. You
16   summarized for your co-workers and Mr. Sirven, your
17   supervisor, the communications that you had with
18   Tara and her family members -- is that accurate?
19 A Yes.
20 Q Okay. And your sentence says, "Tara has been out a
21   full week now, so I need advice how to handle the
22   HR aspects of this. Let me know." Are you seeking
23   guidance on what to do with respect to Ms. Sullivan
24   and how to treat her employment?
25 A Yes.



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 34

1  Q  Who would have made the decisions regarding the HR
2     aspects? Are you referring to human resource
3     aspects?
4  A  Yes.
5  Q  And who are you seeking this HR guidance from?
6  A  All three of them.
7  Q  Did they provide that guidance to you?
8  A  Yes.
9  Q  And tell me, then, what Ms. McCallie told you with
10    respect to HR guidance?
11 A  It had something to do with leave and the time that
12    she had been employed there, and that's really all
13    I remember.
14 Q  And that was Ms. McCallie that provided you that
15    information?
16 A  Yes.
17 Q  Did Ms. Scott provide you any HR information?
18 A  Not that I remember.
19 Q  What about Mr. Sirven?
20 A  Not that I remember.
21 Q  Okay. Let's look, then, back at the globo
22    documents, and let's look at what's been marked
23    Exhibit #3 in this case. Did you have any input in
24    the drafting of this letter dated May 11, 2017 to
25    Ms. Tara Brando Sullivan from Ms. Sherrie McCallie,

Page 35

1     who's listed here as a controller?
2  A  I don't remember.
3  Q  Were you aware that this letter was sent to Ms.
4     Sullivan?
5  A  Yes.
6  Q  And what did you understand with respect to this
7     letter, as to what Ms. Sullivan's obligations were
8     to KTBS?
9  A  I don't really remember. You know, like I said, I
10    take -- you know, I take -- I want to be the one to
11    be the deliverer of the message to my employees
12    because they know me. But I don't know that I had
13    much perception or thinking about what this meant
14    other than the fact that I needed to communicate it
15    and make sure that she understood.
16 Q  Okay. In the first sentence of this letter, it
17    says to Tara: "This is to confirm that you are on
18    unpaid medical leave pending further information
19    about your ability to return to work with or
20    without restrictions."
21       Was that your understanding of what was
22    occurring with respect to Ms. Sullivan?
23 A  Yes.
24 Q  Alright. And it continues, and it says in the
25    third full paragraph: "Please continue to keep us

Page 36

1     updated about any changes in your status as it
2     relates to when you might be able to return to
3     work." Do you see that?
4  A  Yes.
5  Q  "We would appreciate at least weekly status
6     updates."
7  A  Yes.
8  Q  Am I reading that correctly?
9  A  Yes.
10 Q  Did Ms. Sullivan and/or someone on her behalf
11    provide that information to KTBS?
12 A  All I know is the communication that I had with
13    Tara, that I relay -- and her mother and the very
14    brief moment with her husband -- that I relayed
15    that. So, beyond that, I am not aware.
16 Q  Alright. And let me go back just a moment because
17    there's something I forgot.
18       We talked about the text message
19    communications between Tara, her mother, and her
20    husband, and you, correct?
21 A  Mm-hmm.
22 Q  Yes?
23 A  Yes.
24 Q  We've identified all of those?
25 A  Yes.

Page 37

1  Q  Were there any email communications?
2  A  No. Not that I can remember at this moment.
3  Q  Alright. Were there phone communications?
4  A  Yes.
5  Q  Alright. We're gonna talk about these in more
6     detail later, but identify for me, if you will,
7     what telephone conversations you had with Ms.
8     Sullivan and/or someone on her behalf?
9  A  You know the main ones I remember were with Tara
10    herself. The only thing I remember -- I don't
11    remember a lot about them except that I was
12    concerned for Tara and she seemed weak, and she
13    told me that she was having vertigo and all these
14    different problems, and I remember thinking, you
15    know -- you know, "Wow, this is, you know, really
16    bad." It was really concerning for me, but that's
17    really the -- the bulk of what I remember.
18 Q  Do you recall how many telephone conversations you
19    had with Ms. Sullivan?
20 A  No.
21 Q  Okay. Is it fair, though, for me to say that with
22    respect to the request that KTBS was making of Ms.
23    Sullivan to provide at least weekly status updates,
24    that she complied with that request?
25 A  Yes.



