

# Transcript of the Testimony of
# **MCCALLIE, SHERRIE**

**Date:** September 30, 2020

**Case:** TARA BRANDO SULLIVAN v. KTBS LLC

Pilant Court Reporting
Phone: (800) 841-6863
Fax: (877) 474-5268
Email: deponotice@pilant.com
Internet: www.pilant.com

TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

*************************************************************

NO.: 5:19-CV-00784

*************************************************************

TARA BRANDO SULLIVAN

V.

KTBS LLC

DEPOSITION OF SHERRIE MCCALLIE
TAKEN FOR AND ON BEHALF OF THE PLAINTIFF
AT 333 TEXAS STREET, SUITE 450
SHREVEPORT, LA  71101
ON SEPTEMBER 30, 2020
BEGINNING AT 1:00 P.M.

REPORTED BY:

MARCY BROWN, CCR
9453 ELLERBE RD, LOT 5
SHREVEPORT, LA  71106



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

### Page 6

1  Q  Okay?
2  A  Yes.
3  Q  Also, if you would let me finish asking my question
4     before you answer it, that would make the court
5     reporter's job a lot easier.
6  A  Okay.
7  Q  If you don't hear my question or understand my
8     question, I'm not here to trick you in any way.
9     I'm here to find out what it is you know.
10 A  Okay.
11 Q  So just ask me to clarify or repeat my question and
12    I'll be happy to do so.
13 A  Okay.
14 Q  I don't think your testimony is gonna be very long
15    or this deposition is gonna be that long, but if at
16    any time you need a break, I'm not here to make you
17    uncomfortable. My only request would be that you
18    answer the pending question before we take the
19    break.
20 A  Okay.
21 Q  Alright. So, is it fair for me, then, to assume --
22    well, let me ask -- let me step back.
23       Are you taking any medication today that
24    would impair your ability to testify?
25 A  No ma'am.

### Page 7

1  Q  Okay. Is it fair for me then to assume that if
2     you've answered my question, you heard it, you
3     understood it, and you're answering to the best of
4     your knowledge, information, and belief under oath,
5     just as you would in a court of law, without any
6     medical impairment?
7  A  Yes.
8  Q  Alright. If you could, please, give me a brief
9     history of your educational background.
10 A  I've had some college. Graduated high school, of
11    course, and some college.
12 Q  And what high school did you attend?
13 A  Franklin County High School in Winchester,
14    Tennessee.
15 Q  Alright. But you have not obtained a college
16    degree?
17 A  No ma'am.
18 Q  Other than that education, have you had any other
19    training?
20 A  Well, at the station we've done anti-harassment
21    training and inclusion training and safety
22    briefings. That's about it.
23 Q  And who has conducted those trainings for you?
24 A  We had different people come in to do them, and I
25    don't remember their names, but different outside

### Page 8

1     companies.
2  Q  Is it something that you receive credit for, or --
3  A  No.
4  Q  -- any academic credit or business credit for?
5  A  No ma'am.
6  Q  Have you ever received any particular training as
7     it relates to the Americans with Disabilities Act
8     as it was amended in 2008?
9  A  No ma'am.
10 Q  Have you received any specific training as it
11    relates to being a human resource director or any
12    human resource management?
13 A  No ma'am.
14 Q  What is your current title with KTBS?
15 A  Controller.
16 Q  And when you say -- controller or comptroller?
17 A  Con.
18 Q  Controller?
19 A  Controller.
20 Q  And what is that? What are the job duties of a
21    controller?
22 A  I basically handle all of the financial and
23    reporting. We do all the billing, accounts
24    payable. We do payroll. We do, you know, hiring
25    -- we don't hire people but we take care of logging

### Page 9

1     them into the system, things like that.
2  Q  The paperwork --
3  A  Yes.
4  Q  -- type stuff?
5  A  Yes.
6  Q  Okay. Now, after you completed -- or, after you
7     attended college, can you give me a brief summary
8     of your work history prior to going to work at
9     KTBS?
10 A  I was in banking -- started out in banking in
11    Franklin County when I -- and then I got married
12    and we moved to Colorado. My husband's military.
13    Continued in banking. And then when I moved here
14    -- my husband got here through Barksdale -- I
15    started out with Pioneer Bank and then went to work
16    with the FDIC, and then when they closed their
17    office here I got a job with KTBS.
18 Q  Okay. Had you ever been terminated from any of
19    those jobs?
20 A  No ma'am.
21 Q  And it sounds like then prior to KTBS most of your
22    experience had been in banking?
23 A  Yes.
24 Q  And any -- was any of that experience dealing with
25    human resource management?



