**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **TARA BRANDO SULLIVAN** | : | **CIVIL ACTION NO.: 5:19-cv-00784** |
| **VERSUS** | : | **JUDGE: DONALD WALTER** |
| **KTBS LLC** | : | **MAGISTRATE JUDGE: MARK HORNSBY** |
| | : | **JURY DEMAND** |

**PLAINTIFF TARA BRANDO SULLIVAN'S MEMORANDUM IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT KTBS L.L.C.**

Respectfully submitted by:

Allison A. Jones, T.A.
La. Bar Roll No. 16990
DOWNER, JONES, MARINO & WILHITE
401 Market Street, Suite 1250
Shreveport, Louisiana 71101
Phone:    (318) 213-4444
Fax:      (318) 213-4445
Email:    ajones@dhw-law.com

*Attorneys for Tara Brando Sullivan*

# TABLE OF CONTENTS

Contents

TABLE OF AUTHORITIES ........................................................................................................ ii

I. INTRODUCTION .................................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................................ 1

III. LAW & ARGUMENT .......................................................................................................... 2

    A. Legal Standards for Summary Judgment ........................................................................ 2

    B. Americans with disabilities act as Amended 2008 ......................................................... 3

        1. Ms. Sullivan Has a Prima Facie Case of Disability Discrimination ............................ 3

            (a) Ms. Sullivan Was a "Qualified Individual with a Disability" ................................ 4

        2. The Legitimate Business Reason Proffered by KTBS for Taking Adverse Employment Action is Pretextual ................................................................................ 9

        3. Ms. Sullivan Has a Failure to Accommodate Claim Under the ADA, KTBS Failed to Engage in the Interactive Process ................................................................ 11

        4. Genuine Issues of Fact Exist as to the Claims of KTBS of Undue Hardship ............. 14

            (a) Elimination of the Driving Function ..................................................................... 15

            (b) Assigning Someone to Drive Ms. Sullivan ......................................................... 15

            (c) Allowing Ms. Sullivan to Procure Her Own Driver ............................................ 16

            (d) A Six-Month Leave of Absence ........................................................................... 17

            (e) Assignment to the Vacant News Producer Position ............................................ 17

IV. CONCLUSION .................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986)....................................................... 2

Daigle v. Liberty Life Ins. Co., 70 F. 3d 394, 396 (5th Cir. 1995)..................................................... 5

Delaval v. PTech Drilling Tubulars, L.L.C., 824 F.3d 476, 481 (5th Cir. 2016) ......................... 14

EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 621 (5th Cir. 2009)..................................... 14

*Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 240 (5th Cir. 2019) ...................................... 3

Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011) ................................. 14, 15

Hostettler v. Coll. of Wooster, 895 F.3d 844, 854 (6th Cir. 2018) citing 42 U.S.C. Section
    12102(4)(D) ...................................................................................................................................... 13

*Jackson v. Cal-Western Packaging Corp., 602 F. 3d 374, 378 (5th Cir. 2010)*........................... 10

*Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995)............................................................................. 2

LHC Grp., Inc., 773 F.3d at 702 .......................................................................................................... 11

*Machinchick v. PB Power, Inc., 398 F.3d 345, 355 (5th Cir. 2005)* ............................................. 11

*Martin v. Wilks*, 490 U.S. 755, 762 (1989) .......................................................................................... 2

*Randolph v. Laeisz*, 896 F. 2d 964, 969 (5th Cir. 1990)..................................................................... 3

*Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097 (2000) ........................................... 4

*Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F. 2d 577, 578 (5th Cir. 1986)................................. 3

Rowlands v. United Parcel Serv. – Fort Wayne, 901 F.3d 792, 801 (7th Cir. 2018) ................... 13

*Russ v. International Paper Co.*, 943 F. 2d 589, 591 (5th Cir. 1991)............................................... 3

*Snead v. Fla. Agric. & Mech. Univ. Bd. of Trustees, 724 F. App'x 842, 847 (11 Cir. 2018)*....... 16

*Veillon v. Exploration Servs., Inc.*, 876 F. 2d 1197, 1200 (5th Cir. 1989) ..................................... 2

*Wallace v. DTG Operations, Inc.*, 442 F. 3d 1112, 1118 (8th Cir. 2006) ...................................... 2

**Statutes**

29 C.F.R. § 1630.2(1)(1)......................................................................................................................... 5

29 C.F.R. § 1630.2(g)(1)(iii)................................................................................................................... 5

42 U.S.C. § 12102(1)(a) and (c) ........................................................................................................... 5

42 U.S.C. § 12102(3)(A)......................................................................................................................... 5

42 U.S.C. § 12102(4)(A)......................................................................................................................... 5

42  U.S.C. § 12112(a)............................................................................................................................... 4

**Rules**

Fed. R. Civ. Pro. 56(a) .......................................................................................................................... 2

Fed. R. Civ. Pro. 56(c) .......................................................................................................................... 2

**Treatises**

18 C. Wright, A. Miller, et al., *Federal Practice and Procedure* § 4449, at 417 (1981) .............. 2

**MAY IT PLEASE THE COURT:**

## I.  INTRODUCTION

Defendant, KTBS L.L.C. ("KTBS") filed a Motion for Summary Judgment, ("KTBS Motion") arguing that Plaintiff, Tara Brando Sullivan ("Ms. Sullivan" and/or "Plaintiff") cannot satisfy any burden of proof for any of her claims of disability discrimination under the Americans With Disabilities Act as amended in 2008 ("ADA"). For all of the reasons set forth herein, the KTBS Motion should be denied in all respects, and Ms. Sullivan should be allowed her day in court.