Page 38

1  Q  Okay. If you continue to the fourth paragraph of
2     this letter, it says: "We will need a fitness-for-
3     duty from your healthcare provider before you are
4     allowed to return to work."
5         Did you ever receive a fitness-for-duty from
6     Ms. Sullivan's healthcare provider?
7  A  Not to my knowledge.
8  Q  What was your understanding of the need for a
9     fitness-for-duty from a healthcare provider as
10    requested by KTBS?
11 A  It was not on my radar.
12 Q  You had no understanding of that?
13 A  Not really. It wasn't something that I -- you
14    know, as we were progressing along, it just, I
15    mean, that seems like a norm to me. I don't think
16    that was really something that I was focused on. I
17    mean, I was getting personal updates that I was
18    relaying when it moved into that HR realm. I
19    wasn't really -- it wasn't something that I was
20    real knowledgeable about or gave consideration to.
21 Q  So let me ask you this: Is it fair, then, of me to
22    conclude that as the news director, you obtained
23    information from Tara and/or someone on her behalf,
24    and you turned it over to Ms. McCallie, Ms. Scott
25    and Mr. Sirven for whatever decision and however

Page 39

1     they wished to handle it?
2  A  Specific to?
3  Q  Ms. Sullivan.
4  A  Ms. Sullivan? I wouldn't say that I handed it off
5     completely. I was a part of the decision-making
6     but not specific when it comes to the law and leave
7     and procedures specific to --
8  Q  (CROSS-TALK) Those were decisions that were made by
9     others?
10 A  Correct.
11 Q  Okay. So you really didn't understand or you
12    didn't pay -- well, let me rephrase the question.
13        It was not on your radar, then, to pay
14    attention to paragraph four of this letter that
15    said that there was a necessity for a fitness-for-
16    duty by a healthcare provider?
17 A  No.
18 Q  Okay. That's a double negative; it's gonna read
19    wrong.
20        Was it on your radar to -- with respect to
21    the necessity for a fitness-for-duty from the
22    healthcare provider?
23 A  No.
24 Q  Okay. That reads better. When I look at the fifth
25    paragraph of this, it appears that KTBS has taken

Page 40

1     care of the monthly premium for May with respect to
2     healthcare insurance -- is that correct?
3  A  That's my understanding, yes.
4  Q  And Ms. McCallie says, "You may contact me to make
5     arrangements about the remaining $112.50 you owe
6     for May as well as for future months." Do you see
7     that?
8  A  Yes.
9  Q  So it appears here that Ms. McCallie anticipates
10    that this unpaid leave may be leave that occurs at
11    least for the possibility of future months,
12    correct?
13 A  That's what I see here, yes.
14 Q  Okay. I'll show you a document that we'll mark
15    Exhibit #11. I'm just gonna hand these, all three.
16    And you want to -- hand you two, and y'all can pass
17    them down? Okay.
18        Now I know we've looked at these text
19    messages, and when I looked at 'em back and forth
20    they appeared to go all the way through May 12. So
21    I have the text messages are from beginning May 3
22    through May 12. It appears that you did have a
23    conversation with Tara Sullivan, and I think you've
24    identified that you know you had at least one
25    conversation with her. So I would direct your

Page 41

1     attention to the document that I've now marked
2     Exhibit #11 and ask if this document refreshes your
3     memory as to when that conversation may have
4     occurred?
5  A  Yes.
6  Q  Alright. Once again, this appears to be a
7     situation where you're writing an email to Mr.
8     Sirven, Ms. McCallie, and Ms. Scott to document the
9     information that you obtained, correct?
10 A  Yes.
11 Q  And let me ask you, sir, with respect to this
12    telephone conversation that you had with Tara, did
13    you record this conversation?
14 A  No.
15 Q  Did anyone witness you having this conversation
16    with Ms. Sullivan?
17 A  No.
18 Q  Was there anyone that was in a position that could
19    hear either your side or Ms. Sullivan's side of
20    this conversation? If you recall?
21 A  No.
22 Q  Okay.
23 A  Well -- well, I don't know who was with Tara, you
24    know, 'cause she was in a hospital --
25 Q  No, I'm talking about on your side?