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 10

1  A  No ma'am.
2  Q  Okay. So when were you hired by KTBS?
3  A  In August of 1993.
4  Q  So you've been there a good while?
5  A  Mm-hmm.
6  Q  And I take it, if -- because I lived during those
7     times -- the time that you worked at the FDIC was
8     mid-'80s, early '90s?
9  A  No, actually I started there in '92.
10 Q  Okay.
11 A  We moved here in '92, and I worked for Pioneer for
12    just a few months, and then I got the FDIC job, and
13    then in '93 sometime is when they closed the
14    Shreveport office.
15 Q  Right. Okay, alright. As controller for -- well,
16    time out; let me rephrase the question.
17       Were you hired in the position of controller?
18 A  No ma'am.
19 Q  What was your original position?
20 A  I was the accounting assistant to the controller.
21 Q  And who was the controller at the time?
22 A  Dale Beasley (PHONETIC).
23 Q  And how long did you hold the position of
24    accounting assistant?
25 A  About a year and a half. And then I went

Page 11

1     downstairs to be the national sales assistant. And
2     when --
3  Q  Was that a promotion or --
4  A  I don't know if was a promotion. Probably more
5     just like a lateral move.
6  Q  Did it affect your pay?
7  A  Yes, my pay went up a little bit.
8  Q  I consider that a promotion, Ms. McCallie.
9  A  Okay. (LAUGHS)
10 Q  Alright. And how long did you hold the position of
11    national sales account?
12 A  Till 1998, which is when Dale left the company and
13    Edwin asked if I wanted to come back upstairs and
14    move into Dale's position.
15 Q  Okay. So in 1998 is when you became the controller
16    of KTBS?
17 A  Yes.
18 Q  As controller of KTBS, is there a written job
19    description?
20 A  Not that I'm aware of, no ma'am.
21 Q  Are you aware of any written job descriptions for
22    any of the positions at KTBS?
23 A  No ma'am.
24 Q  What do you consider your job duties to be as
25    controller?

Page 12

1  A  I handle the financials, reporting the financial
2     statements. We do all the billing. We do all the
3     accounts payable. We do payroll. We, you know,
4     handle employee paperwork -- things like that.
5  Q  Okay. What you previously described to me?
6  A  Yes, yes.
7  Q  Do you handle any complaints that are made on a
8     human resource level?
9  A  They come to us, and then we bring them to George,
10    and then we consult with our attorney if we need
11    to.
12 Q  Okay. Does KTBS have a human resource manager?
13 A  No ma'am.
14 Q  So when someone comes to you with a complaint, what
15    do you do other than turn it over to George?
16 A  That's -- that's about it. We turn it over to
17    George.
18 Q  Alright. You don't conduct any investigations?
19 A  No ma'am.
20 Q  Okay. Does KTBS have a handbook?
21 A  Yes.
22 Q  And does that handbook state a policy with respect
23    to equal employment opportunity and compliance with
24    federal laws?
25 A  Yes.

Page 13

1  Q  What is your understanding of that policy?
2  A  Of the equal -- I mean, I don't know how -- just
3     that we're not gonna discriminate against anyone
4     based on their race or color or religion in hiring
5     or --
6  Q  What about disability?
7  A  The ADA?
8  Q  Yes ma'am?
9  A  My understanding is if an employee becomes
10    disabled, either physically or mentally, it's the
11    employer's -- is required to provide a reasonable
12    accommodation, but the employee still has to meet
13    the essential functions of the job.
14 Q  And when we're talking about essential functions of
15    the job, those would be included in a written job
16    description?
17 A  We don't have written job descriptions.
18 Q  Where would an employee find out what the essential
19    functions of the job were?
20 A  They would have to talk to their supervisor.
21 Q  So, are you aware of any place where the essential
22    functions of a job are listed?
23 A  No.
24 Q  Okay. As controller, are you responsible for
25    seeing to it that KTBS is in compliance with those



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 14

1 federal laws that you just identified?
2 A Uh, no. I mean, I've never -- never done that, no.
3 Q What role do you play in that compliance process, I
4 guess, is what I'm trying to understand?
5 A I don't have a role in that.
6 Q Okay. Do you have the authority as controller to
7 terminate an employee's --
8 A No ma'am.
9 Q -- employment? Do you have the authority to
10 countermand a decision to terminate an employee?
11 A No ma'am.
12 MR. CARNIE:
13 Are you able to pick that up?
14 MS. JONES:
15 I'm sorry?
16 MR. CARNIE:
17 Her voice was very low, I was asking
18 the court reporter if she heard that.
19 MS. JONES:
20 I heard it. (LAUGHS)
21 BY MS. JONES continuing:
22 Q Okay. Do you know Tara Brando Sullivan?
23 A I don't think I ever met her.
24 Q Okay. Were you involved in the hiring of Ms.
25 Sullivan?