## II.  FACTUAL BACKGROUND

The factual background is fully set forth in Ms. Sullivan's Response to the KTBS Statement of Material Facts Not Genuinely Disputed and Ms. Sullivan's Statement of Contested Fact Declaration filed simultaneously herewith in accordance with Rule 56 of the Federal Rules of Civil Procedure. For purposes of this summary judgment, certain critical facts are undisputed. It is undisputed that on May 2, 2017, Ms. Sullivan had to be hospitalized due to a medical condition that caused her to become unconscious.[1] It is undisputed that Ms. Sullivan's employment was terminated because of this disability.[2] It is further undisputed that the administrative pre-requisties for this lawsuit are met as (i) Ms. Sullivan timely filed a charge with the Equal Employment Opportunity Commission, (ii) received her Notice of Right to Sue, and (iii) timely filed the Complaint initiating this lawsuit.[3]

---

[1]  Rec. Doc. 16-3 at p. 9

[2]  Rec.  Doc.16-3, pp. 17-18 "This is not a case where KTBS had reason to question whether she [Ms. Sullivan] had a disability and / or the need for an accommodation. The need was obvious . . ..". KTBS merely contends that it could not prove an accommodation.

[3]  Rec. 1.

### III.  LAW & ARGUMENT

**A.**     **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

Fed. R. Civ. Pro. 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," but it is not without its limitations. The movant must support each material fact upon which it relies with competent summary judgment evidence. Fed. R. Civ. Pro. 56(c). Federal courts, including the Fifth Circuit, have noted that a court has discretion to deny even a properly supported motion for summary judgment. *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (*per curiam*)(affirming the district court's opinion, including that "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.").[4] This is so even when the motion is not opposed, *Veillon v. Exploration Servs., Inc.*, 876 F. 2d 1197, 1200 (5th Cir. 1989), and particularly true "when examining the factual question of intent." *Wallace v. DTG Operations, Inc*., 442 F. 3d 1112, 1118 (8th Cir. 2006). Indeed, the Supreme Court notes that we have a "deep-rooted historic tradition that everyone should have his [or her] own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1989).[5]

Furthermore, the mere act of "filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case." *Russ v. International Paper Co*., 943 F. 2d 589, 591 (5th Cir. 1991). Instead, the moving party must first demonstrate with competent evidence the absence of a genuine issue of fact material to the non-moving party's case, even when the non-

---

[4]  Quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986).
[5]  Quoting 18 C. Wright, A. Miller, et al., *Federal Practice and Procedure* § 4449, at 417 (1981).

movant will bear the burden of proof at trial. *Id.* Then, and only then, the non-moving party must affirmatively prove that a genuine issue as to such fact exists. In this regard, the non-moving party is not required to prove all of the elements of its case-in-chief but only show that the moving party is incorrect as to the absence of a genuine issue of material fact. The court must view the facts "drawing all inferences most favorable to the party opposing the motion." *Randolph v. Laeisz*, 896 F. 2d 964, 969 (5th Cir. 1990).[6] "A disputed fact is material if it has the potential to affect the outcome of the suit under the governing law." *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 240 (5th Cir. 2019). Summary judgment is only proper "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

Most importantly, summary judgment is no substitute for credibility determinations to be made at trial on the merits. Furthermore, the United States Supreme Court in *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097 (2000), expressed ***serious doubt*** as to whether summary judgment ***is ever appropriate in an employment discrimination matter involving necessarily nebulous questions of intent and reasonableness of conduct***. " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " *Reeves*, at p. 2110. There are in this case "nebulous questions of intent and reasonableness of conduct," which prohibit summary judgment pursuant to *Reeves. .*

**B.**   **AMERICANS WITH DISABILITIES ACT AS AMENDED 2008**

*1.*   *Ms. Sullivan Has a Prima Facie Case of Disability Discrimination*

KTBS argues that Ms. Sullivan cannot satisfy the elements necessary to establish a *prima facie* case of disability discrimination under the ADA alleging specifically that Ms. Sullivan cannot establish that (i) she is a "qualified individual with a disability;" (ii) KTBS was required to provide

---

[6]  Quoting *Reid v. State Farm Mut. Auto. Ins. Co*., 784 F. 2d 577, 578 (5th Cir. 1986).