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 42

1   A   No, no.
2   Q   Alright. And she wasn't still in the hospital on
3       May 19, was she?
4   A   Okay, okay. I -- she may have been home at that
5       time.
6   Q   Alright. So here you appear to be reporting
7       information that you've received from Ms. Sullivan,
8       correct?
9   A   Yes.
10  Q   Okay. She states -- you state here in the last
11      sentence of the first paragraph: "She has begun
12      taking medicine that should get her close to near
13      normal, but her driving will be restricted for the
14      next six months." Do you see that?
15  A   Yes, yes.
16  Q   Now, tell me, if you recall Ms. Sullivan stating
17      specifically that her driving would be restricted
18      for the next six months?
19  A   Yes.
20  Q   Did you ever receive any written documentation from
21      her medical provider that that was going to be a
22      restriction on her return to work?
23  A   No.
24  Q   If you were told that Ms. Sullivan said to you or
25      will testify that she said her driving may be

Page 43

1       restricted, that her mother would testify that she
2       overheard that conversation and that her husband
3       would testify that he overheard that conversation,
4       could it be that your memory is just incorrect with
5       respect with what -- as to what was said with
6       respect to driving?
7   A   I'm human.
8   Q   Okay. But once again, there was no medical
9       information provided by any healthcare provider,
10      correct?
11  A   No, not to my knowledge.
12  Q   Okay. So you report this information on May 19,
13      2017 at 3:23 PM, correct?
14  A   Correct.
15  Q   Alright. After you reported this information, did
16      you have any conversations with anyone at KTBS
17      regarding Ms. Sullivan and her employment?
18  A   Do you mean directly after or just after in the
19      scope of time?
20  Q   Well, let's -- let's do that. That's a fair
21      clarification. Before May 19, 2017, in between the
22      time period that you first became aware on May 2,
23      2017 and May 19, had you had any conversations with
24      anyone at KTBS about Tara Brando Sullivan's
25      continued employment?

Page 44

1   A   No, I don't think so.
2   Q   Alright. Now, after May 19, 2017, did you have any
3       conversations with anyone at KTBS regarding Tara
4       Brando Sullivan's continued employment?
5   A   Yes.
6   Q   And could you tell me about those conversations?
7   A   I don't really remember any specifics.
8   Q   Alright. Well, what do you remember?
9   A   I just remember that there was -- it had to do with
10      employment law specific to, you know, some of the
11      things that are outlined. I didn't get into the
12      nitty-gritty of it.
13  Q   Okay. Let me stop you for a moment.
14  A   Right.
15  Q   Were these conversations with your counsel?
16  A   No.
17  Q   Okay. Because I don't want you to tell me about
18      any conversations you had with your attorney.
19  A   Right.
20  Q   He'd go ballistic over there, okay?
21  A   Right.
22  Q   Alright. So, you had conversations with whom? Do
23      you recall who you had the conversations with?
24  A   As we were communicating, they would tell me --
25  Q   Who -- who is "they?"