Page 15

1 A No ma'am.
2 Q Do you know what position she held at KTBS?
3 A Multimedia journalist.
4 Q Did she also perform some of the job duties of
5 producer?
6 A I don't know.
7 Q You said you don't think you ever met her?
8 A I don't think I have, no.
9 Q Did you ever have the opportunity to review or
10 observe her job performance?
11 A No ma'am.
12 Q Okay. And I think you've already told me that
13 you're not aware of any written job description for
14 the position of producer or MMJ -- is that correct?
15 A That is correct.
16 Q Alright. When did you first become aware of any
17 situation with Tara Brando Sullivan as it related
18 to her employment?
19 A Well, Randy emailed that Trey had called him and
20 said that she had passed out at a -- while they
21 were shooting coverage of the tornado.
22 Q Okay.
23 A That was the first time I --
24 Q And just so we're clear on the record, I would
25 direct your attention to a document that's been

Page 16

1 marked Exhibit #9 in this case.
2 MR. CARNIE:
3 Moving towards the back. Keep going.
4 BY MS. JONES continuing:
5 Q Are you there?
6 A Yes ma'am.
7 Q Is this the email that you are referencing that
8 first put you on notice --
9 A Yes.
10 Q -- that Ms. Sullivan had had a medical incident?
11 A Yes ma'am.
12 Q Other than what's included in this email, were you
13 given any other information with respect to Ms.
14 Sullivan?
15 A Not that I recall.
16 Q Okay. Once you got this email, what did you do?
17 A I think -- I don't -- I mean, I basically kind of
18 just let the department head and George. And if
19 they need me to do anything then they come to me
20 and, you know, say whatever they need from me. I
21 mean, I don't usually get involved in that kind of
22 stuff.
23 Q That's fair.
24 A Okay.
25 Q And when you say "department head," you were

Page 17

1 referencing Mr. Bain?
2 A Yes.
3 Q Alright. So basically Mr. Bain reports this to you
4 and you accept the information but then let Mr.
5 Bain and Mr. Sirven tell you what to do next -- is
6 that right?
7 A Right.
8 Q And that's what I'm trying to figure out --
9 A Mm-hmm.
10 Q -- okay? After you received this email, did you
11 receive any additional information about Ms.
12 Sullivan?
13 A Well, I think Randy emailed a few days later.
14 Q And turn with me, if you will, to what's been
15 marked Exhibit #10.
16 A Okay.
17 Q Do you see this?
18 A Yes.
19 Q And at the subject line it references Tara as a
20 producer/MMJ. Do you know if that was her job
21 title?
22 A That was not her job title in our system. We had
23 her as a multimedia journalist.
24 Q Do you know if she ever performed producer
25 functions?



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 18

1  A  I have no idea.
2  Q  Okay. When you received this email, was this the
3     next email you received?
4  A  Yes ma'am.
5  Q  And it's dated May 10 -- is that right?
6  A  Right.
7  Q  Alright. And so, what did you do when you received
8     this email, if anything?
9  A  Well, I remember George and I having a conversation
10    with Brian, you know, about how to handle this.
11 Q  Hold on just a second.
12 A  Okay.
13 Q  When you refer to Brian, are you referring to Mr.
14    Carnie?
15 A  Yes.
16 Q  Alright. You can tell me you had a conversation
17    with him. I don't want you to tell me the details
18    about it.
19 A  Okay.
20 Q  Alright. So, basically what you did was, you and
21    Mr. Sirven contacted your counselor?
22 A  Right.
23 Q  And after you contacted your counsel -- and I'm not
24    gonna ask you about the conversations you had with
25    him -- but what actions did you take?