3

"reasonable accommodations" for such known limitations; or that (iii) KTBS failed to engage in the required interactive process. [7] KTBS is wrong.

The ADA prohibits an employer from discriminating against a "qualified individual" on the basis of a "disability." 42 U.S.C. § 12112(a). Without direct evidence of discrimination, establishing a prima facie case under the ADA requires a plaintiff to show that: "(1) she has a disability or was regarded as disabled; (2) she was qualified for the job; and (3) she was subject to an adverse employment decision on account of her disability." Caldwell v. KHOU-TV, 850 F.3d 237, 850 F.3d at 241 (5th Cir. 2017). For "regarded as" claims, a plaintiff must only show that she was subjected to an adverse employment action because of a real or perceived impairment, whether or not that impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(g)(1)(iii) and 29 C.F.R. § 1630.2(1)(1). It is conceded that Ms. Sullivan had a disability and suffered an adverse employment decision on account of her disability – leaving only the issue of whether or not she was qualified for her job at issue.[8]

### (a)    Ms. Sullivan Was a "Qualified Individual with a Disability"

KTBS concedes that Ms. Sullivan had a disability. KTBS contends, however, that Ms. Sullivan was not a "qualified" employee for her position as said term is defined in the ADA because, it alleges, she could not perform an essential functions of her job and Producer/Multi Media Journalist – i.e. driving. A qualified individual is "an individual who, with or without

---

[7]  Rec. Doc. 16-3 at p. 2

[8]  Rec. Doc. 16-3 at p. 9, pp.17-18. Disability under the ADA not only refers to a "physical or mental impairment that substantially limits one or more major life activities of such individual" but also "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(a) and (c). Although the EEOC's regulatory definition of "impairment" remains unchanged after the 2008 amendments, the statute now requires that the, term be construed broadly. *Equal Employment Opportunity Comm'n v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018), *citing* 42 U.S.C. §12102(4)(A).

accommodations, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). Here, KTBS alleges that driving was an essential function of Ms. Sullivan's job of "Producer/MMJ".[9] Ms. Sullivan contends that it was not.[10]

Whether a function is "essential" to a job must be determined on a case by case basis and is fact driven. *Credeur v. La. Through Office of Attorney Gen.,* 860 F.3d 785, 792 (5th Cir. 2017). A job's "essential functions" are defined in 29 C.F.R. § 1630.2(n)(1) as those that are "fundamental," not "marginal." Courts may use the EEOC's seven non-exhaustive factors to balance whether a job function is essential:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

*Credeur*, 860 at 792 (quoting 29 C.F.R. § 1630.2(n)(3)).

Moreover, a distinction must be made between the "requirements" of a given position, and the "essential functions" of that position. While generally it is an employer's prerogative to determine the requirements of job positions, not all requirements are "essential" to the performance of the job. Addressing each of these factors, it is clear that a genuine issue of fact exists regarding

---

[9]  Rec. Doc. 16-3 at p. 9, See also. Rec. Doc. 16-16, email from News Director Randy Bains to George Sirven, Sherri McCallie and others on May 10, 2017, identifying Tara Sullivan in the subject line as "Producer MMJ Tara."
[10]  See, Plaintiff Tara Brando Sullivan's Response to the Statement of Uncontested Facts Filed by KTBS and Ms. Sullivan's Statement of Contested Facts, which is filed simultaneously herewith.

the validity of the assertion of KTBS that driving was an essential function of the job of "Producer/MMJ."

KTBS contends that it judged driving to be an essential function of the "Producer/MMJ" position but concedes that there was no written job description for the position of "Producer/MMJ." [11] Even if such a written job description existed courts should not "give blind deference to an employer's judgment" and should "instead evaluate the employer's words alongside its policies and practices." *Credeur*, 860 F.3d 794; *EEOC v. LHC Grp. Inc*., 773 F.3d. 688, 697-698 (5th Cir. 2014).

Here, there is a material dispute of fact regarding whether or Ms. Sullivan's job duties required her to drive herself is an essential function of her job. Her job title in the KTBS personnel office as Multi-Media Journalist, but she was cross-trained to work as a Producer, the News Director described her job as "Producer/MMJ," and she performed duties of each job position.[12] Ms. Sullivan held this title because MMJ's were cross-trained as producers and performed duties of each job position.[13] Though Tara Sullivan's job position title in the KTBS personnel office computer was "MMJ," this was merely a clerical entry, and the human resources director, Sherri McCallie had "no idea" the actual job duties Ms. Sullivan performed.[14]

Further, the job announcement for the job opening for a Multi-Media Journalist states that the MMJ must "travel" to location. It does not state that the MMJ must drive himself or herself to

---

[11]  Rec. Doc. 16-10, McCallie depo at p. 11, ll. 21-23; Rec. Doc. 16-11, Sirven depo at p. 7, ll. 2-3

[12]  Rec, Doc, 16-6, Sullivan depo at pp 17-18; Rec. Doc. 16-16, email from News Director Randy Bains to George Sirven, Sherri McCallie and others on May 10, 2017, identifying Tara Sullivan in the subject line as "Producer MMJ Tara." See also, Rec. Doc. 9, Bain depo, pp. 10-12.