Page 45

1   A   Usually Sherrie --
2   Q   Okay.
3   A   -- would say things like -- the only thing I
4       remember is, based on her employment -- short-term
5       employment -- that some of the things that would've
6       been available if she'd been there longer, weren't
7       available.
8   Q   Such as?
9   A   That's really all I remember.
10  Q   What do you remember that would not have been
11      available?
12  A   It would have something to do with leave -- paid
13      leave.
14  Q   Like family medical leave?
15  A   Yes.
16  Q   Okay, alright. Yeah, and we'll stipulate that she
17      didn't qualify for FMLA. You'd really be in
18      trouble if she had've, but she didn't. Okay. But,
19      so, you understood that she didn't qualify for
20      FMLA?
21  A   That's the only thing I can remember talking about,
22      at all.
23  Q   Alright. But she was placed on unpaid leave,
24      correct?
25  A   That was communicated to me because I communicated



(800) 841-6863    PILANT COURT REPORTING    12 (Pages 42 to 45)
www.pilant.com

Page 46

1     that to her, and in the letter -- I was privy to
2     the letter, so I would've seen that. It's not
3     something that I would've delved into, but I
4     would've seen that information.
5 Q Did anyone ever tell you or Tara or someone on her
6     behalf, when Ms. Sullivan anticipated returning to
7     work?
8 A No.
9 Q So, at this point in time the unpaid leave that she
10    was placed on, you don't know what the term of that
11    would have been, correct?
12 A No.
13 Q And it does appear, at least in the letter that we
14    read that Ms. McCallie sent her, that it was
15    contemplated that it would be months?
16 A Based on that letter, yes.
17 Q Alright. But we're having these conversations now
18    after May 19, correct? Less than a month has
19    passed?
20 A Yes.
21 Q Alright. And so, what other conversations -- tell
22    me more about the conversations you had with Ms.
23    McCallie or anyone else regarding Ms. Sullivan's
24    continued employment.
25 A The only thing I remember is, really, when it got

Page 47

1     to the point where they -- where the decision had
2     been made to release her, I, of course, was made
3     aware so that I could inform her of that and did
4     so.
5 Q Alright. Who informed you that the decision had
6     been made to terminate her employment?
7 A I don't remember. It was probably George, but I do
8     not remember.
9 Q Did you have any discussions with Mr. Sirven about
10    any accommodations that could be made for Ms.
11    Sullivan in order to allow her to continue her
12    employment?
13 A No.
14 Q Did you have any discussions with Mr. Sirven
15    regarding the possibility of allowing Ms. Sullivan
16    to be in a producer role as opposed to a full MMJ
17    role?
18 A No.
19 Q Did you have any discussions with Mr. Sirven
20    regarding the possibility of allowing Ms. Sullivan
21    to resign rather than being terminated?
22 A No.
23 Q Other than being told that the decision had been
24    made to let Ms. Sullivan go, did you have any
25    discussions with Mr. Sirven about the termination

Page 48

1     of Tara Brando Sullivan's employment?
2 A Not that I remember.
3 Q Were you surprised by that decision?
4 A At the time, no.
5 Q And why not?
6 A Because of the severity of her condition.
7 Q Okay. Are you surprised by that decision now?
8 A No.
9 Q And why not?
10 A It just -- at the time it was my overall state of
11    mind that she needed to be hyper-focused on
12    regaining her health.
13 Q And you made that decision without receiving any
14    information from her healthcare provider?
15 A I didn't make the decision, no.
16 Q Er, but that was your -- you weren't surprised for
17    the reasons that you've just articulated, even
18    though you hadn't received any information from her
19    healthcare provider?
20 A I had no reason -- I had no knowledge of what
21    communication had occurred as far as the healthcare
22    provider. So, all I can say is, is that when I
23    received the information, based on my knowledge of
24    the severity of what she was going through, it
25    seemed to me it was going to be a long, long

Page 49

1     recovery process. So, no, I wasn't surprised.
2 Q Okay. Looking at the document that's been marked
3     #11, I believe -- is that right? -- it indicates in
4     the final -- or the -- they're not really
5     paragraphs in your email, but it looks to me like
6     the final paragraph -- that Tara told you that she
7     misses work, loves what she does, and hopes she can
8     return at some point, correct?
9 A Mm-hmm.
10 Q Is that right?
11 A Yes.
12 Q So that was your last communication with her about
13    her willingness to return to work, correct?
14 A Yes.
15 Q Alright. After the decision was made -- well, let
16    me rephrase.
17       Have you told me everything about
18    communications that you had with Mr. Sirven, Ms.
19    McCallie, Ms. Scott, or anyone else, regarding the
20    decision to terminate Ms. Tara Brando Sullivan's
21    employment rather than waiting for healthcare
22    provider information or providing an accommodation?
23 A I've told you what I can remember.
24 Q Okay. After you were told that the decision was
25    made to terminate her employment, what did you do?