Page 19

1  A  George -- I mean, I don't -- we -- was that then
2     after we did the -- can't remember the date that we
3     did the letter to her.
4  Q  Okay. Well, I'll refresh your memory. But you
5     sent Ms. Sullivan a letter?
6  A  Right, right.
7  Q  Okay. Turn with me, if you will, to Exhibit #3,
8     please?
9  A  Yes.
10 Q  Is this the letter that you're referencing?
11 A  Yes ma'am.
12 Q  So after you received the email from Randy on May
13    10, you and Mr. Sirven consulted your counsel --
14 A  Right.
15 Q  -- and following discussions with your counsel, the
16    letter that we're looking at, Exhibit #3, May 11,
17    2007, you sent to Ms. Sullivan -- is that accurate?
18 A  Yes ma'am.
19 Q  Did you draft the letter?
20 A  No ma'am.
21 Q  Who drafted the letter?
22 A  Mr. Carnie.
23 Q  What discussions -- well, let's look at this
24    letter, if we could.
25    MS. JONES:

Page 20

1     (TO MR. CARNIE:) We didn't know you
2     were in it from the very beginning.
3  BY MS. JONES continuing:
4  Q  It says at the beginning that, "Ms. Sullivan was
5     placed on unpaid medical leave" -- is that correct?
6  A  Yes ma'am.
7  Q  "... pending further information about her ability
8     to return to work with or without restrictions."
9     Do you see that?
10 A  Where is that? I'm sorry?
11 Q  It's the first sentence.
12 A  Oh, I see, yes. Uh-huh.
13 Q  Okay. Turn -- go with me, if you will, to the
14    third paragraph.
15 A  Okay.
16 Q  "Please continue to keep us updated about any
17    changes in your status as it relates to when you
18    might be able to return to work." Do you see that?
19 A  Yes.
20 Q  Did Ms. Sullivan do that?
21 A  It's my understanding Randy and her mom were
22    texting, yes, as far as I know.
23 Q  And that Mr. Bain had conversations with Ms.
24    Sullivan, as well?
25 A  Yes, yes.

Page 21

1  Q  The fourth paragraph says, "We will need a fitness-
2     for-duty from your healthcare provider before
3     you're allowed to return to work." Do you see
4     that?
5  A  Yes ma'am.
6  Q  What was your understanding of that requirement?
7  A  Well, that before she would be able to return to
8     work, we had to make sure that she was physically
9     able. We would need that statement from the
10    doctor.
11 Q  Did you ever review any information from Ms.
12    Sullivan's healthcare provider?
13 A  No ma'am.
14 Q  If you go to the second to last paragraph where
15    you're talking about the health insurance and the
16    reimbursement: "You may contact me to make
17    arrangements about the remaining $112.50 you owe
18    for May, as well as for future months." Do you see
19    that?
20 A  Mm-hmm, mm-hmm.
21 Q  Were there discussions between you and Mr. Sirven
22    -- not asking about your counsel -- that this
23    unpaid leave may continue for future months?
24 A  Well, we just didn't know what was going on with
25    her or how long it would be. We had no clue yet.



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

### Page 22

1. Q So that was a possibility?
2. A It was a possibility. It could be a month. It
3. could be whatever.
4. Q Okay. After Mr. Carnie drafted this letter for
5. you, did you sign the same and send it to Ms.
6. Sullivan?
7. A Yes ma'am.
8. Q Okay. And did you receive any additional
9. information from Ms. Sullivan after you sent the
10. letter?
11. A Not that I recall.
12. Q Okay. What was your next involvement with respect
13. to the employment or the termination of the
14. employment of Ms. Sullivan?
15. A We drafted that letter -- I mean, once Randy had
16. sent us the email stating that she had told him
17. that she would not be able to drive for at least
18. six months, then we consulted our attorney again
19. and we decided to do the letter.
20. Q Okay. So, let's go through that if we can. But
21. before we go there, let me ask you: I notice that
22. not only are you copied on the correspondence from
23. Mr. Bain, Mr. Sirven's copied, but Ms. Winnie Scott
24. is copied?
25. A Mm-hmm.

### Page 23

1. Q And what was her title?
2. A She was my accounting assistant.
3. Q Does she have any expertise as it relates to human
4. resource management?
5. A No ma'am, she was in banking.
6. Q (CROSS-TALK) Do you -- I'm sorry?
7. A She was in banking before she started at the
8. station.
9. Q Do you know why she was copied on these emails?
10. A Well, because she handled, like, payroll and new
11. employees. She would, you know, input all the
12. information and insurance and things like that.
13. Q Alright. Just so she would be kept in the loop on
14. keeping the finance -- the paperwork together?
15. A Right, right.
16. Q Does she no longer work at KTBS?
17. A No ma'am, she retired.
18. Q Did she participate in any of the meetings where
19. the continuation of Ms. Sullivan's employment was
20. discussed?
21. A No ma'am.
22. Q Alright. Go with me, if you will, then, to the
23. document that's marked Exhibit #11, please? As I
24. understand your testimony, Ms. McCallie, you
25. testified that your next involvement came as a