[13]  Rec. Doc. 16-9, Bain depo, pp. 10, lines 8-24; 11, lines 14-25, at pp. 11-12.

[14]  Rec. Doc. 16-10, McCallie depo, p. 17, lines 19-25, p. 18, line 1

location. Station Manager George Sirven testified in his Sworn Declaration that the MMJ "travels."[15] He did not testify that the MMJ must drive himself or herself.

Critically, when Ms. Sullivan first became ill at work on May 2, 2017, she was not driving.[16] She was being driven to the field location by another KTBS employee.[17] KTBS has not provided any evidence of the frequency with which a Producer/MMJ must drive himself or herself to a field location. Ms. Sullivan's experience as a Producer/MMJ had been that most field work was done by appointment.[18] This fact indicates there was enough advance notice of travel that Ms. Sullivan could find transportation either with another KTBS employee, or by some other means.

KTBS failed to provide sufficient summary judgment evidence to establish as an uncontested fact that the employee's ability to drive is an essential function of the job. Courts have recognized a distinction between the need to drive versus the need to travel – particularly when there was no written job description listing diving as an essential function of the job. For example, in *Stephenson v. Pfizer, Inc.,* 41 Fed. Appx. 214 (4th Cir. 2016), the Fourth Circuit reversed the District Court's granting of summary judgment noting that it was not clear whether the ability to drive (versus the need to travel) was an essential function of the job for a salesperson where there was no written job description. The Fourth Circuit found that if only the ability to travel was required, then "driving" was not an essential function of the job and there existed an obligation to offer a reasonable accommodation such as a driver or other means to facilitate the travel necessary.

The Fifth Circuit likewise acknowledges the determination of an "essential function" is fact intensive. For example, in *LHC Group, Inc.,* the Fifth Circuit considered a similar fact pattern

---

[15] Rec. Doc. 16-4 at ¶7
[16] Rec. Doc. 16-9, Bain depo p. 65, lines 20-25; p. 66, lines 1-4.
[17] Id.
[18] Rec. Doc. 16-6, Sullivan depo, p. 18, lines 21-25.

and reversed summary judgment for a home health care provider that had refused to provide a driver for a nurse who may have been a team leader (whether she was a team leader or a rank-and-file nurse was disputed by the parties). See, *LHC Group, Inc*. 773 F.3d. at 697-698 Conducting the required analysis, the Fifth Circuit ruled that driving was clearly an essential function of the rank-and-file position (for which there was a written job description) but not necessarily the team leader position. Since the nurse's status as a team leader was in dispute, the Fifth Circuit determined that a jury would have to decide that status, as well as whether driving was an essential function of the team leader position.

Likewise, The EEOC offers guidance on this issue in *Questions & Answers about Epilepsy in the Workplace and the Americans with Disabilities Act (ADA)*, online at http://www.eeoc.gov/laws/types/epilepsy.cfm. Though Ms. Sullivan was not diagnosed with epilepsy, KTBS was under the impression she would have had a driving restriction, similar to that required of those who have epilepsy. Here is an excerpt from the EEOC's guidance on driving:

"10. What other types of reasonable accommodations may employees with epilepsy need?

Some employees may need one or more of the following accommodations: . . . someone to drive to meetings and other work-related events
. . .

16. If an employee does not have a driver's license because of epilepsy, does an employer have to eliminate driving from his job duties?

It depends. If driving is an essential function of a job, an employer does not have to eliminate it. However, an employer should carefully consider whether driving actually is an essential job function, a marginal job function, or simply one way of accomplishing an essential function. If an accommodation is available that would enable an employee with epilepsy to perform a function that most employees would perform by driving, then the employer must provide the accommodation, absent undue hardship. Similarly, if driving is a marginal (or non-essential) function, the fact that an individual with epilepsy does not have a driver's license cannot be used to deny the individual an employment opportunity.

8

Simply put, there exists a genuine issue of fact as to whether driving was an essential function of Ms. Sullivan's position or a marginal function – or even a function at all. Even if driving were an essential function, there is a genuine dispute of fact regarding whether KTBS could have provided an accommodation. Ms. Sullivan has set forth a *prima facie* case for a disability discrimination under the ADA. Therefore, KTBS must set forth a non-discriminatory reason for the termination of her employment which, as shown below, it cannot because it concedes that it terminated the employment of Ms. Sullivan because of her disability.