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

### Page 50

1  A  I went about contacting her to inform her.
2  Q  Alright. And did you call her?
3  A  I did.
4  Q  And when you called her, what happened? Tell me
5     about that conversation.
6  A  I remember it being very brief. I told her in very
7     short form what I needed to tell her. I remember
8     -- I don't remember her -- I don't remember much of
9     a conversation at all. I can't remember much about
10    it, but it seemed -- I remember delivering the
11    information and then after that it was -- I
12    remember her acknowledging, but that's about all I
13    can remember.
14 Q  I'm gonna show you a document that we'll mark as
15    Exhibit #12. Maybe this will help a little bit.
16    These appear to be emails written by you dated May
17    24, 2017. And I'd ask you to review them and see
18    if these help refresh your memory at all?
19 A  Mm-hmm.
20 Q  Do they?
21 A  Yes.
22 Q  Okay. So it appears, then, that on May 24, 2017
23    around 12:46 PM you had a conversation with Tara
24    Sullivan because you say "moments ago," right?
25 A  Mm-hmm.

### Page 51

1  Q  So, we could assume that's about the time, right?
2  A  Mm-hmm.
3  Q  And somebody did train you well for writing emails,
4     by the way -- and that's a compliment.
5  A  (LAUGHS)
6  Q  "I let her know that based on the driving
7     restrictions put in place by her doctor, it was
8     decided she would be released from employment based
9     on job criteria (ability to drive)."
10    Is that what you told Ms. Sullivan?
11 A  Yes.
12 Q  What information had you received from her doctor?
13 A  I had received none except what was communicated to
14    me by Tara and by her mother.
15 Q  Okay. So, other than the communications that you
16    had with Terri Brando and Tara Brando Sullivan,
17    there was no information that you had with respect
18    to driving restrictions put in place by her doctor?
19 A  Correct.
20 Q  Okay. And yet that was the basis of the
21    termination of her employment, right?
22 A  Yes.
23 Q  She asked if she would receive a letter, and you
24    said yes, and then apparently she asked to be taken
25    off the phone. Was she upset?

### Page 52

1  A  Yes.
2  Q  Was she crying?
3  A  Not to my knowledge. She was just kind of -- I can
4     barely remember, but I do not remember her crying.
5     It was kind of just a pause and then she basically
6     just said "okay" and then she got off the phone.
7  Q  You have a subsequent email at 6:01 PM.
8  A  Mm-hmm.
9  Q  It says, "I spoke with Tara again about an hour
10    ago. I basically repeated what was stated in the
11    letter."
12    So that would be, what, about 5 PM? You had
13    another conversation with her, correct?
14 A  Yes.
15 Q  What do you recall about that conversation, if
16    anything?
17 A  You know, very, very brief, to the point. And, you
18    know, it wasn't a whole lot to talk about, and she
19    did not have a -- she didn't ask me anything or
20    anything of that nature, so I can't really
21    remember. I just remember it being very brief.
22 Q  Were either one of these telephone conversations
23    recorded?
24 A  No.
25 Q  And did she subsequently come to KTBS and deliver

### Page 53

1     her phone?
2  A  Yes.
3  Q  Did she drive to do so?
4  A  I have no idea.
5  Q  Do you know how she got there?
6  A  No.
7  Q  Apparently somehow she was able to get to KTBS to
8     drop off her phone, correct?
9  A  Yes.
10 Q  So, clearly she could, at least at some point, get
11    to locations somehow through some accommodation,
12    correct?
13 A  Yes.
14 Q  Direct your attention, then, to a document that
15    I'll mark as Exhibit #13. This appears to be a
16    separation notice issued by KTBS stating that:
17    "Reason for separation: Terminated/fired." Do you
18    see that?
19 A  Yes.
20 Q  And the explanation for the separation was:
21    "Employee can no longer meet the requirements of
22    her job." Do you see that?
23 A  Yes.
24 Q  Did you have any input into the preparation of this
25    separation notice?