### Page 24

1. result of an email that you received from Mr. Bain
2. regarding Ms. Sullivan and her purported driving
3. restrictions -- is that correct?
4. A Yes.
5. Q Is this a copy of that email?
6. A Yes ma'am.
7. Q In this email, Mr. Bain says, "I was able to talk
8. to Tara today." Do you see that?
9. A Mm-hmm.
10. Q Yes?
11. A Yes.
12. Q Okay. Did you participate in that telephone
13. conversation with Tara and Mr. Bain?
14. A No ma'am.
15. Q So the only thing you know about that conversation
16. is what Mr. Bain reported to you in this email --
17. is that correct?
18. A That's correct.
19. Q And are you aware today that Ms. Sullivan states
20. that she did not tell Mr. Bain that she would be
21. restricted for driving for six months?
22. A No ma'am.
23. Q Are you aware today that Ms. Sullivan testified or
24. will testify that she told Mr. Bain that she was
25. going to be released to return to work within a

### Page 25

1. week?
2. A No ma'am.
3. Q And you never saw any paperwork from any healthcare
4. provider of Ms. Sullivan's, correct?
5. A That's correct.
6. Q After you received this May 19, 2017 email, what,
7. if anything, did you do?
8. A I'm sure we met. I don't know if George met with
9. Brian or -- I don't recall meeting with him after
10. that. And then they went over, I guess, what was
11. the next step.
12. Q Alright. So -- and I'm not asking about
13. conversations -- but after you received the May 19,
14. 2017 email, then you or Mr. Sirven or someone on
15. behalf of KTBS consulted counsel?
16. A Yes. I mean, I assume George did. That's all I
17. know. I mean, I didn't, so I assume George did.
18. Q Did you participate in any conversations with
19. counsel regarding this May 19, 2017 email?
20. A I don't recall talking --
21. Q I'm not asking about what was said. I'm just
22. asking if you participated.
23. A (CROSS-TALK) Okay. I don't recall.
24. Q Okay. What was the next thing that you do recall
25. after receiving this email with respect to action



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 26

1 that was taken for Ms. Sullivan?
2 A That it had been decided to terminate and we needed
3 to draft a letter, or --
4 Q (CROSS-TALK) And who told you that?
5 A George.
6 Q Okay. And did he tell you that he had made that
7 decision?
8 A Yes ma'am.
9 Q And did you draft that letter?
10 A No ma'am.
11 Q Alright. Look with me, if you will, at the
12 document marked Exhibit #4. Is that your signature
13 on this document?
14 A Yes ma'am.
15 Q Alright. Is it your testimony that you did not
16 draft this letter?
17 A No ma'am.
18 Q Who drafted this letter?
19 A Our attorney.
20 Q When we look at this letter, it says, "On Friday,
21 May 19, 2017, you let us know that your doctor had
22 restricted you for driving for at least the next
23 six months."
24 You never had any conversation with Ms.
25 Sullivan that provided that information, correct?

Page 27

1 A That's correct.
2 Q Alright. It says, "Driving is an essential
3 function of your MMJ position and all KTBS Newsroom
4 positions." As I understand your testimony, you're
5 not aware of any written job description with
6 respect to KTBS positions, correct?
7 A No ma'am.
8 Q Are you aware of any written document that would
9 reflect the essential functions of the job?
10 A No ma'am.
11 Q It says: "Also, it does not appear that there are
12 other reasonable accommodations that could be made
13 that would enable you to drive sooner than six
14 months." Do you see that?
15 A Yes.
16 Q What conversations did either you or anyone on
17 behalf of KTBS have with Ms. Sullivan to discuss
18 reasonable accommodations?
19 A I don't have any knowledge of anybody -- I don't
20 know.
21 Q You didn't have any?
22 A I did not have any, no.
23 Q What investigations did you do to determine whether
24 reasonable accommodations were available?
25 A Well, they asked if we had any positions open, and

Page 28

1 the only position we had open was a producer
2 position. And just like with all news positions,
3 when we advertise for that position, driving -- we
4 have to have a clear driving record. We keep
5 records on all of their insurance and driver's
6 license. All that has to be kept up-to-date
7 because they are required to drive.
8 Q Are they required to drive, personally, or are they
9 required to have transportation?
10 A They're required to drive, personally, is -- I
11 mean, because we provide a news vehicle or they
12 drive their personal vehicle if we don't have a
13 news vehicle available.
14 Q How often does a producer have to drive?
15 A I have no clue. I do not know.
16 Q With respect to driving, was there ever any
17 discussion that you participated in about an
18 accommodation that could be made with respect to
19 this alleged driving requirement?
20 A No, not that I recall.
21 Q I mean, you're where, are you not, that Shreveport
22 has Uber?
23 A I guess they had it back then, I'm not sure.
24 Q Or someone could drive somebody to where they
25 needed to be, correct?