### 2.   The Legitimate Business Reason Proffered by KTBS for Taking Adverse Employment Action is Pretextual

If a plaintiff can meet her *prima facie* case, as Ms. Sullivan has done, the burden, a "presumption of discrimination arises, and the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'" Id. (quoting *Cannon v. Jacobs Field Seros. N. Am., Inc.,* 813 F.3d 586, 590 (5th Cir. 2016)). If the employer does so, the plaintiff then again has the burden of producing evidence sufficient for a jury to find that the employer's reason is pretextual. *Id*. Pretext can be shown "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id*. (quoting *Jackson*, 602 F.3d at 378-79). Additionally, the Fifth Circuit has held that for claims raised under the ADA, "an employee who fails to demonstrate pretext can still survive summary judgment by showing that an employment decision was 'based on a mixture of legitimate and illegitimate motives . . . [and that] the illegitimate motive was a motivating factor in the decision.'" *LHC Grp., Inc.,* 773 F.3d at 702 (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005).

At the time of the termination of her employment, Ms. Sullivan had still not been released to return to work and was meeting with the doctors to obtain that release.[19] KTBS had requested this release in its letter dated May 11, 2018.[20] KTBS had also requested that Ms. Sullivan keep KTBS informed of her medical condition which Ms. Sullivan did by way of text messages and telephone conversations.[21] At no time did Ms. Sullivan tell anyone at KTBS that she would absolutely be restricted from driving.[22] Despite the uncertainty of whether or not Ms. Sullivan would in fact be under such a restriction, Randy Bains ("Bains"), the Station Manager of KTBS, Mr. Bains reported, without any medical evidence to support the same, that Ms. Sullivan would absolutely be restricted from driving for six months.[23] Mr. Bains admitted that he could have misunderstood Ms. Sullivan during his May 19, 2017, conversation with her and that he was capable of human error.[24] Ms. Sullivan denies ever telling Mr. Bains that she would absolutely be restricted from driving.[25] Notwithstanding this genuine issue of fact as to the actual nature of Ms. Sullivan's medical condition, and despite previous representations that her health insurance and other benefits would be in effect until the end of May, 2018, KTBS terminated the employment of Ms. Sullivan stating:

> Driving is an essential function of your MMJ position and all KTBS newsroom positions. Also, it does not appear there are any other reasonable accommodations that could be made that would enable you to drive sooner than six months.
>
> Given these circumstances, KTBS has no choice but to end your employment effective May 24, 2017.[26]

---

[19]  Rec. Doc. 16-9, Bain depo at p. 43, ll. 8-11; p. 51, ll. 12-19.
[20]  Rec. Doc. 16-11
[21]  Rec. Doc., Sullivan depo at p. 61, p.63, pp. 77-78 ; Rec. Doc. 16- 11, 16-13, 16-15
[22]  Rec. Doc. 16-9, Bain depo p. 43, ll 1-7
[23]  Rec. Doc. 16-9, Bain depo, p. 42, Rec. Doc 16-15
[24]  Rec. Doc. 16-9, Bain depo p. 43, ll 1-7
[25]  Rec. Doc. 16-6, Sullivan depo, p. 61
[26]  Rec. Doc. 16-12

There is no dispute that Ms. Sullivan's employment was terminated because of her disability, her record of disability or as a result of the perception of KTBS regarding Ms. Sullivan's disability. Even worse, KTBS took this drastic action without engaging in any interactive process with Ms. Sullivan.[27]

As shown above, there is a genuine issue of fact as to whether driving was an essential function of the Ms. Sullivan's job. The termination of her employment is inextricably tied to her disability, and, thus, pretext is shown. Reliance upon an asserted essential function of the job that is not found in a written job description and for which KTBS has made no effort to determine Ms. Sullivan's ability to perform, is simply unworthy of credence as a proffered legitimate business reason for the termination of Ms. Sullivan's employment. Finally, the timing of the adverse action, combined with other significant evidence showing pretext, supports a finding of pretext. At a minimum, a genuine issue of fact is created that the proffered legitimate business reasons for taking adverse action are pretextual and/or that Ms. Sullivan's disability or perceived disability was the "motivating factor" leading to the termination of his employment.[28] As such, the KTBS Motion should be denied.

3.   **Ms. Sullivan Has a Failure to Accommodate Claim Under the ADA, KTBS Failed to Engage in the Interactive Process**

In order to bring a failure to accommodate claim, Ms. Sullivan must establish an "actual" disability or a "record of" disability. Even though the 2008 amendments make proving an actual disability easier, for purposes of a failure to accommodate claim, Ms. Sullivan has the burden of

---

[27]   Rec. Doc. Doc. 16-8, Sirven depo, p. 22, ll. 13-220

[28]   Fifth Circuit Pattern Jury Instruction 11.7(k) which discusses the confusion regarding the standard to be applied Post-*Gross*.

11

(i) proving an impairment, (ii) identifying the major life activity impacted and (iii) establishing a substantial limitation in at least one such activity. As shown above, it is conceded that Ms. Sullivan had a disability for purposes of the ADA. And rightly so, the fact that Ms. Sullivan was fully functional and could perform the essential functions of her job, with or without accommodation, is simply irrelevant to a "disability" determination. See, e.g. *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (Although UPS would have been entitled to a doctor's note verifying Rowland's condition as part of the interactive process, it does not follow that she did not have a disability because her doctor cleared her to return to work). Further, an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018) citing 42 U.S.C. § 12102(4)(D). Here, KTBS does not contest that Ms. Sullivan has an actual disability. It claims that it could not accommodate her.