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 58

1  Q  And that's true and limited by paragraph five to
2     the parishes of Caddo and Bossier Parishes,
3     Louisiana, correct? If we look at paragraph five?
4  A  Yes.
5  Q  Okay. And it's true that at the time of the
6     termination of her employment, Ms. Tara Brando
7     Sullivan lived in Caddo Parish, correct?
8  A  Yes.
9  Q  Where is the next closest television station
10    outside of Caddo or Bossier Parish?
11 A  The ones that come to mind to me would be Tyler,
12    Alexandria, Monroe -- you know, those are the ones
13    -- Jackson, you know --
14 Q  All of which would be between 60 and 90 miles away
15    from Shreveport, Louisiana -- is that accurate?
16 A  Yes.
17 Q  Were you aware that because of the termination of
18    Ms. Brando's employment at KTBS that she would be
19    prohibited from working in -- or, pursuant to this
20    alleged noncompetition agreement?
21 A  Yes.
22 Q  Turn with me, if you will, to the document that's
23    been marked Exhibit #6. And I'd ask you, if you
24    would, to turn to page 2, paragraph eight of this
25    document.

Page 59

1  A  Okay.
2  Q  Where it says, "Plaintiff" -- meaning Tara Brando
3     Sullivan -- "at all times kept defendant, KTBS,
4     informed of her medical care, and on May 11, 2017,
5     she received a certified letter from defendant,
6     KTBS, placing her on unpaid leave as an
7     accommodation due to her disability." That's
8     accurate, correct?
9  A  Yes.
10 Q  Alright. And then it says in paragraph nine: "On
11    May 19, plaintiff contacted Mr. Randy Bain and
12    continued to inform him of her status to work,
13    stating that she expected to be released to return
14    to work in a week." Do you see that?
15 A  Yes.
16 Q  Do you recall Ms. Sullivan making that statement?
17 A  No.
18 Q  Alright. And once again, you're human, you may not
19    remember everything about that telephone
20    conversation, right?
21 A  Yes.
22 Q  But you've told me everything that you do remember
23    about that May 19 telephone conversation, correct?
24 A  Yes.
25 Q  And then paragraph 10: "Prior to being released to

Page 60

1     return to work, plaintiff was informed over the
2     phone on May 24 that she was terminated from
3     employment."
4        And that's the conversations that you've
5     identified for me earlier that we've shown the
6     exhibit that you memorialized by email, correct?
7  A  Yes.
8  Q  Alright. And then we've also identified the letter
9     dated May 24 that was received by plaintiff May 25
10    stating why she was terminated from her employment,
11    correct?
12 A  Yes.
13 Q  Paragraph 12: "Prior to the termination of
14    plaintiff's employment, plaintiff's doctor never
15    provided any information to defendant nor was there
16    ever a fitness-for-duty from any healthcare
17    provider provided to defendant as required by the
18    May 11, 2017 certified letter to plaintiff." Is
19    that true?
20 A  I have no knowledge of what was received by the
21    station.
22 Q  You never saw any fitness-for-duty by any
23    healthcare provider provided to KTBS -- is that
24    correct?
25 A  Yes.

Page 61

1  Q  Okay. And in paragraph 13, where it says:
2     "Defendant KTBS failed to engage in any interactive
3     process or to obtain any independent assessment as
4     required by the Americans with Disabilities Act as
5     amended in 2008 to determine what, if any,
6     reasonable accommodations were available."
7        And I think you testified that you had no
8     understanding of the interactive process required
9     under the Americans with Disabilities Act -- is
10    that correct?
11 A  Correct.
12 Q  And nor were there ever any consideration of any
13    accommodations that could be made available to Ms.
14    Tara Brando Sullivan that you're aware of?
15 A  I do remember there was a -- it was one question
16    that was asked -- you know, I do remember Sherrie
17    saying, "Are there any other positions?" And I
18    remember looking into it and saying, "No, not that
19    don't have the exact same restrictions for
20    employment that we've discussed."
21 Q  Where did you look? If there are no written job
22    descriptions, where did you look?
23 A  I looked to see if we had a job open.
24 Q  Alright. So, there were just no other job
25    openings?