Page 29

1 A Well, I think our insurance would limit that
2 because then that would become a liability to the
3 station because we have to report every single
4 driver to our insurance company, and they have to,
5 you know, do a -- we do a motor vehicle search and
6 make sure they have a clean driving record. So we
7 would've had to run that through that before we
8 could ever.
9 Q Are you aware that in the performance of Ms.
10 Sullivan's job duties that she was driven by Trey
11 Lankford on occasions?
12 A Well, I know that they went to that story together
13 from the email.
14 Q So you have situations where someone else could
15 drive to get to the site?
16 A I assume so. I mean, that happened that day, yes.
17 Q Was there any discussion about those types of
18 accommodations that could be made?
19 A Not with me. I didn't have any --
20 Q (CROSS-TALK) You didn't participate in that?
21 A No.
22 Q And you never had any discussions with Ms. Sullivan
23 about what accommodations she might request?
24 A No ma'am.
25 Q Because you didn't know at the time, nor did anyone



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 30

1  at KTBS, whether or not Ms. Sullivan was gonna have
2  any restrictions based upon her healthcare
3  provider's information?
4  A  We knew that she told Randy that she was not gonna
5  be able to drive for six months.
6  Q  Did you know that or were you actually just told
7  that by Randy?
8  A  I mean, I was told that by Randy.
9  Q  You never received any information, did you, from
10  Ms. Sullivan's healthcare provider --
11  A  No ma'am.
12  Q  -- that stated that she was restricted in that
13  fashion -- isn't that correct?
14  A  That is correct.
15  Q  Was there ever any discussion that you participated
16  in that discussed whether or not instead of firing
17  or terminating Ms. Sullivan, she be allowed to
18  resign and then later reapply?
19  A  No ma'am.
20  Q  With respect to the reporting of the termination of
21  Ms. Sullivan's employment, was there a separation
22  notice issued?
23  A  Yes ma'am.
24  Q  And who prepared that separation notice?
25  A  Winnie.

Page 31

1  Q  And I direct your attention to Exhibit #13.
2      MR. CARNIE:
3          It's next to last -- it's stapled back.
4      MS. JONES:
5          Sorry.
6  BY MS. JONES continuing: (witness answering)
7  A  Yes.
8  Q  This is the document that's been produced as a
9  separation notice?
10  A  Yes ma'am.
11  Q  Did you have any involvement in the preparation of
12  this notice?
13  A  No ma'am.
14  Q  Did you have any discussions with Ms. Scott about
15  what should be listed on this notice as reason for
16  separation and explanation for reason of
17  separation?
18  A  I think we got that information from our attorney
19  as to how to -- what to put on the separation
20  notice.
21  Q  Okay. And why do you think that?
22  A  Because we always do that. If there's a
23  termination, we always make sure we're doing it the
24  right way.
25  Q  Alright. And I'm not asking you about any

Page 32

1  discussions with you had with Mr. Carnie about what
2  was listed here, but -- let me make sure I
3  understand this. Did you prepare this document?
4  A  No ma'am.
5  Q  Alright. So you're only assuming that that came
6  from Mr. Carnie -- is that correct?
7  A  I may have gotten the information from Brian and
8  gave it to Winnie to put on here.
9  Q  Okay. So you may have had a role in preparing this
10  document?
11  A  Well, I guess you could say that. I thought you
12  meant did I do it. But I did not go online and do
13  this document -- I'm sorry.
14  Q  Okay. But you may have communicated information --
15  A  Yes.
16  Q  -- to Ms. Scott as to what to put on this form?
17  A  Yes.
18  Q  And that information would've been information that
19  you would've received from your counsel, Mr.
20  Carnie?
21  A  Yes.
22  Q  Did you ever consider the effect of the termination
23  on Ms. Sullivan's right to apply for unemployment?
24  A  No ma'am.
25  Q  Were you aware that Ms. Sullivan was subject to a