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) "An employee who needs an accommodation . . . has the responsibility of informing [his] employer." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 621 (5th Cir. 2009)). "[T]he employee 'must explain that the [proposed] adjustment in working conditions . . . is for a medical condition-related reason'" but is not required to use magic words like reasonable accommodation." Id. (quoting *Chevron Phillips*, 570 F.3d at 621).

Unfortunately, here, the preemptive termination of Ms. Sullivan's employment deprived Ms. Sullivan of her opportunity to request a reasonable accommodation if one had even been needed. Ms. Sullivan's employment was terminated before the end of May (despite the

representations of KTBS that it would hold her job open for that month), and she was never allowed to even present a work release or to request a reasonable accommodation.[29] Even worse, Ms. Sullivan was denied the opportunity to engage in the interactive process with KTBS to discuss possible accommodations.

Had Ms. Sullivan been given the opportunity to request an accommodation, KTBS was required to engage in an "interactive process" with the employee with "the goal of finding an appropriate accommodation for the limitation."). Id. (citing *Chevron Phillips*, 570 F.3d at 621). "An employer that fails to engage in the interactive process in good faith violates the ADA."). *Id.* (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)).

KTBS concedes that a producer position was available.[30] However, neither that position, nor any other reasonable accommodation was even considered for Ms. Sullivan nor was she provided the opportunity to suggest this accommodation.

KTBS did not just fail to accommodate Ms. Sullivan's disability (or even allow the right to request the same), it also never engaged in the interactive process necessary to find a reasonable accommodation and instead just terminated her employment.[31] KTBS assumed that; (i) Ms. Sullivan's neurological disability would render her unable to drive herself, (ii) the ability to drive oneself was an essential function of the job of Producer/MMJ, (iii) a producer position was open, but also required occasional field work, and (iv) thus there was nothing more to talk about. No one at KTBS conducted anything more than a superficial glance at the applicant requirements for the positions of producer and MMJ positions. No one contacted Ms. Sullivan to discuss any accommodation she might need. This failure to engage in the interactive process alone is a

---

[29]   Rec. Doc. 16-11, 16-12; Rec. Doc. 16-9, Bains depo at p. 51, ll. 12-22, p 60, ll. 22-25
[30]   Rec. Doc. 16-4 at ¶ 20.
[31]   Rec. Doc. 16-8, Sirven depo, p. 22, lines 13-20

violation of the ADA. ("An employer that fails to engage in the interactive process in good faith violates the ADA." *Griffin*, 661 F.3d 216, 224 (5th Cir. 2011))

### 4.      Genuine Issues of Fact Exist as to The Claims of KTBS of Undue Hardship

In an effort to avoid liability, KTBS contends that it did consider options for accommodating Ms. Sullivan, but any accommodations that would have been requested by Ms. Sullivan would have caused an "undue hardship." First, Mr. Sirven's contention that he gave any serious consideration to options to accommodate Ms. Sullivan is demonstrably false. He claims he consulted News Manager Mr. Bains and "others." Mr. Bain testified that he was not consulted regarding any potential accommodation.[32] The only "other" Mr. Sirven identified besides his lawyer, Mr. Carnie, was Sherrie McCallie, who fulfills the human resources role at KTBS, in addition to her other payroll and accounting duties.[33] Ms. McCallie testified that once Mr. Sirven heard Ms. Sullivan might be unable to drive for six months, he wanted her terminated.[34] Ms. McCallie would have been unable to provide Mr. Sirven information necessary to refuse reassignment of Ms. Sullivan to the cross-trained position of Producer because Ms. McCallie had "no clue" the travel required of a producer.[35] Undue hardship is generally treated as an affirmative defense, so the burden of proving the same is on. KTBS. *Snead v. Fla. Agric. & Mech. Univ. Bd. of Trustees, 724 F. App'x* 842, 847 (11 Cir. 2018). KTBS offers nothing but conclusory statements to support this contention.

---

[32]  Rec. Doc. 16-10., McCallie depo, p. 22, lines 16-19, Sirven: "Once Randy [Bains] sent us the email stating that she had told him that she would not be able to drive for at least six months, then we consulted our attorney again and we decided to do the letter." Mr. Bain testified that he was not consulted about any possible accommodation for Ms. Sullivan. Rec. Doc. 16-9, p. 47, lines 5 – 22; p. 48, line 12, Sherri McCallie had "no idea" the actual job duties Ms. Sullivan performed. Rec.Doc. 16-10, McCallie depo. p. 17, lines 19-25, p. 18, line 1.
[33]  Rec. Doc. 16-10, McCallie depo. p. 22, lines 16-19
[34]  Rec. Doc. 16-10, McCallie, depo. p. 22, lines 16-19
[35]  Rec. Doc. 16-10, McCallie depo p. 17, lines 19-25, p. 18, line 1.