Page 62

1  A  Right.
2  Q  Okay. So, you never looked to see if there was a
3     place that she could be moved or if there were
4     accommodations that could be made in her current
5     job that would allow her to perform her job duties?
6  A  No.
7  Q  Okay.
8     MS. JONES:
9        Why don't you give me five minutes and
10       then we'll see if we can wrap this up and
11       I'll stay on schedule --
12    MR. CARNIE:
13       Okay.
14    MS. JONES:
15       -- and have you out of here by noon,
16       George?
17    MR. SIRVEN:
18       No problem.
19    MR. CARNIE:
20       Okay.
21    (OFF THE RECORD AND BACK ON THE RECORD)
22 BY MS. JONES continuing:
23 Q  Mr. Bain, just as sort of a catchall -- have you
24    told me everything that you recall about your
25    knowledge of Ms. Brando Sullivan's medical

Page 63

1     condition, the information that you were provided
2     with, and your involvement in the decision to
3     terminate her employment?
4  A  Yes.
5  Q  Okay. Have you identified for me every
6     communication that you had with anyone about Ms.
7     Tara Brando Sullivan's medical condition?
8  A  What I can remember.
9  Q  Okay. Alright. Well, I'm gonna allow your lawyer
10    to ask you questions, and then I'll follow up if
11    necessary.
12 EXAMINATION BY MR. CARNIE:
13 Q  Okay. Mr. Bain, earlier in your deposition, you
14    testified that you didn't have any recollection of
15    discussions about accommodations -- I think was the
16    word -- that was used before you communicated to
17    Ms. Sullivan that she was being terminated. But I
18    believe I recall you testifying that you do recall
19    a discussion I think you said with Ms. Sherrie
20    McCallie about whether the producer position
21    required driving as an essential duty of that job
22    -- is that correct?
23 A  Yes.
24 Q  Okay. At the time that Sherrie asked you that,
25    were there, aside and apart from the producer

Page 64

1     position, were there any other positions that you
2     were aware of which were open or vacant at that
3     time, for which Tara Sullivan was qualified to
4     perform those duties, which did not require driving
5     as an essential duty of those positions?
6  A  No.
7  Q  Before you communicated to Ms. Sullivan that her
8     employment was being ended, based on the
9     communications that you did have from Tara and her
10    family, which you've already testified that, was it
11    your understanding that Tara was gonna be
12    restricted from driving but that she may be
13    released in some sooner time period than six
14    months, or was it your understanding that she was
15    gonna be restricted from driving for a minimum of
16    six months?
17 A  A minimum of six months.
18 Q  And what is that -- your understanding based --
19    what conversation is that that your -- that
20    understanding is based on?
21 A  The conversation on the phone when she told me
22    she'd been put on a medication and that for the
23    next six months she would not be driving.
24 Q  Okay. I don't have anything else.
25 RE-EXAMINATION BY MS. JONES:

Page 65

1  Q  I have a couple of questions. With respect to the
2     alleged essential function of the job as driving,
3     once again, there's no written job description that
4     you're aware of that says that, correct?
5  A  There is a written description that's posted for
6     the purpose of employment that describes the
7     position.
8  Q  Does it say in there that the essential function of
9     the job is driving?
10 A  Yes, I believe it does.
11 Q  In the posted position?
12 A  Yes.
13 Q  Alright. Is there any written job description
14    that's included outside of that posted position?
15 A  Not that I remember.
16 Q  And that's true of the MMJ position and the
17    producer position?
18 A  Not that I'm aware of. Not that I can remember at
19    this time.
20 Q  With respect to accommodations for driving, we've
21    talked about possible accommodations of how someone
22    could get to a place without actually driving. Do
23    you know how Ms. Brando Sullivan made it to Canton,
24    Texas when she had her medical incident?
25 A  Yes.