Page 33

1  non-compete/non-solicitation confidentiality
2  agreement?
3  A  Yes.
4  Q  And were you aware that that would affect her
5  ability to obtain comparable employment for two
6  years?
7  A  It could only -- that she could not work for a TV
8  station within our GMA, yes.
9  Q  Well, have you actually gotten that interpretation
10  of this document, or have you ever looked at the
11  document?
12  A  It's been a long time since I've read that
13  document.
14  Q  Well, look at Exhibit #14, if you would, please.
15  If you look at paragraph two, three, and four of
16  this document, it says that: "2. Employee agrees
17  that during his employment with KTBS and two years
18  with the ending of his employment, he will not
19  directly or indirectly solicit, seize, or encourage
20  any person to leave their employment with KTBS."
21  Do you see that?
22  A  Mm-hmm.
23  Q  Yes?
24  A  Yes ma'am.
25  Q  And it continues: "Employee agrees that during his



TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 34

1  employment with KTBS and for two years after ending
2  of his employment with KTBS for any reason he will
3  not directly or indirectly compete with KTBS or be
4  employed by, carry on, or engage (as employee,
5  owner, director, officer, consultant, independent
6  contractor, or agent) television or cable TV
7  station or business." Do you see that?
8  A  Yes ma'am.
9  Q  So, it's not just television or cable TV stations;
10    it's also business, right? Disjunctive -- or
11    business?
12 A  Says that right there, yes.
13 Q  In paragraph four: "For two years after the ending
14    of his employment with KTBS (for any reason)
15    employee will not directly or indirectly solicit or
16    contract to do business with any customer or
17    advertiser of KTBS."
18        If you enter into a contract employment, it
19    would not just be with television stations, it's
20    also with any customer or advertiser of KTBS,
21    correct?
22 A  I assume so, yes.
23 Q  And it says that that's limited by paragraph five
24    to Caddo or Bossier parishes, correct?
25 A  Yes ma'am.

Page 35

1  Q  Alright. So, you were aware that Ms. Sullivan
2     lived in Caddo Parish, right?
3  A  I -- I -- I guess she did. I mean, I'm sure I knew
4     it, but --
5  Q  That's where you mailed her letters --
6  A  Right.
7  Q  -- right?
8  A  Right.
9  Q  So, under this non-compete, then, she was limited
10    in her ability to obtain comparable employment
11    after the termination of her employment on May 24,
12    2017 up till May 24, 2019, correct?
13 A  Based on the non-compete.
14 Q  Okay. When did you become aware of the fact that
15    Ms. Sullivan had filed a charge with the Equal
16    Employment Opportunity Commission?
17 A  The day we received it in the mail.
18 Q  And when you received that charge, what, if
19    anything, did you do?
20 A  I showed it to George and we sent it to our
21    attorney.
22 Q  Anything else other than sending it to your
23    attorney?
24 A  Not that I recall.
25 Q  Were you aware that Ms. Sullivan had sent a demand

Page 36

1  letter earlier or at the time that the charge was
2  filed?
3  A  No ma'am.
4  Q  Did you participate in any response to the EEOC
5     charge or the claims of Ms. Sullivan in any
6     fashion?
7  A  Not that I recall, no ma'am.
8  Q  Simply relied on counsel?
9  A  Yes ma'am.
10 Q  When did you become aware of the fact that a
11    lawsuit had been filed?
12 A  I don't remember. I guess when we received it in
13    the mail. I don't remember.
14 Q  Okay. Turn with me, if you will, to what's been
15    marked as Exhibit #6. And direct your attention to
16    page 2 of this document, paragraph 8, where it's
17    alleged that, "Plaintiff at all times kept
18    defendant informed of her medical care and on May
19    11th received a certified letter from defendant
20    placing her on unpaid leave as an accommodation to
21    her disability." Do you see that?
22 A  Yes ma'am.
23 Q  That's accurate, is it not?
24 A  Yes ma'am.
25 Q  And we've already identified what that letter is,

Page 37

1  that's Exhibit #3, correct?
2  A  That is correct.
3  Q  Alright. Paragraph nine: "On May 19, plaintiff
4     contacted Mr. Randy Bain and continued to inform
5     him of her status to return to work, stating she
6     expected to be released to return to work in a
7     week." Do you see that?
8  A  Yes ma'am.
9  Q  Did Mr. Bain ever report to you that Ms. Sullivan
10    had told him that she expected to return to work in
11    a week?
12 A  No ma'am.
13 Q  And the only report you ever got from Mr. Bain was
14    the email that we've identified previously in this
15    deposition, right?
16 A  That is correct.
17 Q  Okay. And I think you've already said, you never
18    saw anything releasing Ms. Sullivan to return to
19    work with or without restrictions from any
20    healthcare provider of Ms. Sullivan?
21 A  That's correct.
22 Q  Paragraph 10: "Prior to being released to return
23    to work, however, plaintiff was informed over the
24    phone on May 24, 2017 that she was terminated from
25    her employment." That's correct also, is it not?