KTBS alleges it considered several potential accommodations but determined each would have been a hardship for the employer. The accommodations alleged to have been considered were (1) eliminating the driving function from plaintiff's job[36]; (2) assign another person to drive Ms. Sullivan[37]; (3) permit Ms. Sullivan to secure her own driver or rely upon ride-share or other public transportation[38]; (4) extend Ms. Sullivan's leave of absence[39]; and (5) assign Ms. Sullivan to the vacant producer position.[40] KTBS has failed to carry its burden that any of these accommodations would have posed a hardship.

### (a)  Elimination of The Driving Function

This accommodation assumes that driving oneself is an essential function of the job of Producer/MMJ rather than a marginal function – or even a function at all. As previously discussed, KTBS has provided no proof that driving oneself or the ability to operate a motor vehicle was central to Ms. Sullivan's job, nor has KTBS even specified the amount of time each work day Ms. Sullivan is required to spend driving herself to and from a location. Driving oneself was, at best, a marginal function and a matter of convenience, not necessity for travel. When field work is necessary, the important function is the MMJ's presence, not the mode of transportation used to get there.

### (b)  Assigning Someone to Drive Ms. Sullivan

Mr. Sirven alleges it would have been a hardship to assign someone to drive Ms. Sullivan. KTBS assumes that it would have to assign another MMJ to drive, diluting its staffing resources. KTBS has not explained why it could not assign someone other **than** an MMJ to drive Ms.

---

[36]  Rec. Doc 16-4, Declaration of George Sirven ¶ 18.
[37]  Rec. Doc. 16-4, Declaration of George Sirven, ¶¶19 and 21.
[38]  Rec. Doc. 16-4, Declaration of George Sirven, ¶ ¶ 23-24.
[39]  Rec. Doc. 16-4, Declaration of George Sirven, ¶ ¶ 23-24.
[40]  Rec. Doc. 16-4 Declaration of George Sirven, ¶ 20.

Sullivan. Potential drivers include interns, assistants, or clerical support. There could be a regularly assigned driver, or a driver assigned on an ad hoc basis. As Ms. Sullivan has shown, the important aspect of field work is being there. How the MMJ gets there is not essential. Driving oneself is convenient, but not essential.

### (c)   Allowing Ms. Sullivan to Procure Her Own Driver

KTBS eliminated this potential accommodation based upon unreasonable and unfounded assumptions. First, it assumes that the driver would need to be near Ms. Sullivan at all times during the workday to drive her to location at the drop of a hat. It has provided no evidence at all that field work is so unpredictable. In fact, Ms. Sullivan's experience had been that most field work was anticipated, planned and scheduled.[41] Second, any periodic "spur of the moment" field work could have been handled by another MMJ.

Mr. Sirven raises the specter of liability for a retained driver – but cites no supporting legal authority; and further claims it was his "understanding" that KTBS's insurance would not cover a situation in which Ms. Sullivan procured her own driver. This is all wild speculation. KTBS provided no evidence at all that Ms. Sullivan's retained driver would create liability for KTBS or that (a) its own insurance would be necessary in this situation; (b) its existing insurance would not cover this situation; or (c) that procuring requisite coverage would be impossible or prohibitively expensive. Employees in all aspects of work routinely retain drivers in work related activities using uber, taxi cabs and other drivers. The contention of KTBS is parochial at best.

---

[41]  Rec.  Doc. 16-6, Sullivan depo, p. 18, lines 21-25

### (d)   A Six-Month Leave of Absence

Ms. Sullivan did not request or seek an extended leave of absence. She was looking to return to work within one week of May 19, 2017, or soon thereafter.

### (e)   Assignment to the Vacant News Producer Position

Here, KTBS does not deny that it had an open producer position. KTBS merely claims it would have been a "hardship" to put Ms. Sullivan in that position. It provides no evidence of hardship. The evidence is quite to the contrary. Ms. Sullivan would have been a perfect fit for a regular assignment to news producer.

Sullivan had been cross-trained as a producer.[42] News Director Mr. Bain repeatedly referred to Sullivan as "Producer / MMJ," and he testified that he did so because these are cross-trained positions.[43] Where, as here, the employee is cross trained, switching the employee from the job duties her disability restricts to the job duties in the cross-trained position where the disability poses little, if any restriction, is a reasonable accommodation. See *Dean v. Veterans Admin.*, 1995 U.S. Dist. LEXIS 8782, at *65-66 (N.D. Ohio Jan. 6, 1995) (a Rehabilitation Act case in which the district court found that when employees were cross-trained in both the "portfolio" and the "guarantee" sides of a work section, switching an employee to work only in the "guarantee" side as an accommodation for his handicap was not unreasonable). Also, *Moore v. E. Ga. Reg'l Med. Ctr.*, 2017 U.S. Dist. LEXIS 190770, at *2 (S.D. Ga. Nov. 17, 2017) finding that a certified nursing assistant who was cross-trained in clerical functions stated a claim of pregnancy discrimination based upon allegations of the employer's refusal to move her to the cross-trained position as an accommodation for her pregnancy.