TARA BRANDO SULLIVAN v. KTBS, LLC
BAIN, RANDY

Page 66

1  Q  And how was that?
2  A  She went with Trey Lankford.
3  Q  Someone drove her, correct?
4  A  That's correct.
5  Q  Alright. And are you aware of any others instances
6     where MMJs have been driven by KTBS employees?
7  A  Yes. Short -- very short-term. Never long-term.
8  Q  As an accommodation?
9  A  When we put -- MMJs work separately. They're on
10    their own. It's rare that we put two together, but
11    this was a huge story and it was a long distance to
12    cover. It was necessary specific to that story
13    because of the distance and the magnitude.
14 Q  I understand. But that accommodation is something
15    that's available, correct?
16 A  I wouldn't call it an accommodation.
17 Q  Well, what would you call it?
18 A  It's a decision that's made strategically to put
19    resources on a story so that it can be covered in a
20    timely manner based on what has to be done.
21 Q  But it is a possibility for getting the story done,
22    correct?
23 A  Yes.
24 Q  In the public health emergency pandemic of COVID,
25    are your MMJs still required to drive to events?

Page 67

1  A  Yes.
2  Q  Is there ever an MMJ that's worked for KTBS that
3     has been unable to do so?
4  A  No.
5  Q  Is there ever an MMJ that has been driven by
6     another KTBS employee?
7  A  To a story?
8  Q  Yes.
9  A  On a given day? Yes.
10 Q  And who is that?
11 A  Well, like I say, it's random. It depends on what
12    the story is and how many resources.
13 Q  But it is a possibility, correct?
14 A  Yes.
15 Q  And it has occurred at KTBS, correct?
16 A  Yes.
17 Q  With respect to the public health emergency of
18    COVID-19 and a producer, what changes have been
19    made with respect to the producer role, if any,
20    because of COVID?
21 A  For a short period we were shifting some of them to
22    work at home. We had half at the station and half
23    at home so that we could create distance by
24    minimizing the number of people actually in the
25    building.

Page 68

1  Q  And when they were working at home was there a
2     driving requirement?
3  A  There would have been if the necessity arose, like
4     if we had had an event and assigned them to that
5     event.
6  Q  During post-COVID has that occurred?
7  A  Yes.
8  Q  And where and when?
9  A  Re-ask the question, if you would?
10 Q  Post-COVID -- public health emergency --
11 A  Right.
12 Q  -- has it occurred where a producer who was working
13    at home has had a driving requirement?
14 A  Okay. Post-COVID they didn't work at home, so, no.
15 Q  Well, then I -- maybe I misunderstood your answer.
16    I understood that you had half working at home and
17    half working in the office?
18 A  Oh, I'm sorry -- I'm thinking pre; you're saying
19    post. Yes.
20       MR. CARNIE:
21          I think you guys are getting hung up on
22       what post-COVID is.
23 BY MS. JONES continuing: (witness answering)
24 A  Yeah, I apologize.
25 Q  That's okay.

Page 69

1  A  I was thinking pre.
2  Q  Okay.
3  A  Okay. So, ask the question again, please?
4  Q  Post-COVID has any producer who's been working at
5     home, tele-working, been required to drive as an
6     essential function of the job?
7  A  Yes.
8  Q  And who has that been?
9  A  The 4th of July event. I can't remember exactly
10    who, but we had field producers for that event.
11 Q  And as a field producer, where were they required
12    to be?
13 A  We had people in multiple locations from Texarkana
14    to north of town at a golf course, and then we had
15    some people at a church over in North Bossier, we
16    had some folks on the Riverfront, and we had some
17    folks at the fairgrounds. And I'm -- my perception
18    is that they had field producers in some of those
19    positions.
20 Q  Okay. And so those field producers just had to get
21    to that location, correct?
22 A  Yes.
23 Q  They could've gotten there by someone else driving
24    them, correct?
25 A  Yes.