(800) 841-6863

10 (Pages 34 to 37)

www.pilant.com

TARA BRANDO SULLIVAN v. KTBS LLC
MCCALLIE, SHERRIE

Page 38

1  A  Yes ma'am.
2  Q  And then paragraph 11 states that she received on
3     May 25 a letter that we've already marked in this
4     case as an exhibit, which is your May 24 letter
5     that Mr. Carnie wrote for you, correct?
6  A  Yes ma'am.
7  Q  Okay. Paragraph 12 says: "Prior to the
8     termination of plaintiff's employment, plaintiff's
9     doctor never provided any information to defendant,
10    nor was there ever any fitness-for-duty from any
11    healthcare provider provided to defendant as
12    required by defendant's May 11, 2017 certified
13    letter." And that's accurate, is it not?
14 A  Yes ma'am.
15 Q  The assessment that plaintiff "could not drive for
16    at least the next six months" was not communicated
17    to the defendant by any of plaintiff's healthcare
18    providers -- and that's accurate, is it not?
19 A  Yes ma'am.
20 Q  Paragraph 13 says: "Defendant failed to engage in
21    any interactive process or obtain any independent
22    assessment as required by the Americans with
23    Disabilities Act as amended in 2008, to determine
24    what, if any, reasonable accommodations were
25    available."

Page 39

1     You didn't have any conversations with Ms.
2     Sullivan to discuss accommodations, correct?
3  A  That's correct.
4  Q  Are you aware of any conversations that Mr. Bain
5     had with Ms. Sullivan to consider any
6     accommodations?
7  A  I'm not aware.
8  Q  And what about Mr. Sirven?
9  A  I'm not aware.
10 Q  What is your understanding of the interactive
11    process that's required by the Americans with
12    Disabilities Act as amended in 2008?
13 A  Well, it's just a conversation you have between
14    employee and employer trying to figure out what
15    their limitations are gonna be and whether you can
16    provide a reasonable accommodation where they can
17    still perform the essential job functions.
18 Q  But you never participated in any of those
19    conversations, correct?
20 A  No ma'am.
21 Q  And you're not aware of those conversations
22    occurring, are you?
23 A  No ma'am. Other than the email that Randy sent
24    saying that he had talked to her and she'd said she
25    was not gonna be able to drive for six months.

Page 40

1     That's -- that's all I know.
2  Q  The hearsay report that you got from Mr. Bain?
3  A  I guess it's hearsay, yes.
4  Q  Well, a conversation that you never participated
5     in?
6  A  Right.
7  Q  Right. Do you know why KTBS doesn't have an HR
8     manager?
9  A  Never have.
10 Q  Do you know why?
11 A  (CROSS-TALK) They'd always -- we're just a small
12    company and they just never have. We just rely on
13    counsel.
14 Q  Did you keep any notes from any of your meetings?
15 A  Not that I recall. I don't ...
16 Q  Following the termination of Ms. Sull -- well,
17    first of all, let me strike that. Let me go back.
18    Have you told me about all the conversations
19    you had with Mr. Bain, Ms. Scott, or George Sirven
20    leading to the termination of Ms. Sullivan's
21    employment?
22 A  As far as I can recall, yes ma'am.
23 Q  Okay. And after Ms. Sullivan's employment was
24    terminated, with whom have you discussed this case?
25 A  Just George and our attorney. I mean, talking

Page 41

1     about this deposition coming up and things like
2     that.
3  Q  Did you have any conversation with Mr. Sirven where
4     your attorney was not present?
5  A  Not that I recall, no ma'am.
6  Q  Anyone other than Mr. Sirven and your counsel?
7  A  No ma'am.
8  Q  Okay. Have you told me everything that you can
9     recall about Tara Brando Sullivan's employment with
10    KTBS and the events leading to the termination of
11    the same?
12 A  Yes ma'am.
13 Q  I have no further questions.
14    MR. CARNIE:
15       I don't have anything. We'll read and
16    sign.
17
18    (Whereupon, the taking of the witness's testimony
19    was concluded at 1:10 p.m.)