---

[42]  Rec. Doc.16-4, Declaration of George Sirven, ¶ 10, "KTBS also cross trained MMJ's, including Plaintiff, to handle some producer duties . . .."
[43]  Rec. Doc. 16-9 Bain depo, at p. 10, 11 8-25, p. 11-12.

The positions of producer and MMJ are different job positions, but producer/MMJ employees are cross trained to fulfill each position. Producers and MMJ's write and create content. "The producer role is more in the crafting and the stacking of the show . . . the formatting of the newscast."[44]

While an MMJ is an "electronic news gatherer that would go out in the field." Field work is the exception, not the rule, for producers.[45] The producer works in the station "through the day."[46] The producer participates in the editorial meeting and, unlike an MMJ who is responsible for covering one story in the field, the producer covers the crafting and stacking of multiple stories, for purposes of making decisions about which stories, local and national, will be included in the newscast.[47]

Producers enter the field "from time to time."[48] However, KTBS provided no evidence that the producer must drive himself or herself to the field location. As KTBS News Director Mr. Bain conceded, even in large field coverage events, they could get there with someone else driving.[49] Further, when a producer does "field produce, they work alongside the MMJ's to cover whatever's going on."[50] Because the producer would be working with an MMJ in the field, the MMJ could drive the vehicle. In fact, at the time Ms. Sullivan had her medical emergency, she was being driven to a field location by another KTBS employee.[51]

Following his description of an example in which multiple producers were engaged in field

---

[44]   Rec. Doc. 16-9, Bain depo at pp. 11-12

[45]   "Producers go out in the field from time to time to cover stories." Rec. Doc. 16-4, Declaration of George Sirven, ¶ 10.

[46]   Rec. Doc. 16-9, Bain depo at p. 18, 11 18-25

[47]   Id.

[48]   "Producers go out in the field from time to time to cover stories." Rec. Doc. 16-4, Declaration of George Sirven, ¶ 10.

[49]   Rec. Doc. 16-9 Bain depo ,p. 69, ll. 11-25

[50]   Rec. Doc. 16-9, Bain depo. p. 20, ll. 1-6

[51]   Rec. Doc. 16-9, Bain depo. p. 65, lines 20-25; p. 66, lines 1-4

production of a large event, News Director Bain was asked if he knew how each of those field producers got to the locations.[52] He did not know, and. Interestingly, he had "never thought about it".[53] Certainly had "driving oneself" been an essential function of the job, Mr. Bain's answer would have been a definitive, "they drove themselves." That was not his answer because driving oneself is not an essential function.

Vital to the entire analysis of reasonable accommodation in this case is the fact that the driving restriction, if any, was anticipated to last only six months. While any supposed neurological impairment was anticipated to be long term, possibly permanent, the driving restriction (and any corresponding need for accommodation of that job function) was temporary – even under KTBS's alleged understanding. KTBS has not shown any reason why some combination of the accommodations it considered – and rejected – could not have been employed during the temporary driving restriction. For example, in furtherance of Ms. Sullivan's cross-training as a producer, she could have been assigned to the vacant producer position, which had field assignments only "time to time." On those times when a producer was called into the field, Ms. Sullivan's need for transportation could have been accommodated by any of the various options: a driver assigned by KTBS, her own driver, a commercial ride-share or other public transportation.

KTBS failed to provide Ms. Sullivan reasonable accommodations, failed to engage in the interactive process and utterly failed to carry its burden of proving that any such accommodations requested would have caused an undue hardship. As such, the KTBS Motion should be denied.

---

52  Rec. Doc. 16-9 Bain depo, p. 18, ll. 1-6
53  Rec. Doc. 16-9 Bain depo, p. 18, ll. 1-6

19

## IV.  CONCLUSION

Ms. Sullivan was just starting a career in television – a career she had dreamed of while watching her father in broadcast journalism for decades.[54] Even better, she was starting it with a television station that she considered family.[55] That career was snatched from her in violation of the Americans with Disabilities Act as amended in 2008. For all of the foregoing reasons, the Motion for Summary Judgment filed by KTBS L.L.C. should be denied it its entirety, and Tara Brando Sullivan should be allowed her day in Court.

Respectfully submitted,

DOWNER, JONES, MARINO & WILHITE
401 Market Street, Suite 1250
Shreveport, LA 71101
Tel: 318-213-4444
Fax: 318-213-4445

Allison A. Jones, T.A.
La. Bar No. 16990

By:____/s/ Allison A. Jones_____
Attorneys for Tara Brando Sullivan

---

[54]     Rec Doc. 16-6, Sullivan Depo at pp. 11-13, p 28.
[55]     Id at p. 67, lines 18-21

20